/

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

FEB 0 5 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **COREGIS INSURANCE COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **B-02- 021** |
| **THE MARINE MILITARY ACADEMY, INC.,** | § | CIVIL ACTION NO. _____ |
| **d/b/a THE MARINE MILITARY ACADEMY;** | § | |
| **MAJ. GENERAL HAROLD G. GLASGOW;** | § | |
| **LT. COL. G. D. ANDRESEN; and COL. T. A.** | § | |
| **HOBBS, individually and as Officers of** | § | |
| **MARINE MILITARY ACADEMY,** | § | |
| | § | |
| **Defendants.** | § | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff COREGIS INSURANCE COMPANY ("Coregis") for its Complaint for Declaratory

Judgment against Defendants, states as follows:

### JURISDICTION AND VENUE

1.     Plaintiff brings its Complaint under 28 U.S.C., §2201, et seq., for a declaration of

rights and obligations under an insurance policy issued to MMA.

2.     This Court has subject matter jurisdiction over this matter based on diversity of

citizenship between Plaintiff and Defendants pursuant to 28 U.S.C. §1332(a). The amount in

controversy exceeds $75,000, exclusive of costs and interest.

3.     Venue is appropriate under 28 U.S.C. §1391 because this judicial district is where

the events or omissions giving rise to the claim occurred.

### THE PARTIES

4.     Coregis is an Indiana corporation with its principal place of business in Chicago,

Illinois.

5.      THE MARINE MILITARY ACADEMY, INC. d/b/a THE MARINE MILITARY ACADEMY ("MMA") is an Arizona nonprofit corporation with its principal place of business in Harlingen, Texas.

6.      MAJOR GENERAL HAROLD G. GLASGOW is a former President of MMA.  On information and belief, he was a citizen of either the State of Texas or the State of Tennessee at all times relevant herein.

7.      LT. COL. G. D. ANDRESEN is an employee of MMA.  On information and belief, he was a citizen of the State of Texas at all times relevant herein.

8.      COL. T. A. HOBBS, was an employee of MMA.  On information and belief, he was a citizen of the State of Texas at all times relevant herein.

## THE UNDERLYING ACTIONS

9.      On November 21, 1997, MMA was sued by numerous cadets and their parents and/or guardians. GLASGOW, ANDRESEN and HOBBS have been named as defendants in some of these suits individually and as officers of MMA.

10.      There are currently five lawsuits ("the underlying actions") pending that have been filed by cadets and/or their parents and/or guardians. *The Parents or Parent or Guardian of John Doe I, et al. v. Marine Military Academy, et al.*, Cause No. 97-11-7227 [filed on November 21, 1997]; *The Parents Individually and as Parents of John Doe 45, 50, 37-A and 39 v. Marine Military Academy et al.*, Cause No. 99-11-4891-E, *John Peter, individually and as next friend of Timothy Peter, a minor v. Marine Military Academy, et al.*, Cause No. 98-07-2761-C; *Debbie Wayne, et al. v. The Marine Military Academy, Inc.*, Cause No. 98-01-119-C; and *Marilyn Chalfant, et al. v. The*

2

*Marine Military Academy, Inc.*, Cause No. 99-02-863-C.  Copies of the most recently filed complaints and/or amended complaints in each of these five actions that are in the possession of Coregis are attached, respectively, as Exhibits "A"-"C."

11.    Generally, the complaints in underlying actions allege numerous causes of action, including various forms of negligence, breach of fiduciary duty, and violation of the Texas Deceptive Practices Act ("DTPA").

12.    The plaintiffs in the underlying actions also allege that MMA's failure to supervise and/or wrongful admission of boys unsuitable for enrollment at MMA created an environment whereby their sons were preyed upon by their fellow cadets, and, in some cases, Drill Instructors, a teacher, and a coach.

13.    Four cadets were allegedly raped by another cadet.

14.    Most, but not all, cadets allege some form of physical abuse, usually in the context of hazing.

15.    Most cadets allege some form of emotional distress/mental anguish.  Even if they were not personally abused, these cadets witnessed the abuse of other cadets.

16.    Most of the cadets and/or their parents and/or their guardians seek the return of tuition and fees paid to MMA and/or compensation paid for tuition and fees at institutions in which the cadets were enrolled after withdrawing from MMA.

17.    Subsequent to the filing of the underlying actions, MMA filed for protection under the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona. The automatic stay was lifted with respect to the underlying actions on or about October 13, 2000.

18.    Pursuant to a Stipulated Order entered in the bankruptcy court on February 5, 2001,

3

the personal injury claims in the underlying actions were bifurcated from the non-personal injury claims in the underlying actions. Exhibit "D." Pursuant to paragraph 2 of the Stipulated Order:

> "Personal Injury Claims" are defined herein as personal injury tort or wrongful death claims (as used in 28 U.S.C. § 157(b)(5)), and further includes the negligence or fraud claims of the former cadet claimants which resulted in personal injury tort damages. Other than the Personal Injury Claims, any and all "Claims" (as that term is defined in Bankruptcy Code § 101(5)) of the Joining Claimants, including but not limited to breach of contract, fraud, misrepresentation, and Deceptive Trade Practices Act claims (collectively the "Non-Personal Injury Claims") shall be, and hereby are, determined to be "core" proceedings to be adjudicated by this Court, and the Joining Claimants hereby submit to this Court's jurisdiction for those purposes. The Joining Claimants shall stipulate to severance of the Non-Personal Injury Claims if a formal stipulation is required in whatever court ultimately will adjudicate the Personal Injury Claims.

19.     The non-personal injury claims will be adjudicated in the Arizona bankruptcy court. Exhibit "D."

20.     The personal injury claims were remanded to Texas state courts by the United States District Court for the District of Arizona on March 14, 2001. Exhibit "E."

## THE COREGIS POLICY

21.     Coregis issued a claims made Educators and Employment Liability Insurance policy to the Marine Military Academy ("MMA"). Attached as Exhibit "F" is policy number SBD 000 136 1, effective for the policy period December 21, 1996 to December 21, 1997, with limits of liability of $5,000,000 each loss and in the aggregate excess of a $5,000 self insured retention for each loss.

22.     The insuring agreement of the Coregis policy provides:

> The Company will pay on behalf of the Insureds Loss as a result of civil Claims made against the Insureds by reason of a Wrongful Act, provided that Claim is first made during the Policy Period and written report of said Claim is received by the Company during the Policy Period or within sixty (60) days thereafter.

23.     "Wrongful Act" is defined in the Coregis policy to mean "any act, error, or omission

4

of an Insured constituting a breach of a duty imposed by law or a breach of an Employment Contract." *Definition F.*

24.     "Claim" is defined in the Coregis policy to mean a "demand for Money Damages as of right." Further, "[a]ll Claims against any Insureds Arising Out Of the same Wrongful Act, or logically or causally connected Wrongful Acts, will be considered one Claim. All such Claims will be considered first made at the time the earliest such Claim was made against any Insured." *Definition H.*

25.     "Arising Out Of," a term used in the exclusions, is specifically defined to mean "connected with, incidental to, or growing out of." *Definition E.*

26.     Coregis first received notice of an underlying action on or about December 4, 1997.

27.     Coregis accepted the tender of defense under a reservation of rights.

## THE COVERAGE DISPUTE

28.     Various terms, conditions, and provisions of the Coregis policy operates to preclude coverage for the bifurcated personal injury claims of the underlying actions. Accordingly, Coregis has no duty to defend or indemnify MMA for these claims.

29.     By virtue of the Stipulated Order, the only claims that may be litigated in the underlying actions pending in the Texas state courts are personal injury claims excluded from coverage by Exclusions B, D, E, F, G and/or H of the Coregis policy.

30.     Coregis, therefore, has no duty to defend or indemnify MMA with respect to the bifurcated personal injury claims.

31.     Accordingly, Coregis is entitled to a declaration that it owes no duty to defend and/or indemnify MMA from the bifurcated personal injury claims pending in the Texas state courts, and

5

that Coregis may withdraw from the defense of the underlying claims pending in the Texas state courts.

32.     Coregis believes that the Defendants disagree with Coregis' position. On information and belief, Coregis believes that the Defendants maintain that there is coverage under the Coregis policy for the bifurcated personal injury claims alleged in the underlying actions.

33.     There is, therefore, an actual and justifiable dispute between Coregis and the Defendants.

## Count I

### Bodily Injury and Mental Anguish Exclusion
### (Exclusion D.)

34.     Coregis realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

35.     The Coregis policy contains Exclusion D., which provides:

This policy does not apply to the following, regardless of the cause of action or legal theory alleged:

any Claim or Loss Arising Out Of death, bodily injury, sickness, disease, disability, shock, humiliation, embarrassment, mental injury, mental anguish, emotional distress, or injury to personal or business reputation or character.

36.     Most of the cadets alleged they were assaulted and battered, and that there were often sexual overtones to the assaults and batteries. Many of the cadets allege that they suffered bodily injury.

37.     Most of the cadets alleged they suffered as a result of physical and verbal hazing. Among other things, the cadets allege they were beaten, forced to shout vulgarities, eat cigarettes

until they threw up, and were forced to stand at attention until they urinated on themselves.

38.    Some cadets allege that they suffered mental anguish as a result of racial slurs.

39.    While most of the bodily injury, assault and battery, and mental anguish, arose from the actions of fellow cadets, there are some claims that bodily injury was suffered at the hands, or at the direction, of Drill Instructors and athletic coaches, and that emotional distress was suffered at the hands of a teacher who threatened his students with a loaded weapon.

40.    All of the cadets appear to allege that they suffered mental injury or mental anguish either as a result of their own beatings and mistreatment, or at having witnessed the beating and mistreatment of other cadets.    The cadets also allege various forms of shock, humiliation and embarrassment as a result of the hazing, physical abuse, sexual abuse, and verbal abuse they sustained, or the abuse of others which they witnessed or otherwise learned about.

41.    The plaintiffs in the underlying actions allege that they suffered bodily injury, sickness, shock, humiliation, embarrassment, mental injury, mental anguish and/or emotional distress.

42.    There is no coverage for the foregoing claims as a result of Exclusion D.

## Count II

### Assault, Battery, and False Imprisonment Exclusion
### (Exclusion F.)

43.    Coregis realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

44.    The Coregis policy contains Exclusion F., which provides:

This policy does not apply to the following, regardless of the cause of action or legal theory alleged:

7

any Claim or Loss Arising Out Of assault, battery, false arrest, detention, imprisonment, malicious prosecution or abuse of process.

45.     Some of the plaintiffs in the underlying actions allege that they suffered from assault, battery. Some cadets allege that their freedom of movement was curtailed because they were locked in confined areas. One cadet alleges that he was wrongfully imprisoned in a Mexican jail as a result of lax supervision at MMA.

46.     There is no coverage for the foregoing claims as a result of Exclusion F.

## Count III

### Criminal and Malicious Acts Exclusion
### (Exclusion B.)

47.     Coregis realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

48.     The Coregis policy contain Exclusion B., which provides:

This policy does not apply to the following, regardless of the cause of action or legal theory alleged:

any Claim or Loss Arising Out Of any criminal, dishonest, malicious, fraudulent or knowingly wrongful act or omission.

49.     Several plaintiffs in the underlying actions allege that they were raped by a fellow cadet. Several plaintiffs in the underlying actions allege that they were assaulted, battered, and hazed by cadets and others.

50.     The plaintiffs allege criminal and malicious forms of abuse inflicted upon the cadets by other cadets, teachers, coaches, and Drill Instructors (and abuse by persons outside MMA that allegedly occurred when cadets were allowed to leave MMA unsupervised). These allegations include the crimes of rape, assault, and battery, and other malicious conduct that may not rise to the

level of a criminal offense.

51.     There is no coverage for the foregoing claims as a result of Exclusion B.

52.     The plaintiffs in the underlying action seek the recovery of punitive damages.

53.     As a matter of law, punitive damages are not recoverable absent proof of malice.

54.     Punitive damage awards are excluded from coverage as a result of Exclusion B.

## Count IV

### Invasion of Privacy Exclusion
### (Exclusion E.)

55.     Coregis realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

56.     The Coregis policy contain Exclusion E., which provides:

This policy does not apply to the following, regardless of the cause of action or legal theory alleged:

any Claim or Loss Arising Out Of invasion of privacy, disparagement or defamation, including but not limited to, libel or slander.

57.     Some of the cadets in the underlying actions allege that persons entered their quarters for the purposes of conducting "blanket parties" and other forms of hazing.

58.     One of the cadets in the underlying actions alleged that racial slurs were uttered against him.

59.     Some of the cadets in the underlying actions allege claims arising out of invasion of privacy, disparagement, and/or defamation.

60.     There is no coverage for the foregoing claims as a result of Exclusion E.

## Count V

### Trespass and Violation of Right of Occupancy Exclusion
### (Exclusion G.)

61.     Coregis realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

62.     The Coregis policy contains Exclusion G., which provides:

This policy does not apply to the following, regardless of the cause of action or legal theory alleged:

any Claim or Loss Arising Out Of trespass, nuisance, wrongful entry, eviction, or violation of rights of occupancy.

63.     Some of the cadets in the underlying actions allege that persons wrongfully entered their quarters for the purposes of conducting "blanket parties" and other forms of hazing, including but not limited to, the theft of personal property.

64.     Some of the cadets in the underlying actions allege claims arising out of trespass, wrongful entry and/or violation of the rights of occupancy.

65.     There is no coverage for the foregoing claims as a result of Exclusion G.

### Count VI

### Theft and Conversion Exclusion
### (Exclusion H.)

66.     Coregis realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

67.     The Coregis policy contains Exclusion H., which provides:

This policy does not apply to the following, regardless of the cause of action or legal theory alleged:

any Claim or Loss Arising Out Of destruction, loss, theft, conversion, loss of use, diminution in value of, or injury to, any tangible property.

68.     Some of the cadets in the underlying actions allege that their personal property was damaged, lost, stolen and/or destroyed.

69.     Some of the cadets in the underlying actions allege claims arising out the destruction, loss, theft, conversion, or injury to tangible property.

70.     There is no coverage for the foregoing claims as a result of Exclusion H.

WHEREFORE, COREGIS INSURANCE COMPANY, for its Prayer for Relief, respectfully requests entry of an Order declaring its rights as follows:

(a)     That Coregis owes no duty to defend or indemnify Defendants for the bifurcated personal injury actions pending in Texas State Court and described more specifically at Paragraph 18 herein;

(b)     That Coregis may withdraw from the defense of Defendants in the underlying actions; and

(c)     Such further and other relief as this Court deems just.

                    Respectfully submitted,

                    COREGIS INSURANCE COMPANY

BY:     _____
                    Carlos H. Cisneros, Local Counsel

11

Carlos H. Cisneros, Esq.
State Bar No. 00793508
Fed. Id. No. 21865
Charles E. Mattingly, Jr., Esq.
State Bar No. 00791202
Fed. Id. No. 20638
*Cisneros & Mattingly, P.C.*
Local Counsel for Coregis Insurance Co.
845 E. Harrison Street, Suite A
Brownsville, Texas 78520
*Tel.* 956- 504-2260
*Fax. 956-504-5988*
*Email: cima_law@hotmail.com*


*Of Counsel*
Jeffrey A. Goldwater, Esq.
Illinois State Bar No. 6189014
Carol L. Johnson, Esq.
Illinois State Bar No. 6188497
***BOLLINGER, RUBERRY & GARVEY***
**FIRM'S FEDERAL ID. NO. 6193694**
Lead Counsel for Coregis Insurance Co.
500 West Madison Street, Suite 2300
Chicago, Illinois 60661-2511
*Tel. 312- 466-8000*
*Fax. 312-466-8001*

*Exhibit A*

CAUSE NO. 97-11-7227-E

THE PARENTS OR PARENT, INDIVIDUALLY AND AS § NEXT FRIEND OF JOHN DOE 15 ▮▮▮▮▮, § JOHN DOE 16 (▮▮▮▮▮▮), JOHN DOE 18 ( § ▮▮▮▮▮▮▮▮), JOHN DOE 19 (▮▮▮▮ § ▮▮▮▮), JOHN DOE 21 (▮▮▮▮▮), JOHN DOE 23 § ▮▮▮▮), JOHN DOE 27 ▮▮▮ § ▮▮▮▮), JOHN DOE 29-A & B (▮▮▮▮▮▮), § JOHN DOE 33 ▮▮▮▮▮▮▮), JOHN DOE 34 § ▮▮▮▮▮▮), JOHN DOE 36 ▮▮▮▮ § ▮▮▮, JOHN DOE 38 (▮▮▮▮ § JOHN DOE 42 (▮▮▮▮▮▮), JOHN DOE 47(▮▮▮▮ § ▮▮▮▮), JOHN DOE 48 (▮▮▮▮▮) and JOHN § DOE 50 ▮▮▮▮▮), JOHN DOE 51 ▮▮▮ § ▮▮▮▮) and each of the following individually: Parent of § JOHN DOE 32 (▮▮▮▮▮▮), and CAROL EHM, § JAMES P. FOLEY, TED REKERDRES, VON MICHAEL § RISHER, CANDACE WYATT, ANNA OWENS, ELZIE § WESTBROOK, CARRIE WOODS, LINDA CHAMPION, § JAN BAKER, PAT GRAY, ELIZABETH BLUM, BECKY § CAMPBELL, ENRIQUE MOLINA, SR, TOM MCINTYRE, § ELIZABETH ALCORN, JOHN TRICE, SR., GAIL § MADDEN, SUSANA AGUILAR, DEBRA MORRIS, § TOMMYE LANHAM, CAROL GASNER, FLORIDA § WRITER, JOE A HUNTER, TERRI CAMPBELL, EARL § STOUT, THOMAS MASON, SHERWOOD FLORA, § JERROLD ARBON, TROY LAMBERT, ROBIN § MCMAHON, JUSTIN BLANTON, CHARLES EHM, § RYAN FOLEY; ADAM REKERDRES, MICHAEL RISHER, § WYATT TURNER, JAMES VARAS, ERIC WESTBROOK, § MARK WOODS, JASON NULL, KRISTOPHER § JOHNSON, ALAN EVERETT GRAY; JOHN CRUMBY, § ENRIQUE MOLINA, JR., KEVIN MCINTYRE, RYAN § ALCORN, JOHN TRICE, JR., STACE MCINTYRE, DAVID § AGUILAR, SAMUEL CAMPBELL, SPENCER LANHAM, § JOSEPH GASNER, DAN CAMPBELL, ROBERT HUNTER, § JOSHUA CAMPBELL, THOMAS MASON, DANIEL § WRITER, JOSEPH ARBON, SHANNON LAMBERT, and § JOSHUA VANCE §
§
Plaintiffs §
§
v. §
§
THE MARINE MILITARY ACADEMY, INC., §
d/b/a THE MARINE MILITARY ACADEMY, §
and, MAJ. GENERAL HAROLD G. GLASGOW, Lt. Col. §
J. D. ANDRESEN and Col. T.A.HOBBS, Individually §
d as Officers of MARINE MILITARY ACADEMY, and §
BOARD OF TRUSTEES, individually and in their §
sentative capacities. §
§
endants §
§

IN THE DISTRICT COURT OF

404TH JUDICIAL DISTRICT

OF

CAMERON COUNTY, TEXAS

# PLAINTIFFS' FOURTEENTH AMENDED PETITION AND REQUEST FOR JURY TRIAL

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiffs in the above entitled cause file their Fourteenth Amended Petition and request for Jury Trial and respectfully state as follows:

## I.

## JURISDICTION AND INTRODUCTION

1. The Marine Military Academy ("MMA") in Harlingen, Cameron County, Texas, is a private boarding school which, undertakes the care and custody of boys ages 13 through 22. All pertinent allegations contained in this petition occurred in Cameron County, Texas. Jurisdiction is proper in Cameron County pursuant to §15.002(1) of the Texas Civil Practice & Remedies Code. MMA has ignored and concealed the physical, sexual and emotional abuse that has plagued the school. MMA induced the Plaintiff-Parents to trust them, through false advertising and representations designed to make parents think that MMA is a top-notch school and that it is part of the United States Marine Corps. Based on these material misrepresentations, MMA persuaded Plaintiff-Parents to pay for the privilege of sending their Plaintiff-Sons to an inadequately supervised school.

2. It appears that the only thing regulated by law at the school is the food under the authority of the local health department. The teachers are not certified by the Texas Education Association (TEA), or any other governmental body. There appears to be little background checks, training requirements, or proficiency standards for the teachers, drill instructors and other staff members.

3. To save money, the school placed older boys, some with known behavior problems, in charge of younger adolescent boys, in dormitories poorly supervised by adults. When the lights were turned off, serious foreseeable harm resulted.

4. Although Defendants, MMA, Lt. Col. G. D. Andresen and Maj. General Harold G.

Glasgow specifically had numerous warnings and knowledge of security problems, night-time dangers to cadets, and other forms of liability from parents and professionals, the brutality and hazing continued. The daily emotional and physical pain suffered by the Plaintiff-Sons created such a pervasive fear that many boys slept with makeshift weapons and clubs in their bunks to try to protect themselves through the night. This hellish existence has been described in various forms by former cadets, Plaintiffs among others, as a "prison without guards" and a place like the movie, "Lord of the Flies."

5.      This corporal punishment was done in the name of "discipline" and often at the implied or specific direction from drill instructors, coaches, or other MMA personnel, to young and impressionable boys, ages 13, 14, 15 etc. The Plaintiffs and their families have brought this action to warn other parents about MMA, to protect boys who might attend the school in the future, to stop the false and deceptive advertising, to obtain refunds of their tuition, and to obtain recovery for damages, both past and future, for themselves and their sons.

6.      The school often "over-booked" enrollment knowing that there would be an attrition rate of a certain percentage, and despite this knowledge the Defendant school strongly encouraged full, up-front payment of tuition. When Plaintiff-Parents pulled their boys out of MMA, the school engaged in the practice of refunding only a small portion of the tuition. If they secured a small refund, the Plaintiff-Parents were asked to sign a release of claims against the school, at which point they were generally unaware of the above-stated misrepresentations and the more serious harms, including sexual and physical abuse, which were often perpetrated against their Plaintiff-Sons. The reason for the parents' continued ignorance has been that the Plaintiffs' sons had not immediately informed their parents, of the above-described conditions until after leaving the school. The parents signed a release of claims, but were not fully informed as to the full extent of the child's abusive experiences, until years had passed. This pattern has been consistently carried out by the school on a repetitive basis against individuals who have claimed a

refund of tuition is due.

7.      Despite the knowledge of prior harm, and despite repeated requests by employees of the Defendant school to augment and increase the number of paid adult supervisors necessary to adequately supervise the boys, the Defendant school continued to refuse to provide additional adult supervision of the cadets.

## 2.
## PARTIES

### DEFENDANTS:

8.      Defendant, Marine Military Academy (MMA) is a private school in Harlingen, Texas and is an Arizona non-profit corporation, Charter No. 00023804-07. This Defendant has been served with citation and has filed an answer.

9.      Defendant Maj. Gen. Harold G. Glasgow is an individual and was President of MMA for several years. He formerly resided in Cameron County and is now believed to be in Tennessee. He has been served with process, and has filed an answer.

10.     Defendant Lt. Col. G. D. Andresen is an individual and is still an employee of MMA. This Defendant has been served with citation and has filed an answer.

11.     Defendant Col. T. A. Hobbs is an individual and was an employee of MMA. He has been served with process and has filed an answer.

12.     Members of the Board of Trustees of the Marine Military Academy from 1994-1998 are being sued individually and in their capacity as directors and which include but are not limited to:

    A.      General Alfred M. Gray, Jr. USMC (Ret) - answered.
            Chairman of the Board 1994, Chancellor, 1996.
            6317 Chaucer View Circle
            Alexandria, VA 22304
            703-212-9374
    B.      Dr. E. Bruce Heilman, President 1994, Chairman, 1996. - answered.
            4700 Cary St. Rd
            Richmond, VA. 23226
            804-289-8810

C.  Capt. William A. Gary, Executive Vice President 1994, Vice-Chairman 1996. - answered.
    Yavapai Builder
    P. O. Box 1301
    Prescott, AZ 86302
    520-445-5694

D.  Robert G. Farris, Sr., Treasurer/Assistant Secretary - answered.
    President, Valley Transit Co., Inc.
    P.O. Box 530010
    Harlingen, TX 78551
    956-423-4710

E.  Brig. Gen. George L. Bartlett, USMC (Ret)

F.  Harold G. Blaschke
    322 Hunter Trail
    Houston, TX 77024
    713-461-0572

G.  Col. H. William Card, Jr. USMC (Ret), - answered.
    Now mayor of Harlingen, Texas in Cameron Co.
    105 E. Austin
    Harlingen, TX 78550
    956-428-6003

H.  Col. George W. Carrington,  USMC (Ret) - answered.
    9560 Hidden Valley Rd.
    Beverly Hills, CA   90210
    310-859-0721

I.  Maj. Gen. Walter A. Churchill,  USMC (Ret)
    Churchill's Super Markets, Inc.
    5700 Monroe St.
    Sylvania, OH 43560
    419-882-0051

J.  Barry A. Zale of Dallas, Texas
    Barry Zale Fine Jewelry
    6121 Luther Lane
    Preston Center
    Dallas, TX 75231
    214-363-0066

K.  Evelyn East - answered.
    Box 56
    Linn, TX 78563
    512-568-3457

L.  Col. James A. Embry  USMC (Ret)

M.  A. Earline Folsom - answered.

N.  Col. Russell M. Harwood,  USMC (Ret)

O.  Robert S. Jepson, Jr.
    Chairman & CEO
    Kuhlman Corporation
    1 Skidmore Village Walk, Suite 201
    Savannah, GA 31411
    912-598-0601

P.  Lt. Gen. William M. Keys,  USMC (Ret) - answered.

Q.  Hugh L. McColl, Jr. - answered.
    Corporation Chairman
    NationsBank Corporation
    NationsBank Corporate Center
    Charlotte, NC 28255
    704-386-5687

R.  Alvin G. Padilla, Jr. - answered.
    401 E. Jackson

Harlingen, TX 78550
956-425-5555

S.   Brig. Gen. O.L. Peacock, Jr. (USANG) - answered.
     Brays Island Plantation
     P. O. Box d 189
     Sheldon, SC 29941
     803-846-1201

T.   Henry C. Schulte

U.   Brig. Gen. William M. Simmons
     Dir. Marine Corps. Historical Fdn.
     Washington Navy Yard, Bldg 58
     Washington , DC 20374-0580
     202-433-2273

V.   Robert A. Lutz

W.   Maj. Gen. Walter H. Baxter (USAF - Ret.)

X.   Nicolas C. Taylor

Y.   James. E. Warren, Jr.

Z.   O. B. Teague

AA.  Joe E. Sharp

BB.  Dr. James L. Fisher

CC.  Joseph M. Murphy

Plaintiffs are in the process of locating these individuals and will be serving those defendants process as soon as they are located.

## PLAINTIFFS:

(Some of the names of the following Plaintiffs are redacted by order of the Court to protect the privacy interest of the juveniles.)

15.   John Doe 1 is Justin Blanton and the mother of John Doe 1 is Jeannette Blanton, who resides at 2705 Foxboro, Garland, Texas 75044.

16.   John Doe 2 is Charles Ehm, Jr. and the mother of John Doe 2 is Carol Ehm, who resides at 24 Pleasant Avenue, Lincoln Park, New Jersey 07035.

17.   John Doe 3 is Ryan Foley and the father of John Doe 3 is James P. Foley, who resides at 3407 Racquet Street, Nacogdoches, Texas 75961.

18.   John Doe 4 is Adam Rekerdres and the father and mother of John Doe 4 are Ted and Carolyn Rekerdres, who reside at 6432 Northport, Dallas, Texas 75230.

19.   John Doe 5 is Michael Risher and the father of John Doe 5 is Von Michael Risher, who resides at 2183 Buckingham Road, #181, Richardson, Texas 75081.

20.   John Doe 6 is Wyatt Turner and the mother of John Doe 6 is Candace Wyatt, who resides

at 1400 Oaklawn, Corsicana, Texas 75110.

21.    John Doe 7 is James Varas and the mother of John Doe 7 is Anna Owens, who resides at 12018 S. Blackjack Oak Circle, The Woodlands, Texas 77380.

22.    John Doe 8 is Eric Westbrook and the father of John Doe 8 is Elzie Westbrook, who resides at 5820 Foxhill Lane, Dallas, Texas 75232.

23.    John Doe 9 is Mark Woods and the father and mother of John Doe 9 are Dr. Mark and Carrie Woods, who reside at 10443 Rocky Hollow, La Porte, Texas 77571.

24.    John Doe 10 is Jason Null and the mother of John Doe 10 is Linda Champion, who resides at 2726 Brook Meadow, O'Fallon, Missouri 63366.

25.    John Doe 11 is Kristopher Johnson and the mother of John Doe 11 is Jan Baker, who resides at 3709 Maywood Court, Carrollton, Texas 75007.

26.    John Doe 12 is Alan Everett (Rett) Gray and the mother of John Doe 12 is Pat Gray, who resides at 606 Lee Shore Lane, Houston, Texas 77079.

27.    John Doe 13 is John Crumby and the mother of John Doe 13 is Elizabeth Blum, who resides at 10100 Frio Cove, Austin, Texas 78733.

28.    John Doe 14 is Enrique Molina, Jr. and the father John Doe 14 is Enrique Molina, Sr., who resides at 6105 N. 26th, McAllen, Texas 78504.

29.    John Doe 15 is ███████████ and the father of John Doe 15 is ██████████, who reside at ██████████████████████████████████████

30.    John Doe 16 is ███████████ and the mother of John Doe 16 is ████████████, whose address is P. O. Box 2484, ██████████████████████

31.    John Doe 17 represents two boys, John Doe 17-A is Kevin McIntyre and John Doe 17-B is Sean McIntyre and the father of John Does 17 is Thomas McIntyre, who resides at 8522 Upton, San

Antonio, Texas 78250.

32.    John Doe 18 is ████████ and the mother of John Doe 18 is ████████ ████, who resides at ████████████████

33.    John Doe 19 is ████████ and the mother of John Doe 19 is ████████ who resides at ████████████████████

34.    John Doe 20 is Ryan Alcorn and the mother of Ryan Alcorn is Elizabeth Alcorn who resides at 5602 Sugar Hill, Houston, Texas 77056.

35.    John Doe 21 is Aaron Nefe and the mother of John Doe 21 is Gail Nefe, who resides at 17807 Theisswood Lane, Spring, Texas 77379.

36.    John Doe 22 is John Trice, Jr. and the father of John Doe 22 is John R. Trice, who resides at 2814 S. Surrey, Carrollton, TX 75006.

37.    John Doe 23 is ████████ and the mother of John Doe 23 is ████████, who resides at ████████████████

38.    John Doe 24 is Stace McIntyre and the mother of John Doe 24 is Gail Madden, who resides at 3308 Glade Road, Colleyville, Texas 76034.

39.    John Doe 25 is David Aguilar and the mother of John Doe 25 is Susana S. Aguilar, who resides at 2213 Norma, Mission, Texas 78572.

40.    John Doe 26 is Samuel Campbell and the mother of John Doe 26 is Debra C. Morris, who resides at 21514 Morris, New Caney, Texas 77357.

41.    John Doe 27 is ████████ and the mother of John Doe 27 is ████████ who resides at ████████████████

42.    John Doe 29 represents two boys, John Doe 29-A is Scott White and John Doe 29-B is Ben White and the mother of John Does XXIX is Arlene C. White, who resides at 8524 Bandera Circle

E., Jacksonville, Florida 32244.

43.     John Doe 31 is Spencer Lanham and the mother of John Doe 31 is Tommye S. Lanham, who resides at 418 Swan Ridge, Duncanville, Texas 75137.

44.     John Doe 32 is ███████ and the mother of John Doe 32 is ███████, who resides at ███████████████████.

45.     John Doe 33 is ███████ and the mother of John Doe 33 is ███████ who resides at ███████████████████.

46.     John Doe 34 is ███████ and the mother of John Doe 34 is ███████, who resides at ███████████████.

47.     John Doe 35 is Joseph Gassner and the mother of John Doe 35 is Carol GASNER, who resides at 5237 Daytona, Garland, Texas 75043.

48.     John Doe 36 is ███████████ and the guardian of John Doe 36 is ███████, who resides at ███████████████.

49.     John Doe 37-B is Dan Campbell and his mother is Becky Campbell, who resides at 132 Sessions Drive, Aiken, South Carolina 29803.

50.     John Doe 38 is ███████ and the father of John Doe 38 is ███████ who resides at ███████████████.

51.     John Doe 40 is Robert Hunter and the father of John Doe 40 is Joe A. Hunter, who reside at 3301 Austin, Waco, Texas 76710.

52.     John Doe 41, Joshua Campbell, is deceased. Ms. Terri S. Campbell, who resides at 8815 Barrenway, Houston, Texas, 77064 was his mother.

53.     John Doe 42 is ███████ and the father of John Doe 42 is ███████ who resides at ███████████████.

54.     John Doe 43 is Ryan Stout and the father of John Doe 43 is Earl R. Stout, who resides at 1710 Dewberry Brook Court, Kingwood, Texas, 77345.

55.     John Doe 44 is Thomas Mason, Jr. and the father of John Doe 44 is Thomas Mason, who resides at 125 Catalina Circle, Portland Texas, 78374.

56.     John Doe 46 is Layne FLORA and the father of John Doe 46 is Sherwood FLORA, who resides at 1235 Sunset View, San Antonio, Texas, 78258.

57.     John Doe 47 is ████████████ and the mother of John Doe 47 is ████████ who resides at ████████████████████████████████.

58.     John Doe 48 is ████████████ and the mother of John Doe 48 is ████████, who resides at ████████████████.

59.     John Doe 49 is Daniel WRITER and the mother of John Doe 49 is Florida Rose WRITER, who resides at 18751 Walnut Hill, Conroe, Texas, 77302.

60.     John Doe 50 is ████████ and the father of John Doe 50 is ████████, who resides at ████████████████.

61.     John Doe 51 is ████████ and the father of John Doe 51 is ████████ who resides at ████████████.

62.     John Doe 52 is Joseph A. ARBON and the father of John Doe 52 is Jerrold E. ARBON, who resides at 1460 Robinson Dr., Red Bluff, California.

63.     John Doe 53 is Shannon T. Lambert and father of John Doe 53 is Troy Lambert who resides at 12344 Longmire Trace, Conroe, TX 77304.

64.     John Doe 54 is Joshua Vance and the mother of John Doe 54 is Robin McMahon who resides at 2 Sage Street, The Woodlands, Texas 77081.

## 3.
## FACTS

65.    **John Doe 1** - (Justin Blanton, mother: Jeannette Blanton). Plaintiff Justin Blanton, was

enrolled as a cadet at MMA between January of 1995 and March 8, 1995.  Plaintiff Justin Blanton  and

his mother, Plaintiff Jeannette Blanton, selected Defendant MMA's program because Justin wanted to

change his life.  He wanted to gain better self-discipline and raise his ambitions.   At the Defendants'

recruiting presentation, Plaintiff Jeannette Blanton was given the impression that the young men at MMA

would be under constant supervision.  This representation was false.  Plaintiff Justin Blanton, was exposed

to drugs, physically abused, hit, slapped, kicked, punched, thrown, pushed, knocked out of his chair, had

his nose badly injured, denied medical care, hazed, threatened, and gang beaten.  He was locked in a

closet, with only a mattress, for 24 hours by other cadets who were assigned to "physically train"(PT) him,

without adult supervision, in the name of discipline. After leaving MMA, Justin was a depressed young man

numbing himself with drugs.  Justin's relationship with his family has been severely  damaged.

66.    **John Doe 2** - (Charles Ehm, Jr., parents: Charles and Carol Ehm) .  Plaintiff Charles Ehm,

Jr. first went to summer camp at MMA in 1993.  He later attended MMA as a cadet from August 1994

to December 1994.  Plaintiff Charles Ehm, Jr. wanted to attend MMA because his uncle had attended in

the early '70's and Plaintiff wanted to attend the U. S. Naval Academy.  His parents had been led to

believe, by materials sent them by MMA that MMA was an academically superior academy with fine

students and round-the-clock supervision.  During his plebe time period he saw many cadets hazed. One

boy was beaten badly and the cadets who did it were bragging about it. On September 28, 1994 Cadet

Toomey made Charles and another cadet fight each other. Cadet Toomey was cited for that violation. In

September and October of 1994, Charles was repeatedly beaten in his own room by other cadets.

Nightly, for several weeks, older cadets, especially Cadet Toomey, came in his room during his study hours

and hit him in the same place on his arm. His CO noticed the bruise, which covered the upper part of his

arm. Although the matter was brought to the attention of his Drill Instructor and Commandant Hobbs, his parents were never notified of any of these incidents. On October 3, 1994, Toomey was given demerits and was demoted from Private First Class to Private.  Charles was an exemplary cadet and was commended by Col. Hobbs for devoting "innumerable hours of his precious little off duty hours in the maintenance of the armory and weapons contained therein."  Charles enjoyed being away from the violence and noise of the barracks so he spent as much time at the armory as possible. Plaintiff Charles Ehm, Jr. had many personal items stolen from his room. Since the cadets' room doors could not be locked. Plaintiff-Parents were led to believe, through admissions materials sent to them by MMA that no students would be accepted with a prior record of trouble or legal problems. These representations were false. Since leaving MMA, Charles failed all subjects in school, is disrespectful and aggressive. Charles experienced nightmares at least once a week for over a year.

67.    **John Doe 3** - (Ryan Foley, father: James P. Foley)  Plaintiff Ryan Foley was a cadet at MMA from August of 1994 to May of 1995. Ryan's parents visited MMA and were very impressed with MMA's representations of a structured environment. They were told that their son would receive the supervision he needed. These representations were false. During the Plebe period and "Hell night" Ryan was assaulted by being hit hard in the eye while asleep by John Thomas McCoy. He was also the victim, on that same night, of having "ICY HOT" or similar balm placed without his consent, in his anus which caused intense burning and pain. Defendant Lt. Col. G.D. Andersen supposedly investigated this incident. In April or May of 1995, there was so little supervision that Plaintiff Ryan Foley was sexually abused by Richard James Licata who stuffed his erect penis into Ryan's ear as he was talking to his mother on the telephone. Ryan was so upset he started crying. Ryan was also held down in April or May of 1995, near the Mess Hall, by two unknown cadets. They hit him with their fists in his stomach and arms leaving visible bruises.  Those bruises were part of a continuing pattern of bruises over Ryan's body. Ryan's parents

photographed these bruises during holiday visits. Ryan was constantly harassed physically and mentally. Ryan's stress level exacerbated his asthma and he experienced severe breathing problems. Ryan's roommate, Michael Risher notes he saw Foley with bruises on his body and noted Ryan looked like a "cheetah." Risher remembers that other cadets would hit Ryan for no reason. The Foleys have suffered financially and the whole family has suffered emotionally due to Ryan's experiences at MMA. Before going to MMA Ryan was a funny, nice boy with a sense of humor. Ryan came back from MMA a violent, aggressive and a disturbed child. Ryan continues to have problems sleeping. He also has had suicidal thoughts. His parents sent him to a private school in Utah where he received counseling. Ryan remains a depressed young man and has trouble getting or keeping a job.

68. **John Doe 4** - (Adam Rekerdres, parents: Ted and Carolyn Rekerdres). Plaintiff Adam Rekerdres attended MMA August of 1994 until May 14, 1996, just short of his graduation. MMA, specifically Defendant Col. Hobbs and Msgt. McLaughlin, represented to Plaintiff Carolyn Rekerdres, that MMA had a policy in place of "no tolerance" regarding drugs and alcohol. This representation was false, as both drugs and alcohol were readily available to anyone who wanted to obtain them. This included providing alcohol to minors. Defendant Col. Hobbs, acting as an agent for MMA, personally told Plaintiff Carolyn Rekerdres that no boy would be accepted by MMA if he had been in any kind of trouble. This information was false. MMA failed to warn Adam's parents that their son would be on his own much of the time, unsupervised and exposed to situations that were inappropriate for a child of his age. As a result of Adam's exposure to drugs at MMA, he left school before graduation which has affected his future.

While at MMA Adam was directed to be the disciplinarian for one class. This class consisted of several cadets who were considered unruly by the administration. Adam also talked to Doe 37-B James Campbell shortly after James was victim of a sexual assault by Defendant Butler. Rekerdres found another cadet, Doe 52 Joseph ARBON, curled up in the shower in full uniform. After seeing how distraught the

cadet was, he tried to get cadet ARBON to tell him what was wrong. The cadet kept saying that Defendant, Col Hobbs said that he and anyone he told, would get in big trouble. Adam finally got the cadet to talk about the sexual assault that had happened to him while on liberty in town. The cadet had reported the assault to Defendant Col. Hobbs and his Drill Instructor. He was told to keep quiet about it. Adam convinced the cadet to call 911.

It was after this event that the urinalysis was ordered on Adam and he was told to resign or he would be expelled just weeks before his graduation. Adam had been a leader at the academy. He has been damaged by MMA, including his reputation. He and his family were promised the urinalysis would be kept confidential if he would just resign from the school. Defendant Col. Hobbs and other school personnel did not keep this information confidential. Defendants breached their duty to Plaintiffs Adam, Ted and Carolyn Rekerdres, and in doing so they violated the Family Educational Rights and Privacy Act (FERPA). Such violation of FERPA constitutes negligence per se for which Defendant MMA is liable.

Adam has been seeing a counselor, Dr. Samuel Roberts, for several years for the problems that he developed as a result of the lack of supervision at MMA.

69.     **John Doe 5** - (Michael Risher, father: Von Michael Risher) Plaintiff Michael Risher went to summer camp at MMA in 1993. He became a cadet at MMA during summer school of 1994 to January, 1995, his 9th grade year. His parents attended a recruiting meeting at a hotel in Dallas, Texas. MMA represented in the "Right Guide," that the cadets' rooms would be private and that except for an assigned roommate, no one could enter their son's room without his permission. These representations were false. In fact, anyone who wanted to could come in, at any time, and do anything he wanted (even take anything he wanted.) Michael Risher went to summer camp at MMA in July of 1993. His right leg had a deep sore when he arrived. He brought a recommendation from his doctor to keep the wound clean.

That summer his leg became very infected due to having to crawl in the mud pit even though he had an open sore on his leg. On July 26, 1993, Doc Castillo made a order that Michael was not to do the mud course anymore. Michael told Doc Castillo that he needed to go home. Michael still had to do the mud course and the water being pumped in from a nearby stagnant creek. He developed red streaks up his leg.

In September and into November, 1994, Michael was physically ill for well over a month before his parents were informed. Michael went to the MMA infirmary several times and was turned away because MMA used a defective thermometer to take his temperature. MMA and its medical staff failed to diagnose Michael's illness. Finally, in the fall of 1994, Michael was told by a MMA medical staff person at MMA, that they had determined that the thermometer was broken. Michael was finally admitted to the hospital, with a temperature of 105.3 degrees, for three days. Michael was denied appropriate medical care at MMA, and as a result he became extremely ill. The illness persisted for several months, during which time he lost over 45 pounds (25 pounds of which was lost the first month he was sick).

Michael was hit in the mouth by another cadet and chipped a tooth. On another occasion he was knocked unconscious. While at MMA, Michael saw Plaintiff Ryan Foley beaten by the older cadets. One time he saw Foley with his shirt off and told him he looked like a cheetah because he had so many bruises. Michael has been seeing a counselor, Dr. Samuel Roberts, for over a year for the problems that he developed as a result of the lack of supervision at MMA.

70.    **John Doe 6** - (Wyatt Turner, mother: Candace Wyatt). Plaintiff Wyatt Turner was a cadet at MMA between the August of 1995 until August 26, 1996. Wyatt's mother was assured by Drill Instructor Hughes and other staff members that her son would be well supervised while at MMA . This representation was false. He was assaulted, beaten, and witnessed the beatings of other cadets. He and his fellow cadets were left unsupervised for periods of time both in the barracks and on camping trips. While at MMA, Wyatt was offered drugs by other students. Wyatt Turner was a cadet at MMA from

August of 1995 until August 26, 1996. He was assaulted, beaten, and witnessed the beatings of other cadets. He reported a "blanket party" in his barracks and also that a cadet urinated on another cadet's bed. #08365. He and his fellow cadets were left unsupervised for periods of time both in the barracks and on camping trips. While at MMA, Wyatt was offered drugs by other students.

Wyatt had asthma and MMA did not accommodate this condition. When he was having an asthma attack, he still was required to do the PT. Wyatt made Lance Corporal in February of 1996 and then was promoted to Sgt. on August 14, 1996. Even though he was rising in the ranks, he hated the violence, intimidation and fear that permeated the school. In May of 1996, his drill instructor, Mst. Sgt. Krauss, said Wyatt had "Unlimited potential." In January of 1996, Wyatt's shoulder separated and was on medical restrictions, specifically as to push-ups. However, they kept making him do push-up which aggravated his shoulder and kept it from healing.

Mst. Sgt. Rick Hughes, Wyatt's D.I., was absent for two long periods. The boys were totally unsupervised at night. As Mst. Gny. Sgt. James Hager said in his deposition, he and other Drill Instructors would check on the boys around 11:00 p.m. and then go back to their own barracks' apartment. The boys were left completely without adult supervision and they knew it. Many violent assaults occurred during these time periods. Wyatt's mother finally withdrew Wyatt because he was unhappy. When he went back in the Fall of 1996, he just could not take the environment of intimidation and violence.

After leaving MMA, Wyatt continued to have nightmares, reliving the fearful nights at MMA. In the recurring dreams, he would hear the screams of other cadets who were being beaten down the hall. He was depressed for several years after leaving MMA. He is afraid that his mother might be harmed by "people from MMA," because of their involvement in this lawsuit.

71.     **John Doe 7** - (James Varas, parents: Perry and Anna Owens).     Plaintiff James

Varas attended MMA as a cadet from August 1991 until May 1995. James' parents were told, and informed through admissions and promotional materials that MMA had an excellent academic program. At the recruitment meeting, MMA claimed to have the top 1% of national merit scholarship students in the nation. MMA also claimed to have a superior study environment, supervised study quarters, without distractions, such as radios, etc. One of the primary reasons Plaintiff James Varas' parents sent him to MMA was the claim that MMA had the power of "appointment" to service academies. James' dream was to go to one of the service Academies and become an officer in the military as a career. While at MMA , Plaintiff James Varas was subjected to repeated physical harassment, denied medical care, and forced to sleep outside on one or more occasions. He was denied a scholarship that MMA promised to award him due to a clerical error on the part of MMA. After Plaintiff James Varas had completed the work necessary to get the offered scholarship, MMA negligently lost their own internal records, and then denied him the promised scholarship on the grounds that they did not have his records. Plaintiff Varas was a leader at the school during his tenure there, until he became so despondent and depressed due to the behavior and intimidation that was required to be a leader.

James Varas attended MMA as a cadet at summer camp in July 1991 until May 1995. James' dream was to go to one of the service Academies and become a career officer in the military. In the 8th grade, he was the top cadet for his grade. While at MMA, James was subjected to repeated physical harassment, denied medical care, and forced to sleep outside on one or more occasions. In the 9th grade, (school year 1992-93) he was held down on his stomach and sodomized with a broomstick by an unknown assailant. On October 20, 1994, James was stabbed in the eye with a ball point pen by another cadet. He went to the clinic for treatment. Varas was a leader at the school during his tenure there, until he became so despondent and depressed due to the behavior and intimidation that was required to be a leader.

In the summer of 1994, James attended camp at the Naval Academy.  It was there he realized that the tenets MMA was teaching its cadets were not honorable nor standard in the military.  Drugs were easily available and heavily used, and James began abusing Ritalin. The stress became unbearable and on March 13, 1995 with sores in mouth  He was admitted to a Houston hospital on March 15, 1995 for the condition . He was disillusioned with the school  and felt betrayed by Sgt. Pruitt, for talking about him to other boys, calling him lazy.  He had a mental breakdown in the Spring of 1995 and shaved his head in the shower.  He has been despondent and depressed ever  since due to the mental abuse and emotional trauma he had at MMA.   James has attempted suicide on numerous occasions. He has violent rages and very severe depression.  He has had flashbacks and hallucinations.  James struggles to stay motivated to keep a job or finish his education.  His family  and James struggle daily with the loss and betrayal they feel for the destruction of the career of a  morally and intellectually excellent young man.

72.    **John Doe 8** - (Eric Westbrook, parents: Mr. & Mrs. Elzie Westbrook).  Plaintiff Eric Westbrook was a cadet at MMA  between August of  1994 and January 29, 1996.  Eric Westbrook's parents sent their son  to MMA for discipline and supervision.  Through  materials MMA sent to the Westbrooks, they were led to believe that Eric would have a better chance for a career in the United States Marine Corps. MMA's representations of adult supervision were  false.

Eric was in the 9th grade when he entered.  While at MMA, Eric was repeatedly beaten and emotionally abused. The first day Eric was subjected to racial slurs such as "nigger" by other cadets. On one occasion, several cadets put pillow cases over their head and put a noose around Eric's neck in an attempt to portray a "lynching party."  The white boys thought it was funny but Eric was humiliated. Eric's parents witnessed severe bruises on him on one or more occasions. While at MMA, Eric was also given access to drugs and alcohol.  He went to Mexico on many occasions although his parents

had been promised that the cadets did not go there. In April of 1995, Eric was awarded Cadet of the Month for the Drill Team/Color Guard.

On December 20, 1995 Eric was promoted to Lance Corporal and became part of the leadership of Charlie Company, even though his grade point was at an all time low. One month later he got into a fight with another cadet and was given a urine test, which was reported to be positive for marijuana. Assaultive behavior and drugs were the norm at MMA for the leadership of the cadet corp.

Eric returned from MMA a child who abused alcohol, rarely smiles, is withdrawn, aggressive, and uses profanity. He has sleep problems. Once when his mother touched him to wake him up, he came up swinging. Like most of the cadets in this lawsuit, they are scared when awakened suddenly.

73.     **John Doe 9** - (Mark Woods, parents: Mark and Carrie Woods). Plaintiff Mark Woods was a cadet at MMA from August of 1995- December of 1995. Mark's parents attended a recruiting meeting for the Marine Military Academy in Houston, Texas. MMA represented to Mark's parents that MMA was affiliated with the United States Marine Corps. Much of the literature and information distributed to the parents bears the United States Marine Corps Emblem. MMA represented that they provided a secure and well supervised environment. MMA also promised the Woods that there would be no hazing or intimidation used. These representations were false.

Mark Woods was a cadet at MMA from August of 1995 through December of 1995. While at MMA, Mark was assaulted, beaten, hazed, threatened, pulled from a shower naked and beaten by several other cadets, verbally and mentally abused, and degraded mentally and physically. He witnessed the hazing of other cadets. D.I. Rick Hughes took pictures of Mark's injuries. After one assault to him, Mark sustained a tooth injury which required several procedures to repair. Mark had a horrible prank pulled on him by a perverted cadet. The cadet handed Mark his toothbrush with

"toothpaste" on it. After Mark put it in his mouth, the cadet laughed and told him it was semen. This incident repulsed Mark so much that it has interfered with his sexual relations as an adult.

Mark was beaten violently by a cadet named Gonzales on December 11, 1995. Col. Andresen wrote a memo to Hobbs regarding the assault on Mark Woods by Corporal Gonzales. Andresen's report provided Hobbs and MMA with the knowledge of the condition and deterioration of the school. He wrote: **"That statements by witnesses indicate that MMA is admitting a number of undesirable kids who have a history of previous drug use and arrests."** However, Mark had to stay in the same barracks with Gonzales for the few weeks following the assault. He stayed awake for three nights before the Christmas break because Gonzales continued to threaten him. Mark did not return to MMA after the holidays. After leaving MMA, Mark suffered from headaches, depression and began experimenting with drugs and alcohol. Mark suffers from Post Traumatic Stress Disorder and sexual inhibitions.

74.     John Doe 10 - (Jason Null, mother: Linda Champion). Plaintiff Jason Null attended MMA from August, 1994 through January 31, 1997. MMA represented to Jason's parents that he would be in a safe, adult supervised environment. This representation was false. Drugs were easily accessible to cadets.

Jason's arm was broken while at MMA. MMA school officials never notified his parents of Jason's broken arm or any other injury sustained by him. Jason was also "tapped in" in the head after plebe week. Jason's Drill Instructor directed other cadets to take him into the T.V. room, turn off the lights, and give him a "blanket party". There were other occasions on which Jason was assaulted, hit, knocked to the floor. Jason was also taken to Mexico by his MMA football coach without his mother's permission. Since leaving MMA, Jason has been depressed and suicidal. He has uncontrollable rages, has difficulty accepting authority, and has abused alcohol.

75.  <u>John Doe 11</u> - (Kristopher Johnson, mother: Jan Baker) Plaintiff Kristopher Johnson attended MMA between August of 1994 to January of 1995, while he was in the ninth (9th) grade. In the Summer of 1994, Kris's mother went to a presentation at the Holiday Inn on LBJ in Dallas, Texas. There were cadets there (in uniform) who talked about their grades and attitudes having improved because of MMA. All through the presentation, and later in a tour through MMA, the family was repeatedly told that MMA was structured and well-supervised. Master Sgt. McLaughlin told Kris' parents that the school did not accept boys with criminal records or even with troubled lives. The family later discovered, that there were many boys enrolled at MMA who had criminal records and/or troubled lives. Kris' parents would never have sent their son to MMA if they had known the truth.

Kris was given access to alcohol and started drinking at MMA for the first time. Because of the lack of supervision, Kris was able to go to Mexico during weekend liberty with older boys. Two of whom were William Hannan and Walter Teague, senior leaders at MMA. The boys went to Mexico by leaving on liberty and just walking through the turnstile. They often stayed in Mexico as long as eight (8) hours. The boys believed that the Drill Instructors and staff knew about the trips to Mexico as it was shouted through the halls and talked about in front of the staff, including Drill Instructor MSgt. Rombkowski.

Kris was assaulted, beaten, physically abused, hazed, and became the victim of a "blanket party" which started while he was sleeping. He was sound asleep and was awaken by three or four cadets holding him down and putting duct tape over his mouth and a pillow over his face. They beat him with socks with bars of soap in them. They told Kris if he told, that they would kill him. He did not tell his parents or the drill instructor about it. The "blanket party" was the result of Kris scratching another cadet's shoe. Kris was injured several other times, (including receiving a gash on his head,) but his parents were not notified of any injuries to him. Kris also witnessed other cadets being hazed. One

roommate slept in his locker with it locked all night because he had trouble earlier in the day with some cadets. He told Kris to unlock it the next morning. Kris has received counseling from Sam Roberts, Ph.D. Kris still has nightmares about his MMA experiences. He is depressed and has had alcohol abuse problems.

76. <u>John Doe 12</u> - (Alan Everett (Rett) Gray, mother: Pat Gray) . Plaintiff Alan Everett (Rett) Gray was a cadet at MMA between January 1994 to March of 1995. Rett's parents attended a recruiting meeting and were led to believe that MMA provided a disciplined, structured, highly supervised environment. MMA promised Rett's parents that boys with criminal pasts were not accepted at MMA, that the boys did not go to Mexico and that there would be confirmation classes available to Rett.   These representations were false.

Rett was allowed to go to Mexico, took air flights to other parts of the state (without his parents' knowledge), was given access to alcohol, and was not supervised. He was hazed, "tapped in," had staples driven through his arm as part of a hazing ritual, Rett was degraded verbally, and witnessed the hazing of other cadets. Rett was locked in a cold room without a shirt and was told that he would be there for a few days. Rett began singing loudly off-key and was finally let out o f the locked cold room in the middle of the night. Had there been. adequate adult supervision as promised by MMA none of this would have occurred.

77. <u>John Doe 13</u> - (John Crumby, mother: Elizabeth Blum). Plaintiff John Crumby was a cadet at MMA from August of 1993 to May of 1994. His family attended a recruitment meeting at the Summit Hotel in the spring of 1992. John and his family were told that MMA had small classes, with very good instructors, and that a very heavy emphasis was placed on after-hour studies. John and his family were also told that during the study hall the Drill Instructor would check to make sure that the boys were studying what they should be. These representations were false.

John was assaulted several times, sometimes at night when the Drill Instructors were not available and there was no other adult supervision present. John's parents received a call from MMA informing them that he had been involved in a minor incident which resulted in his being admitted to the Infirmary overnight, for a bruised jaw. The actual fact was that John had been held in the Infirmary for a week due to a severe beating. For most of that time, he could not even walk. John's injuries were the result of one of the after-effects from the "blanket party" assault. During this assault, blows were directed towards his genitals which has left a mass of scar tissue in his testicles. John will need surgery and it is possible that he is sterile. None of this would have happened had there been the adult supervision as promised by MMA. The doctors' notes, made on November 18, 1993, included the word "assault."

78.    <u>John Doe 14</u> - (Enrique Molina, Jr., father: Enrique Molina, Sr.). Plaintiff Enrique Molina, Jr. attended MMA as a cadet between August of 1995 and May 1996. He was in the 9th grade. MMA represented to Enrique's parents that MMA was directly affiliated with the United States Marine Corps, and stood for the ideals of the Marines. Enrique's parents were also told that MMA's academic quality was held at an extremely high standard. These representations were false.

Enrique was in constant fear of retaliation by other cadets. Enrique, a Hispanic, experienced racism by other cadets of higher rank in the form of constant racial slurs which often contained sexual references. Racist behavior and comments were directed towards Enrique. After Christmas Break of 1995, Enrique refused to return, but was finally talked into returning in March of 1996. His parents enrolled him for the Fall of 1996 and requested a transfer from Bravo to Golf. In a letter dated July 8, 1996, Mr. Molina wrote "Because we feel that there is a racial conflict involved in this matter." Col. Hobbs responded: " We do not feel this issue is valid." The Molinas did not return Enrique, Jr. for the Fall semester.

PLAINTIFFS' FOURTEENTH AMENDED PETITION AND REQUEST FOR FURTHER

Other cadets regularly urinated in Enrique's bed and tore up his bed and locker. The ideals of the United States Marine Corps were not upheld.   Enrique witnessed numerous beatings of other cadets as well as rampant drug use. Enrique suffered weight loss, sleeplessness, and nausea . Enrique returned from MMA a troubled young man who is disrespectful and angry.  Enrique returned from MMA a troubled young man who is disrespectful and angry.   He is depressed and has frequent nightmares.  Enrique has had problems with drug and alcohol abuse.  He went to counseling a few times and wishes to continue, but his family cannot afford the cost.

79.   <u>John Doe 15</u> - (███████████, parents: ██████████████████) John Doe 15, attended MMA the month of  January, 1997.  The parents of John Doe 15, sent their son to MMA because he wanted to be a Marine.  They had seen an article about MMA in the Houston newspaper, advertising a recruitment presentation in Houston.  The ad said that MMA could turn boys into men, that grade averages would be improved, that boys who attended MMA would have a better chance of being accepted to prestigious colleges, and that they their careers in the military would be advanced. The ad ran in the Houston Chronicle in October 1996.

When the ██████were notified by MMA that their son had been accepted, ███████████ called to verify the information.  Whoever answered the phone in the office verified that ██████████ ██ had been accepted.  However, when they arrived on registration day, John Doe 15 was not enrolled in any classes nor was he assigned a barracks.  He should never have been admitted, in fact, Dean Neal Meier rejected his application because MMA "cannot meet the special ed requirement for this applicant."   John Doe 15 had been in a Special Education class in the 8th grade at Arnold Jr. High in Cypress, Texas. His psychiatrist Dr. John Steffek prescribed appropriate educational modifications for John Doe 15 and gave him a health-impaired status.  However, this decision was overruled (against MMA's own policies) and he was admitted, packed into a room with two other cadets and given a

schedule for school at the last minute. Whoever made that decision to admit him knew he would not last long and the school would have a large profit margin on his tuition. This is a **"quick cash"** case as MMA made over $5,000 off the parents in less than a month.

While at MMA, John Doe 15 was beat on his hands with soap bars by other cadets while he was in the shower. He was threatened by older cadets who told John Doe 15 that they would put him in the hospital and he would wish he were dead. One of these older boys was the "Commanding Officer" (CO) in charge. John Doe 15 was threatened and assaulted many other times. The Chaplain, Drill Instructor Pruitt, and Gen. Glasgow were told of these threats and assaults, but nothing was ever done. John Doe 15's father called Sgt. Pruitt and told him that his son was in fear for his life and that he had been threatened. His father also called the Chaplain to tell him that his son felt his life was in danger. The MMA Chaplain refused to check on John Doe 15 and told his father that he would need to make an appointment to come to see him "next week." After those calls, John Doe 15 was awakened during the night, beaten, kicked in the testicles. He ran away the day after he was beaten up because he was told by another cadet that after John Doe 15 fell asleep that night he would be "...taken care of". He escaped from MMA by stealing a van on the campus, although he did not have a license. He was desperate to get away from the thugs who were assaulting him and threatening his life. On January 30, 1997, John Doe 15 was found by the police and taken back to MMA the following day. The van had caught fire and burned after the young boys wrecked it.

While at MMA, John Doe 15 was beat on his hands with soap bars by other cadets while he was in the shower. He was threatened by older cadets, Lt. H_____, Lt. H_____, and Private E_____, who told John Doe 15 that they would put him in the hospital and he would wish he were dead. One of these older boys was the "Commanding Officer" (CO) in charge. John Doe 15 was threatened and assaulted many other times.

MMA materially misrepresented the nature and extent of John Doe 15's injuries and abuse and the complete lack of adult supervision to his parents. Prior to attending MMA, John Doe 15 was a loving sweet boy who was very close to his mother. After he went through the horrible experiences at MMA, he was distrustful and distant. He blamed his parents for putting him in the school, although they thought it was going to be a beneficial experience for him. They had trusted the assurances made by MMA recruiters as to their experiences with ADHD children.

John Doe 15 was hospitalized several times after escaping from MMA. After his traumatic experience at MMA, John Doe 15 had a psychotic break. He exhibited self-mutilating behavior including burning himself. He ended up at Provo Canyon Psychiatric facility in Utah where he was a patient for one year and five days. The facility cost $6,500 per month, which totaled $78,000 in medical expenses for the Palmer family.

80.    <u>John Doe 16</u> - (███████, mother: ███████) John Doe 16 attended MMA from August 1997 to November 1997. MMA made claims to parents that led the parents to believe that their sons were safe and supervised at MMA. John Doe 16's mother was told that he would have a better chance of getting into the Naval Academy. These were misleading statements. John Doe 16 was given access to drugs at MMA. At MMA, John Doe 16 was also assaulted, verbally abused, shamed and humiliated. He and his roommate were the only two 8th graders on the top deck of their barracks and they were terrorized by the older boys. At the end of his Plebe training, his plebe class was "tapped in." The older cadets hit the cadet's pins on their head. They would walk by and hit the pin up against the plebe's head. D. I. Clarke broke it up when a cadet started bleeding from his head. He was so depressed after his plebe training, that he tried to commit suicide with a razor. John Doe 16 was exposed to drugs as an 8th grader at MMA. On the weekend, marijuana and cocaine was consumed by many of the cadets. He had his $150 CD player stolen while at MMA. Theft was very

common. Once he and his roommate were attacked by cadets with homemade dart guns. The dart guns were made from the cardboard from a coat hanger. The tip from a shoelace attached to a sewing needle made the dart. He and his 8th grade roommate were asleep when a group of older cadets barged in, tore off their sheets and peppered them with the darts blown from their homemade dart guns. He had several needles stuck in him. He was told he would get his ass kicked if he told anyone about it. He was extremely afraid at night while at MMA. He has had problems with drugs since then due to his introduction to marijuana at MMA.

81. <u>John Doe 17-A and B</u> - (John Doe 17-A is Kevin McIntyre and John Doe 17-B is Sean McIntyre, parents: Tom and Marlene McIntyre) Plaintiffs Tom and Marlene McIntyre had two boys, who attended MMA. Kevin McIntyre attended MMA from January 1994 through May of 1996 and he has sued MMA individually. Sean McIntyre attended MMA from Fall of 1993 to May of 1997. The family chose to send their sons to MMA because MMA promised structure and the United States Marine Corps' standards, leadership and discipline. These representations were false. MMA had complete and blatant disregard for Marine Corps concepts. The environment at MMA was not structured or supervised. Sean McIntyre, Kevin's brother, returned home with cigarette burns on his arms and back, and Kevin's parents saw bruises on his body on numerous occasions. Kevin was not given the academic support the family was promised. Kevin was assaulted by other cadets, who beat him with locks in socks. Kevin and Sean both had "tapping in" experiences. Sean was doing great in academics until he started dating his Drill Instructor's (Sgt. Frank Fonte) daughter, Sandy. This relationship was against the rules and the McIntyres complained about the relationship. This situation put a strain on their relationship with Sean. Sean's grades went down extremely after the advent of this relationship, because of the special treatment he received due to this relationship.

Kevin was well-liked by his teachers at Mainland Christian School in San Antonio, where he

attended prior to going to MMA.  In the Confidential school report in Kevin's MMA records, the

Principal stated: "Kevin is well-liked by his teachers and peers, we are sorry he is not returning."

Kevin often was afraid to sleep because someone might "come for him" at night.   In the Fall of 1995

his academic advisor, Dr. Ricciardi, confiscated a home-made dart that Kevin was carrying in his

pocket.  Kevin did fairly well his first semester in school with 5 Bs and 1 D, then his studying began to

deteriorate.  Kevin's father complained in November of 1995 to Kevin's school counselor because he

did not know Kevin had deficiencies until the Quarterly grades came out.   His last semester (Spring of

1996) he made 3 Fs, 3 Cs, and 1 D.  The noise level in the barracks was so loud and rowdy that it was

difficult to study.  Kevin's attitude slipped with each semester and he gave up his dream of going to

college.  He lost respect for the Drill Instructor and the other adults in authority.  In November, 1995,

his mother tried to get the schools attention by talking to several teachers and by asking to send Kevin

to a counselor or medical doctor or both.

Kevin tried to be a good cadet with character.  On November 21, 1994 he received a

commendation for meritorious service:  In January of 1995 – Kevin, Sean and Scott White were

commended by businessman David R. Smith for retrieving his briefcase, which had been stolen by car

thieves.  Now he is a disillusioned young man who often has no job and no place to live.

82.    <u>John Doe 18</u> - (▓▓▓▓▓▓▓ mother: ▓▓▓▓▓▓▓▓▓▓▓) John Doe 18

attended MMA from January 1996 to April 1996.  MMA represented that all the boys would be well-

supervised so that hazing incidents could not occur.  Accounts of hazing were represented to the family

as minimal and isolated occurrences. While John Doe 18 was there, he was beaten and forced to

proceed down a central hallway while naked and being verbally degraded.   Some of his personal

property was stolen.  An example of the daily harassment he endured is that when he tried to talk on

the telephone, other cadets would rip it out of his hands and hang it up.   He was threatened and still

fears retaliation for any action taken against MMA.  The cycle of abuse at MMA is perpetuated.  After

younger boys, (who have been mistreated,) get power and rank, they believe it is their "turn" to pass on

the abuse, they themselves have experienced, in the name of discipline.

In April of 1996 John Doe 18 and his roommate, Joseph ARBON, were made to eat an entire

pack of cigarettes until they threw up.  Cadet Sgt. George was the ringleader of this hazing incident. But

when they both did not vomit, they were made to spin around and around until they did.  They were

told to throw their vomit on each other.  He had to hold his vomit in his T-shirt and roll it into a ball.  He

and Joe were told that they were to trade vomit and eat each other's vomit. There was obviously a lack

of adult supervision in his barracks.  Their drill instructor, Mst. Gny Sgt. James Hager, terrorized the

barracks by walking down the hall with a baseball bat, hitting things, smashing radios.

John Doe 18 has been diagnosed with Post Traumatic Stress Disorder and has been in

counseling off and on ever since he left MMA.  He is now on prescription drug medicine, Zoloft, to

help him cope with his depression.  He has had trouble succeeding in school and has not got his high

school diploma yet, although he has attempted to return to school several times.

83.    John Doe 19 - ▨▨▨▨▨▨, mother: ▨▨▨▨▨▨) John Doe 19 attended MMA

from August 19, 1995 to March 27, 1996.   The family was sent promotional materials which claimed

to improve students' focus and help academically challenged students improve their grades.  During the

enrollment process, the ability to control students with ADD and the ability to deal with ADD problems

was reinforced.  Drill Instructor Chamberlain told the family  that the structure of MMA would help

with John Doe 19's ADD.  The family also talked with MMA teachers about help with John Doe 19's

ADD.  MMA represented that because of John Doe 19's ADD, he would get a better education at

MMA.   This was based on the fact that they had smaller classes and supervised study periods.  While

at MMA, John Doe 19 was subjected to battery of his genitals. After being repeatedly assaulted, and threatened by other cadets, John Doe 19 ran away. His parents took pictures of his bruises, and of his roommate's black eye. John Doe 19 once called his parents from Harlingen and reported that he had been stranded on weekend liberty. He wanted to know if he should get a hotel, because he had no way to return to campus. This would not have happened if there had been proper adult supervision as claimed.

Toby had learning disabilities and should not have been admitted. He had special needs that MMA could not accommodate. He was doomed to failure at this school. The Drill Instructor and other cadets were not sympathetic or tolerate of his limitations. He was called a "wimp," whiner and was made to feel like a cry baby by his drill instructor Mst. Sgt. Chamberlain. When Toby went home for Spring Break, he refused to return. He told his parents that he would run away again, so his parents withdrew him.

Toby has had a difficult being motivated and getting on his feet. He was depressed and angry for several years after leaving MMA, due to the traumatic events he experienced there.

84.   John Doe 20 - (Ryan Alcorn, mother: Elizabeth Alcorn) Plaintiff Ryan Alcorn attended MMA from January of 1994 to January of 1995. The family chose MMA after they received admissions materials which represented that MMA had an excellent academic program, and as well as offering a wide variety of elective courses, such as skydiving. When Plaintiff Ryan Alcorn arrived at MMA, Drill Instructor McFarland told him that skydiving was available. However, Ryan was never given the opportunity to take the class. The scholastic challenges he encountered were far less than at other academies he had attended, such as St. Thomas and Lamar. Because of insufficient adult supervision, Ryan was able to often skip. He thought that the quality of the teachers employed at MMA were lower than at other academies and that their credentials should be examined. MMA was

not a safe place for him.  He was assaulted and hazed constantly.  Several assaults were directed at his genitals.

Ryan was in Golf Company and once when he was visiting friends in Alpha, the Drill Instructor, Mst. Gny. Sgt. Jim Hager told him to never come back to Alpha or he "would kill him and kill his family."  On September 23, 1994, Ryan was thrown in a dark bathroom one night and was kicked by several senior cadets.  They kicked him all over, in the head and in the genitals.  He went to the clinic for treatment.

Ryan was exposed to drugs and alcohol at MMA.  The substances were easily available although his parents had been assured that no drugs, tobacco or alcohol were tolerated.  Ryan was expelled of MMA for smoking marijuana right before finals in the Spring of 1994, but he was allowed to reenroll in the fall.  General Glasgow wrote in his letter of June 16, 1994 that MMA "is not a school which operates on a "0" tolerance base."  After leaving MMA, Ryan has had problems controlling his anger.

85.    John Doe 21 - (Aaron Nefe, mother:  Gail Nefe) Plaintiff Aaron Nefe attended MMA for Summer Camp in 1996 and then attended from August of 1996 to March 14,1997.   His experience at MMA's summer camp, caused the family withdrew $25,000 from a retirement fund and enroll him for the school year.  The family did not realize that there was a severe lack of adult supervision, especially during weekend liberty.  Nefe, age 14,  later told the family that he had gone alone into town. Representations by MMA of adequate adult supervision were false. The family chose MMA based on those representation.  At MMA,  he access to drugs, alcohol, cigarettes, and vulgarity. The students were able travel  to Mexico, because they were not supervised during Liberty.  Plaintiff Aaron Nefe  also witnessed the hazing and abuse of other cadets.

He was given access to drugs, alcohol, cigarettes and vulgarity.  Aaron's parents felt the easy

access to drugs and unsupervised weekend liberty policy of MMA caused their son to use drugs.

After he tested positive for LSD in March of 1997. Aaron is depressed and has trouble sleeping. He

is quick to anger, aggressive and uses profanity. Aaron abuses tobacco and alcohol. He has not

finished high school and his lack of motivation as well as substance abuse add to his depression.

86. <u>John Doe 22</u> - (John Trice, Jr., father: John Trice, Sr.) Plaintiff John Trice, Jr.

attended MMA from January of 1993 through May 4, 1993. The family chose MMA because they

were given the impression that MMA provided a rigorously structured, highly supervised living

environment for the boys. These representations were false. John Doe 22 was hazed, robbed,

choked, beaten, made to stand at attention while being lit on fire with lighter fluid. He was forced to

watch while a friend and fellow cadet, Joseph GASNER, was so severely beaten by other cadets that

he suffered a concussion and had his teeth knocked out.

John tried to succeed in this turbulent and violent atmosphere. On March 19, 1993 he was

complimented by his drill instructor Sgt. Mjr. Behr for an above-average job in ROTC. On March 25,

1993, John was given a commendation for meritorious service when he recovered a stolen geometry

teacher's edition book.

John's life was threatened by a gang of Hispanic cadets and he was desperate to get out of this

school. So he made sure he was caught in possession of marijuana. This 10th grader was a good cadet

and then all of a sudden he is caught with Marijuana on May 4, 1993? The drug environment at MMA

was thriving, so it was easy to get and it was a way out for John..

John was traumatized by the hazing incidents, especially when they caught him on fire. He has

anger outbursts, which has caused him trouble. He never finished high school or even complete

requirements for a GED.

87. <u>John Doe 23</u> - ( ████████████, mother: ████████ )John Doe 23 attended MMA

from January of 1996 and January of 1997.  His mother spent retirement savings to send him to MMA

because the family had been led to believe that he would be in a structured and academically excellent

environment.  They were assured that his grades would improve, and that he would become more

disciplined and responsible.  At MMA, John Doe 23  was treated with a complete lack of respect, had

his personal belongings stolen, was beaten for not giving his food to another cadet.  On one occasion

the Harlingen police came to MMA  and reportedly found 158 pills of some type of drug, and several

ounces of marijuana in his barracks.  More drugs were found in the room of two cadets who fled.  John

Doe 23 wrote his mother the next day, detailing what had happened.   He wrote that the Drill Instructor

had been present for the search.  This occurred on April 15, 1996.  The family  never heard from

MMA concerning this incident.

His Drill Instructor, Mst. Gny.Sgt James Hager would walk the halls with his aluminum bat

smashing radios and intimidating cadets.  John Doe 23 saw him chase Cadet Ho up the stairs while

waving the bat and yelling racial slurs at the boy

John Doe 23 learned vulgarity and profanity at MMA.  He has trouble sleeping and has

nightmares.  It has taken him years to get over the trauma that he experienced at the school.   He had

never used drugs prior to going to MMA.

88.     <u>John Doe 24</u> - (Stace McIntyre, mother:  Gail Madden) Plaintiff Stace McIntyre

attended MMA from December, 1996 to January, 1997.   The family chose to send him to MMA after

attending a local recruitment meeting and then visiting the Campus of MMA.  The information MMA

gave them, both verbally and in writing stated that the school was one that helped young men learn self-

discipline in an academically challenging environment.  The family was also told that every effort was

made to help cadets adjust to the environment at MMA.  These representations were false.  The

barracks were overcrowded.  In Plaintiff Stace McIntyre's room, three boys were assigned to a room

that was designed and advertised to hold two boys. This continued until after the plebe period. MMA stressed that "...they did not admit just anyone", but the family later found out that MMA admitted boys with severe problems. Plaintiff Stace McIntyre's family was lied to regarding the disappearance of Plaintiff Stace McIntyre from MMA. His mother was not informed of his disappearance until she arrived at the MMA campus to visit him, and at that time was informed that he was missing. After being questioned by Plaintiff Gail Madden, Stace McIntyre's mother, the Drill Instructor indicated the police had been called. A trip to the police station revealed that the police had no record of any report ever being filed. The dispatcher said it was common for boys to run away from MMA, and that a lot had. Later, the Drill Instructor filed a missing persons report. After Plaintiff Stace McIntyre's mother had left town, (according to the Police Investigator assigned, possibly named "Martinez,") the Drill Instructor called to have that report canceled, as he told the investigator, the boy was a juvenile. The investigator called Plaintiff Stace McIntyre's mother, and she asked to get the report re-filed. While at MMA, Plaintiff Stace McIntyre was assaulted. He received blows which were primarily directed at his genitals. He was made to scream obscene phrases, under threat of being beaten by other cadets.

Stace has had bouts of depression and problems sleeping since he left MMA. He has fits of rage and anger which leaves him regretful and remorseful.

89.    John Doe 25 - (David Aguilar, mother: Susana Aguilar)Plaintiff David Aguilar attended MMA from August of 1992 through Spring of 1994. His mother chose MMA because she wanted her child to attend a good school in the United States. MMA represented that it provided close adult supervision. They also promised excellent academics. On his first night at MMA, three cadets, two of whom were named David Medina and Brian Andrew Leskousky, placed a sword to Plaintiff Aguilar's penis and twirled it around, while threatening him. The following day, he was "tapped in" by Cadet

Medina. He was subsequently "tapped in" by cadets Medina, Leskousky and Hardaway on multiple occasions. Plaintiff Aguilar was assaulted in November of 1993 by Cadet Rubalcaba, who sprayed Aguilar with some type of chemical until his foot burned. While in class, Plaintiff Aguilar was poked in the left eye by Cadet Eagliar. He went to the MMA clinic and was kept there for two days. While at the infirmary, he was reported as "AWOL" and missing from campus. His parents were notified of this. After his parents drove from Mexico to investigate, Sgt. Garza admitted to them that Aguilar had been in the infirmary for two days, because he had been stabbed in the eye with a pencil. Plaintiff Aguilar was repeatedly threatened, physically assaulted and a victim of extortion from other cadets. He was also the victim of a "blanket party." Three of the cadets who participated in these activities against Plaintiff Aguilar were Cadet David Medina, Cadet Leskousky and Cadet Baglionni. These three individuals were turned into D.I. Durham by Plaintiff Aguilar. He also had his telephone card stolen by Cadet Leskousky and Cadet Austin Abel Smith on two separate occasions, where they charged approximately $1,500.00 in calls. There was an investigation performed by the D.I. and restitution of not even ½ of the amount charged was paid to the Aguilars. Plaintiff Aguilar lived in fear of being harmed and in fear of retribution from the other cadets when he reported their actions against him. After several visits, Plaintiff David Aguilar's mother learned that he was being harassed and threatened and that he would not sleep because he was afraid someone would harm him. Plaintiff Aguilar also witnessed physical assaults on other cadets, performed by cadets in leadership and Drill Instructor(s).

Although David managed to obtain his G.E.D., he is having a difficult time staying in college or keeping a job. He is depressed and overweight. David cannot sleep at night and has frequent nightmares about his MMA experiences.

90. **John Doe 26** - (Samuel Campbell, mother: Debra Morris) Plaintiff Samuel Campbell attended MMA between August 19, 1995 through December 20, 1995 and again from August of 1997

until November 10,1997. He wanted to go to MMA because the family was led to believe, through advertisements and recruitment materials, that MMA had an excellent academic program, as well as great athletic programs in a safe and adult supervised environment. The family withdrew him after another cadets' throat was slashed (Cortez incident). After this incident, the cadets were not allowed to call home. He was in the same barracks as Cortez. It had been a concern before, because he had told his parents that he was not allowed to call during the week. But when he was not allowed to call home after the Cortez incident, it became apparent that MMA was not a safe environment and that Plaintiff Samuel Campbell was in danger. His family withdrew him from MMA.

He went to Mexico several times, although his mother had been promised that the boys did not go to Mexico. He was with Ryan Stout when Ryan was thrown in a Mexican jail.

The ranking officer of his company was doing an inspection and got mad at Sam and cut his hand with a knife. D.I. MacFarland wrapped it and cleaned it, but did not send him to a doctor. Later, Plaintiff Samuel Campbell admitted that he had been beaten up and that MMA accepted boys who had problems, including criminal records. He was punished by being awakened every two hours and made to do P.T. After that he could not go to sleep because his adrenaline was still pumping. He was deprived of sleep for days. He did not have trouble sleeping before MMA, but has since his time at MMA. The attitude of the staff was cavalier: In one instance, the Drill Instructor Clark called Sam's mother and stated, "I just called to let you know I don't know where your son is." The fact that the parents were not notified after the Cortez incident, (which was also a concern of other parents who attended MMA's Ball,) and that the families had to learn of the incident on the Internet, was deeply troubling. Plaintiff Samuel Campbell's mother asked the Drill Instructor to have Plaintiff Samuel Campbell call her after the throat-slashing incident, and her son was not allowed to do so. This was inexcusable.

Terri Campbell, his mother sent a sweet smiling boy to this school and he returned a glowering, sullen young man. Sam has trouble sleeping and has problems with controlling his anger. He has rages. He has trouble with relationships and represses his feelings. Sam was introduced to drugs at MMA. He and his cousin J. R. were smoking marijuana when J.R. dove into the river and broke his neck on a rock. These boys did not smoke marijuana prior to going to MMA.

91.   **John Doe 27** - (████████, mother:  ████████████) John Doe 27 attended MMA as a 9th grader from January of 1996 through a few weeks of his junior year when he was withdrawn by his grandmother on September 11, 1997. He had an excellent report from Huntsville High School showing absolutely no problems with this boy. He was sent to MMA because they advertised structured environment, control of the student population and thorough supervision. They were also promised that he could enroll in skydiving, scuba diving and skeet shooting. Of the three activities mentioned, the only activity that was available to Justin was on one afternoon exercise, he was allowed to use scuba gear in a swimming pool. John Doe 27's family were promised verbally and in written literature that their son would be supervised totally and that his attitude, grades, and his sense of responsibility would improve. Instead, he regularly left campus unsupervised and went to Mexico. He was given access to drugs and alcohol. Eventually, after running away, he was sent home in handcuffs (which were put on him by Drill Instructor Ron Chamberlain and left on him for a number of hours.)

Mst. Sgt. Chamberlain stated in his quarterly report on October 17, 1996 his assessment of Justin: "No problems, well motivated, tried hard, a pleasure to have." In December of 1996 he was promoted to Fire Team Leader. On March 11, 1997, Sgt. Chamberlain stated in his report, giving him a 100 in conduct and a 93 in Military Science: "When Justin puts his mind to it, he's one of the best cadets in the company." His first semester grades were great: 5 As and 1 B. However, succumbing to

the intense peer pressure at MMA, by the Fall of 1997, Justin had become a normal MMA cadet – he started hazing, participating in blanket parties, drinking, doing drugs and going to Mexico.

Justin has been very depressed since his experience at MMA. He tried to commit suicide in May of 1999. He also has fits of rage where he smashes property, jerks phones out of the wall and scares people. He doesn't care about anything and doesn't work. He has a hard time keeping employment. Before going to MMA, he had dreams of being an architect. Now he has a hollow-eyed look of someone who has no emotions, which has created a shell over his heart and mind. He learned this at MMA --- if you don't care, they can't hurt you.

92. **John Doe 29** - ( John Doe 29-A is ▓▓▓▓▓▓ and John Doe 29-B is ▓▓▓▓▓▓ mother: ▓▓▓▓▓▓ John Doe 29 represents two boys, John Doe 29-A is Plaintiff ▓▓▓▓▓▓ and John Doe 29-B is Plaintiff ▓▓▓▓▓▓ Their father was a football coach at MMA from 1994 through part of 1996, and as a result both sons attended MMA. Plaintiff ▓▓▓▓▓▓, the older son, attended MMA from August, 1994 through September 6, 1996. Plaintiff ▓▓▓▓▓▓ attended MMA from September, 1995-September 6, 1996. The younger son, John Doe 29-B, because he was in the 6th grade, only attended one year and one month. Although the family lived near the boys, and were there with them on campus, they were still subjected to verbal and physical abuse, drugs, obscenity, gang fights, humiliation, degradation, assaults and hazing, which resulted in the younger son, Plaintiff ▓▓▓▓▓▓ having his nose broken and a tooth knocked out. The older son, Plaintiff Scott White, was severely emotionally abused. Once when some boys were playing a prank on him, they sprayed his back with lighter fluid and ignited it, causing a fireball to engulf Plaintiff ▓▓▓▓▓▓'s head. The lack of supervision in the barracks was unbelievable. At one point, Plaintiff ▓▓▓▓▓▓ was denied medical care, while running a fever. Although his Drill Instructor Fonte, knew he was ill, the older son was not allowed to contact his parents. At a football game, he managed to come to them. At that

point he was dehydrated, his eyes were glassy, and he was obviously ill.   After that, the decision was made to pull him out.  Both sons were severely and emotionally abused at MMA, and the repercussions are still being dealt with by the family.

███ has incurred dental bills as a result of the assault. ███ has had some counseling and has been diagnosed as having Post Traumatic Stress Disorder.  Both sons were severely physically and emotionally abused at MMA, and the repercussions are still being dealt with by the family. ███ is still having trouble with his teeth, from the assault.  Ben struggles with wanting to have his "back watched." ███ has problems controlling his anger and to such an extent that he has even punched his mother. He has become verbally abusive to supervisors at work and been terminated.  He has had trouble maintaining employment.

93.   **John Doe 31** - (Spencer Lanham, mother:  Tommye Lanham) Plaintiff Spencer Lanham attended MMA the fall of 1997. Spencer's parents chose MMA based on assurances by MMA that they provided an excellent education and constant adult supervision.  The family had been promised by the Commandant (while they sat in the Registrar's office) that Spencer would get to play golf and do a lot of other extra-curricular activities like rifle classes.   He was never allowed to do those activities. While at MMA, he was hazed in the name of discipline.  He was beaten so severely that he passed blood in his urine afterwards.  His scalp was severely skinned in another assault.  He was choked and thrown against the wall.  He witnessed  numerous beatings of other cadets.  The classes at MMA were substandard compared with the classes he had attended previously, (closer to "remedial" than "excellence.")  When complaining about the lack of adult supervision and substandard academics, parents were treated rudely by various members of the staff, including Mr. Lanoue.  He was withdrawn from the academy on January 27, 1997 due to the "physical abuse caused by Cadet Lt. Horton of

Bravo Co." Mrs. Lanham also discovered that there was "Rampant drug use throughout the Academy."

Spencer managed to get his G.E.D., but is struggling to repair his life due to the physical and emotional abuse he suffered.

94.    **John Doe 32** - ███████████, mother: ███████████) John Doe 32 attended MMA from the summer of 1997 to the fall of 1997. He attended MMA for three weeks. He was and still is a straight A student and a member of the National Junior Honor Society. He wanted to attend a military academy to be part of an excellent JROTC program and to expand his education. John Doe 32 and his parents went to the MMA orientation in Houston where MMA promoters described the school as a place where boys can get an outstanding education and an abundance of self-esteem and leadership through rising in the ranks and being a part of a company. The academy also stated that they were allotted 6 appointments to the Naval Academy, second only to the President of the United States, and 5 appointments to West Point. They also said they would not take anyone who was in trouble with the law. When he arrived at the school it was a different story. He was rarely able to call his parents. He was reprimanded for using the phone. His cadet leader was the boy who later was accused of slitting a boy's throat. He witnessed assaults and hazing and was in danger while he attended MMA. Jimmy was scared at MMA and he had problems sleeping after he returned.

95.    **John Doe 33** - ███████████, parents: ███████████)John Doe 33 attended MMA from August 1997 through December 1997. The family chose MMA because the school advertised and sent out literature claiming that they could improve GPA's. MMA further promised that MMA was an environment that would build character, self-discipline and a sense of responsibility. The family was also assured that at MMA the boys would be constantly monitored and supervised. These assurances were false. While at MMA, John Doe 33 was assaulted twice in the

same day by Charlie Company Commander Landon K. Hardin. He was assaulted once in the mess hall, by having a knife thrown at him (and hitting him in the back) while on kitchen duty and later assaulted in his room in Bravo Company because Cadet Hardin was supposedly attempting to locate a few packages his mother had incorrectly mailed him at Bravo Company. When John Doe 33 told Cadet Hardin he didn't know anything about the missing packages, Cadet Landin put his hands around John Doe 33's neck, pinned him against the wall and lifted him off the ground. While assaulting him, he threatened him and another cadet with retaliation for the missing packages. John Doe 33's mother was at MMA at the time, to pick up her son for liberty. Doe 33 was terrified to leave the barracks because he thought Cadet Landin was still around and would physically assault him again. Even after Sgt. Mjr. Krauss prepared a memo requesting Landin be considered for dismissal (noting his apparent disregard for the "rules" at MMA and putting other cadets in harms way), MMA chose only to punish Landin with nominal demerits, 48 hour restriction and reduction in rank. MMA gave a copy of Sgt. Mjr. Krauss' memo to John Doe 33's family. Upon representation that Cadet Landin would be dismissed and/or harshly dealt with because of his assault of John Doe 33, his father decided not to press criminal charges against Cadet Landin, who was a larger and older cadet than his son. After Landin was disciplined, John Doe 33 was threatened with serious harm by Cadet Landin's friends. Additionally, and in separate occurrences, John Doe 33 was threatened, assaulted, and hazed. As a member of the boxing team, John Doe 33 was jogging with the team one day. He told Cadet Arceneaux (leadership) that his stomach hurt and he could not keep up. Arceneaux said John Doe 33 was going to keep up, took him by the arm and dragged him up to the group and hit him twice in the head.

John Doe 33 witnessed other cadets being hazed, for example, sometime after Plebe graduation Cadet Billando lost his glasses. Sgt. Mjr. Pruitt ordered a search of all cadets' rooms and said that no one could leave for liberty until the glasses were found. While the cadets in leadership searched the

rooms, John Doe 33 saw Cadet Arceneaux go into Cadet Supavoda's room, (directly across the hall from John Doe 33's room) approach Supavoda, twist his arm back to his back and push him to the ground. While on the ground, Arceneaux pushed Supavoda's arm up so high that John Doe 33 heard a "popping" sound. Arceneaux also had Supavoda's throat so tight that there were visible bruises later. Arceneaux threatened Supavoda about the missing glasses, about his liberty being delayed and that he'd better have nothing to do with it. The glasses were later found. John Doe 33 lived in such fear of being harmed every night that he never slept without some type of weapon close at hand. The parents became aware, from later conversations with a Drill Instructor's wife, that other Drill Instructors also felt that there needed to be more supervision and had repeatedly asked the school for additional adult staffing. John Doe 33 learned to not care about anything. He has a sign on his bedroom door today that reads, "If you don't care, they can't hurt you."

John Doe 33 learned to not care about anything. He has a sign on his bedroom door today that reads, "If you don't care, they can't hurt you." He cannot forget the night his fellow Bravo cadet Cortez had his throat slit. He has trouble sleeping and has flashbacks of his fearful experience at MMA. He is suffering from Post Traumatic Stress Disorder.

96. **John Doe 34** - (▨▨▨▨▨▨▨ mother: ▨▨▨▨▨▨▨) John Doe 34 attended MMA from August 17, 1996 until September 24, 1997. The family applied to MMA because they had received information from MMA that led them to believe that MMA had an excellent academic program. They were also given literature that gave the impression that MMA only took good kids. MMA represented that they maintained a highly disciplined and structured environment due to experienced drill instructors who supervised the boys 24 hours a day, seven days a week and who lived on premises with the boys as surrogate parents. Because the families were all told that it was common for the boys to exaggerate their experiences at MMA in letters and communications, John

Doe 34's parents did not believe him when he described "blanket parties," beatings, hazing, the availability of drugs, and the fact that he had to sleep with a pipe under his pillow for protection. John Doe 34 felt betrayed and abandoned by his parents. Before Christmas of his first semester, he was completely disillusioned and felt isolated from his family. This experience caused considerable damage to the relationship that John Doe 34 had with his parents. He was driven away from his parents. John Doe 34 was made to walk tours almost every weekend (two hours of marching with a rifle without being able to adjust it at all while the strap cuts into the cadet's shoulder). One Saturday afternoon, he was marching tours, when his Drill Instructor Sgt. Clark came up to him and said with a sardonic grin on his face, "I have a surprise for you." He would not tell John Doe 34 what it was and made him continue to march. Afterwards, John Doe 34 snuck away to call his mother. She told him his father had been in a serious car wreck and was in the hospital. He was at first angry with her for not calling her. Then she told him that she had called Sgt Clark and had asked him to have him call her. John Doe 34's parents sacrificed financially in order for their son to go to this school where his future could be improved, with strong academics and the confidence-building promised by MMA. The representations made by MMA were false. There were far too many boys for one drill instructor to supervise. Boys from such a wide span of ages should not have been put together under the same roof.

At MMA he lost all respect for the military and the retired Marine personnel at the school. By 1997 he was disillusioned with the cadet corp. leadership and the adult officers. He just gave up trying to conform to their inconsistent and hypocritical honor code. Damon was sent to therapy while in his second year at MMA.

John Doe 34 has been angry and depressed for periods of time since going to MMA. The experience has caused him to have anger outbursts. He felt betrayed by his parents for sending him. The parents trusted the school authorities and believed the drill instructor. He has had to have

counseling. His parents sent a boy in need of self-discipline and structure to MMA and got back a

profane, assaultive and disrespectful boy who had developed a tobacco addiction. Further, this

experience has made him lose respect for authority and distrust authority figures.

97.    **John Doe 35** - (Joseph "Greg" GASSNER, mother: Carol GASSNER) Plaintiff

Joseph Greg GASSNER attended summer camp at MMA in 1992 and then attended January 16,

1993 through February 24, 1994. The family chose to send him to MMA because they felt that the

structured environment would help him because he had had some minor discipline problems. MMA

promised verbally and in written literature that Plaintiff Greg Gassner would be adequately supervised.

Instead the barracks were overcrowded with not enough staff being provided.   In January of 1993,

Greg's plebe class was constantly hazed. They were "tapped in" on Hell night. When Greg was a

plebe in January of 1993, there were a number of cadets who were extorting money from the plebes.

On March 5, 1993, cadets Essary, was still extorting money and was caught and given demerits for

stealing.  On March 26, 1993, Greg was threatened and assaulted, a tooth (molar) was almost

knocked out, and he got a concussion from a beating by cadet Franco that was witnessed by Plaintiff

John Trice.  He was in the infirmary a few days for his  injuries.  Franco was not dismissed, only

punished and moved to another barracks.  On April 29, and 30, 1993 Greg went to sick bay and told

Doc Castillo he was afraid of the boys that were going to hurt him.

He was given access for the first time to drugs while at MMA.  He saw the cadet leadership

abusing drugs such as Ritalin and steroids. On February 7, 1994, Greg was attacked by a group of

cadets, Mandaville, Proal and Granello.  Mandaville hit him in the head with a lock.  He was kicked in

the ribs and hit in the neck by the others.  On December 19, 1994, Greg was promoted to Lance

Corporal (#011962) less than 2 months before he tested positive for marijuana.  He had made the

leadership ranks and decided to fit in with the rest of the corp. leaders.  The longer Greg was at MMA,

the more he realized that he had to be tough and assaultive to be respected there. The place was like the "Lord of the Flies" novel, run by bullies. He began hazing and abusing drugs himself.

Since leaving MMA, Greg has had trouble sleeping, with violent outbursts and with adapting to "civilian" life. He has had trouble completing school and with holding a job. He was still abusing drugs when he left MMA.

98.   **John Doe 36** - ▨▨▨▨▨▨▨ mother: ▨▨▨▨▨▨▨, guardian: ▨▨▨▨▨▨ John Doe 36 attended MMA from August, 1996 until May 16, 1997. The family sent him to MMA because they promised excellence in academics, not because he was a problem child. MMA repeatedly told the family that John Doe 36 was exactly the kind of student MMA seeks to recruit. The family had been told that he would be in a structured, disciplined, and rewarding environment. Rather, he was assaulted by a basketball player on May 12, 1997, who was much larger than him at the direction and with the approval of a basketball coach named Fass. After the assault, the Drill Instructor in charge of John Doe 36 telephoned his grandmother, late at night. He told her that she should call the police. He said that he couldn't call the police, but that John Doe 36 needed medical attention. He told her to call the police as soon as they got off the phone. She immediately called the Harlingen police, and they went to MMA. The officials at MMA said he was fine and had already been looked at by a medic and did not need any further medical attention. However, the police believed his injuries were severe and they took John Doe 36 to the hospital. Brandon had a skull fracture and a concussion.

Brandon suffers from Post Traumatic Stress Disorder. He has fits of rage and he is reckless in his behavior.

99.   **John Doe 37** - (John Doe 37-B, parents: Dan and Becky Campbell) Plaintiff Doe 37B, from August, 1995 to May, 1996. While at MMA as a plebe, Dan was assaulted and "tapped

in." He was also burned with cigarettes by his superior cadet officers. He was verbally abused, and

beaten. He was afraid to sleep at night because of the violence that occurred at MMA. He was

concerned for his brother Jimmy who had been sexually abused by James Butler III. After Jimmy

reported it, some of Butler's friends called him a "fag." Dan felt anguish because his brother was

wrongfully being labeled. Before the incident of sexual assault involving his brother Jimmy, the family

took a trip to MMA, and Danny went with them. While visiting, Mrs. Hager and several other staff

members talked to the family about the flight program, telling them that if they enrolled Danny then he

would be able to sign up, fly, and get his licence in the first year. These representations were false. The

entire staff at MMA neglected to tell the family that there were many reasons that he might not be able

to get his license. So the family sent Danny to MMA in expectation of his being able to obtain his

pilot's license.

On August 21, 1995- Dan was upset and instead of hitting a cadet he hit the wall. His medical

records state: "cadet got upset at another cadet--troop handler— and punched wall, pain in left hand."

On September 25, 1995, Dan had "blisters on both feet," from marching. The fights occurred daily.

Dan was injured in a fight on December 6, 1995. His MMA medical records state: "complains of

pain to the left arm..hit during a fight with another cadet, pain to facial area (nose)." It took Dan awhile

to get back on track after leaving MMA. He had feelings of anger and depression when he thought

about his experience at MMA.

100. **John Doe 38** - (████████ father: ████████) John Doe 38 attended

MMA from August, 1995 through May, 1996. He chose to attend MMA because he was interested in

a career in the military. MMA claimed to have the power of appointment to service academies and that

graduation from MMA would generally further their cadets' military careers. The family also chose it

for the preparatory aspects, as the family was told by MMA that they had an excellent academic

program.    John Doe 38 was assaulted, sexually abused, forced under threat of beatings to scream

obscene phrases and simulate oral sex on objects such as flashlights, and "tapped in" with the heels of

shoes.  This is when the steel points of emblems and badges worn by the student are hit hard by others

so they penetrate the flesh of the boy's skull or chest depending on whether the boy is wearing them on

the cadet cap or on his chest.   Not only was MMA academically sub-standard, but due to his

experiences at MMA,  John Doe 38 now is repelled by the idea of anything further to do with the

military.

He was picked up and slammed into a wall by his Drill Instructor, Mst. Sgt. Frank Fonte.  He

was so afraid that he slept with a towel bar in his bed for a weapon.  He had a friend, Cadet Graf, who

was locked in a closet.  John Doe 38 felt it was like a prison.  Pornography was prolific in his barracks.

The sexually charged atmosphere at this school created many sexual problems.

John Doe 38 suffers from severe depression due to the incidents at MMA.  He becomes tearful

and anxious when he talks about the school and what went on there.  He has uncontrollable rages at

times.  He has had trouble in school and in sustaining employment.  He has a disrespect for authority

since attending MMA.  He still has trouble sleeping.  John Doe 38 wants to go to counseling, but the

family cannot afford it.

101.    **John Doe 40** - (Robert Hunter, parents: Mr. and Mrs. Joe Hunter) Plaintiff Robert

Hunter attended MMA from August 1992 to September 14, 1992.  The family chose MMA after

having heard about it from several sources, including ads in Texas Monthly.  They  called to inquire

about the summer camp.   When they visited the campus, they  were told by staff members, including

Gunnery Sgt. Ward, that MMA had an excellent academic program.  They were also told  that more

national merit scholars came out of there, than anywhere, and more kids went on to service academies.

They were assured that MMA had a highly supervised, structured regimen, and because of the

structured environment  Plaintiff Robert Hunter's grades would be improved, his ADD would be

controlled, and his overall attitude would get better.  Instead, after summer camp, in the fall semester.

1992, within a week or so of his arrival,  he told his parents of several incidents that sounded extreme,

like late night "physical training;" doing hundreds of pushups at 1:00 a.m., being thrown across the room

while asleep; being urinated on, along with his possessions, like his canteen. After he told his DI, in

Alpha Company, he was "punished" by being made to stand outside at attention at 1:00 am, until finally,

it was announced to the group that he must have urinated on himself.  D.I Ward also slapped Robert

several times and threw him across a room.  Although he called and told the family the things that had

happened, the family was told by his Drill Instructor not to believe what Plaintiff Robert Hunter was

telling  them.   He ran away several times and finally slit his wrist because the family  and the Drill

Instructor  refused to believe him when he told them of the incidents that happened to him.   He hoped

he would be dismissed for slitting his wrist.  Later, Dr. Stidevant of a Brazos psychiatric clinic, told the

family that he  had used that as his last resort, in order to get himself out of a hellish situation.  Dr.

Elizabeth MacNaughton, from Houston, did a three-day evaluation, told the family  that MMA was the

worst possible place to have enrolled him with ADD. Not only that they had misrepresented the amount

of supervision, they were aware that he had ADD, and as Dr. MacNaughton  put it, they had been in

the business long enough to know that it was not a good choice in terms of the ADD. MMAs'

verbalized theory, was that ADD did not really exist, but that the kids just needed an "attitude

adjustment."  They have one answer for everything, corporal punishment, which was not what the

literature said, and not what the family would have chosen.

    102.   **John Doe 41**  - (Joshua Campbell, mother: Teresa Campbell) Plaintiff Joshua "J. R."

Campbell, deceased,  attended MMA from August 14, 1995 through November 5, 1997.  The family

chose MMA because J.R's cousin Plaintiff Sam Campbell was going to go there and the family thought

the boys would benefit from the structured environment. While he was at MMA, he was given access to drugs and alcohol. He witnessed assaults and violence and was also victim of it. After Cadet Cortez had his throat cut in October, 1997, J. R. was helping him until the EMS came. He saw the blood everywhere and tried to hold Cortez' throat together with his hand until Sgt. Pruitt made him go to his room. He was very scared that night and pushed the desks against the doors. During the first days after the Cortez incident, the school cut off contact with the parents, and families could not reach students. Plaintiff Joshua Campbell had to sneak out to a phone to let his mother know he was okay. After the family talked with him, it became obvious that MMA was an unsafe and unhealthy environment, and he was withdrawn  There was obviously a lack of adult supervision in his barracks.

After he left MMA, J.R. was never the same boy as the one his mother sent there. He was using drugs and eventually had a diving accident wherein he was paralyzed from the neck down. He was into high-risk activities and drugs after he left MMA, due to the intense hazing and behavior. He dove off a cliff while stoned on marijuana and hit his head on a rock, leaving him a quadriplegic. He later died of pneumonia related to his condition.

103.   **John Doe 42-**⬛⬛⬛⬛⬛, father:   ⬛⬛⬛⬛⬛ John Doe 42  attended MMA the summer of 1997. He attended the MMA summer camp, and while he was there, he was the victim of abuse by other boys at the camp, including his cadet instructor. When the family called to check on him, they were misinformed as to the conditions their son was in. John Doe 42 wrote that he had been hit in the genitals, threatened, and was very afraid. He told his family the blows had been severe enough to cause bruising in the area. The family called MMA many  times before getting any response from MMA. When the family finally was able to talk to MMA, they did acknowledge the incident. They said they were aware of it and that there would be a hearing on the matter.  The Cadet Instructor was moved to another barracks and demoted.  Later, the family found out that MMA had no record of

the incident.   The family didn't get to talk to John Doe 42 at that time, but MMA claimed he was

perfectly fine and that everything was okay.  After he got home, he told his family about the abuse and

assaults, and they chose not to send him back for the regular school year, even though the family had

already paid for part of it.  Jeffrey has had difficulty sleeping after returning from MMA.  He has fits of

rage and has had a hard time adjusting to school since that horrific experience.

104.   **John Doe 43** - (Ryan Stout, father:  Earl Stout) Plaintiff Ryan Stout attended MMA

from August of 1995 to May of 1997.  He was placed at MMA because the family was assured, by

representatives of MMA, that he would be in a structured, highly supervised environment.  The family

was worried about the proximity to Mexico. When Plaintiff Ryan Stout's father specifically asked if

there was any chance Plaintiff Ryan Stout would be able to get to Mexico, he was told that it would be

impossible for any cadet to go to Mexico.  In November, 1995, Plaintiff Earl Stout was shocked when

he received a telephone call from a Mexican National, in Mexico.  The lady who called Plaintiff Ryan

Stout's father spoke little English, but enough to let him know that she had seen Plaintiff Ryan Stout  in

a Mexican jail, and that he had begged her to call his family.  Plaintiff Ryan Stout's father called the

school immediately, and was informed that no one at MMA knew where Plaintiff Ryan Stout was.

They didn't know he was gone. His father flew down to MMA, where he was met by Plaintiff Ryan

Stout's Drill Instructor Sgt. Roger Rook.  His fifteen year old son was in the Mexican jail for four days.

In 1997, Plaintiff Ryan Stout's roommate was beaten up by other cadets.  In September of 1997, Sgt.

Maj. Clark began shouting in Ryan's face.  He then began hitting his hard drill sergeant's hat against

Ryan's nose trying to provoke him.  Ryan's nose had been operated on twice and Sgt. Clark's assaults

with his hat to Ryan's nose was extremely painful and in violation of the rules in the Right Guide.  Ryan

finally pushed Clark back to get him out of his face and off his nose, which gave Clark the opportunity

he was seeking to manhandle the cadet.  He pushed Ryan backwards about ten feet.  Ryan was

severely punished for the episode. There were further representations made to the Stouts by MMA. At the end of Ryan's year, the football coach told them that Ryan was one of two boys chosen for a scholarship. Ryan was thrilled at the honor. However, MMA hired a new coach and the scholarship was not given to Ryan.

105.   **John Doe 44** - (Thomas Mason, parents: Thomas and Sharon Mason) Plaintiff Thomas Mason attended MMA as a mid term entrant in January, 1996 and stayed until February 21, 1996.. The family decided to send him to MMA primarily because he was very interested in the Marines, and the family was given the impression that MMA was affiliated with the U.S. Marines Corps. MMA was staffed by former Marines. The family was also told that MMA would provide a structured environment. While he was there, an incident occurred in which he was directed by an cadet supervisor to point his rifle at another classmate. The cadet supervisor, in an attempt to humiliate another student, had ordered the entire class to point their weapons at this student. Plaintiff Thomas Mason refused. He was punished for his refusal. There was no adult present. Plaintiff Thomas Mason's father had trained him in the use and handling of firearms, and he was well aware that aiming a weapon at a person was never permitted. On February 10, 1996, he was kicked in the shin by a cadet and then thrown to the ground by that cadet. Mason hit his head on his rifle as he fell. On February 12, 1996, the same kid kicked him again and then took a rifle and slammed it into Mason's shoulder. Along with this incident, there were other occasions when Plaintiff Thomas Mason witnessed violence at MMA. He was exposed to an abusive environment. MMA did not have enough adult supervision for the number of boys that were under each adult supervisor, or Drill Instructor. His father likens the situation to the *Lord of the Flies*, or like the inmates running the asylum, which was a very different situation than was described to the family. They were assured repeatedly during an orientation given by MMA that there would be no abuse or hazing at MMA. Thomas has trouble controlling his

anger and has trouble sleeping due to the nightmares he suffers.

106.  **John Doe 46** - (Layne Floria, father: Sherwood Floria) Plaintiff Layne Floria attended

Summer Camp at MMA in July of 1996 and he attended the academy from August of 1996 to May of

1997.  The family chose to send him to MMA because he was very active in the JROTC program at

his high school. He was a member of the High School's Varsity Rifle Drill Team. At MMA, he was

exposed to an environment in which there was a lack of adult supervision.  The family was not kept

informed of his academic status, his grades, or other pertinent information.  The family was invited to

participate in fund raising events for school materials such as alarms for the dorms and a new student

center.  The alarms should have been installed, regardless of donations made, and the student center

was built, amid much publicity, but the Plaintiff parents  later found out only because the former student

center had been condemned.

At summer camp in July of 1996, Layne was struck and knocked down by  Drill Instructor

Mst. Gny. Sgt. James Hager.  Before he went to MMA, he was very enthusiastic about everything

connected with the military, especially the Marines.  After his experiences at MMA, he is repulsed by

the idea of anything to do with the military. He has had a difficult time adjusting to regular life and school

after MMA.  Counselor Jimmy LaComb saw Layne for a period of time to work him through his

depression and  problems associated with MMA.

107.  **John Doe 47** - (███████████████, mother:  ███████████) John Doe 47

attended MMA from August to late September of 1998.  John Doe 47's mother sent him to MMA

because they were looking for a strong academic environment.  He is not a problem child, and he was

not sent there for any discipline problems.  Prior to signing the contract,  numerous misrepresentations

were made to John Doe 47's mother.  MMA  fraudulently concealed that they were currently being

sued by over forty former cadets and their families at the time she signed the contract.  Also after

signing the contract, she has found out more things which were fraudulently concealed from her, such as: John Doe 47's mother sent him to MMA because he has always wanted a career in the Marines and MMA led her to believe that it was affiliated with the United States Marine Corp. While considering MMA, John Doe 47's mother was sent a brochure. This brochure contained all of the MMA literature, the Marine's emblem is displayed in this brochure and the Iwo Jima statute is promoted. On page 9 of the brochure, is discussed the MMA Traditions, "that have made the Marines unique since 1775. They're also the functions that provide the model for the Corps of Cadets at the Marine Military Academy." John Doe 47's mother learned later that the Marines did not sponsor MMA. John Doe 47's mother was also looking for a strong academic environment for him. He was not a problem child, and he was not sent there for any discipline problems. However, physical punishment and intimidation was the norm at the school although the brochure, again on that same page, represents the following: "Important: It should be firmly emphasized that intimidation is not a method of instruction at the Marine Military Academy and never will be." While at MMA, John Doe 47 was in a military science classroom where Drill Instructor Roger Rook, took a gun, loaded it with live ammunition, put it on his desk and told the boys he would blow the head off the first boy who fell asleep in his class. He continued on, using larger guns for ninth graders, sophomores, etc. He used larger ammunition for each consecutive class, until he came to the end, and told them that he really would do it, because all that would happen to him would be that he'd be put back on his medication. The brochure further fraudulently represented that: "No hazing is permitted and the response to any violation is severe disciplinary action." John Doe 47 was threatened, harassed, verbally abused, and assaulted while at MMA. The violence at MMA was a reality and created real fear in John Doe 47 while at MMA. The brochure also misrepresented that: "No drugs, no alcohol, no tobacco *at any time*." John Doe 47's mother was also verbally told by MMA representatives that the school had a zero tolerance as to

drugs. John Doe 47 had not willingly been exposed to drugs before, in fact he had left social functions when there was any type of drug use. However, at MMA his headmate was a boy who was undergoing withdrawal from Cocaine.

The tuition refund policy sets parents up to lose a lot of their money: After notifying the school she would be withdrawing her son, John Doe 47s' mother got a phone call from Tee Recore in admissions, telling her that John Doe 47 did not want to leave MMA. She asked to speak personally with him, and John Doe 47 assured her that was not the case. He told her he did want to leave MMA. Contact between parents and children is prohibited for three weeks, after which time parents find out what is going on, and after three weeks, the refund amount allowed drops dramatically. In the case of John Doe 47's family, they paid $9,675 for tuition, and after three weeks was only eligible to receive a refund of $2,600 which meant they paid $7,075 for three weeks at MMA. John Doe 47's DI. Sgt. Krauss, told the kids that he was going to prohibit them from seeing their parents on that "plebe" graduation, when John Doe 47 objected he was punished.

When John Doe 47's mother came to see his plebe graduation, she noticed a striking difference in her son's demeanor. He was withdrawn, sad and depressed. She visited with another mother of a plebe on the airplane and heard her tell of a similar situation with her son. His mother decided to withdraw John Doe 47 before he suffered any more emotional trauma.

After leaving MMA John Doe 47 was depressed and suffered from emotional outbursts. He has tremendous feelings of guilt and felt like a failure. He also suffered from terrifying nightmares almost every day.

108. **John Doe 48** - (⬛⬛⬛⬛⬛⬛mother: ⬛⬛⬛⬛⬛) John Doe 48 attended MMA from August through part of September of 1998. He was sent to MMA because the family felt he could benefit from strong male role models of honor and integrity, as his mother is a single parent.

While at MMA, he was in a classroom where a teacher took several guns, loaded them, cocked them, and threatened the class with them. He told them that their parents would pay for the bullets. John Doe 48 watched with terror as Drill Instructor Roger Rook took a gun, loaded it with live ammunition, put it on his desk and told the boys he would blow the head off the first boy who fell asleep in his class. He continued on, using larger guns for ninth graders, sophomores, etc. He used larger ammunition for each consecutive class, until he came to the end, and told them that he really would do it, because all that would happen to him would be that he'd be put back on his medication. MMA represented to the family, in writing, that intimidation was not used on the boys. John Doe 48 was verbally abused, harassed, threatened, and assaulted. His mother visited the grounds after "plebe" graduation, and saw boys in the barracks running around unattended. John Doe 48 told her that many kids there used drugs. He said he had taken the screws out of his bathroom window so that if other cadets locked him in, he could get out. John Doe 48 ran away on August 25-26 of 1998, and then returned to MMA on his own. She notified MMA by phone, e-mail and fax. Afterwards, they claimed that they had expelled him, and therefore she was entitled to less of a refund.

His mother decided to withdraw him after she returned home from that visit. She withdrew him after talking to another mother on the plane home and they compare notes. She decided that this was not a wholesome or safe environment for her son. John Doe 48 has problems controlling his anger due to the experience he had at MMA.

109.   **John Doe 49** - (Daniel Wrider, mother: Florida Rose Wrider) Daniel attended MMA from the summer of 1992 through October of 1993. The family placed Daniel at MMA because it had been represented to his parents that MMA would provide excellent academics, discipline and supervision. While attending MMA, Daniel was subjected to at least two blanket parties, hazed by other cadets in leadership (ie. "Tapping in"), spit on, dehumanized, and locked in the locker-closet in

his room.  On one occasion he was locked in his closet, from the outside, for approximately four hours.

During that four hours, other cadets would come by the outside of the locker-closet and spray cans of

deodorant in the slats of the closet, making it very difficult for Daniel to breathe.  Daniel told his mother

that drugs and alcohol ran rampant at MMA, and because of all the representation MMA had made to

his parents as to the supervision, zero tolerance, desperate attempts for the new students to make up

stories to be sent home, etc., his parents did not believe him.  Daniel later became involved in the drugs

and alcohol on campus.  Prior to MMA Daniel had never taken drugs, drank alcohol or had problems

with the law.  Since MMA, Daniel has been depressed and has struggled to be a productive member of

society.  MMA neglected to supervise Daniel as well as many other cadets on campus, and as a result

of the lack of supervision, Daniel along with other cadets ventured into Mexico.  MMA failed to advise

his parents of his leaving campus without permission and going to Mexico, until after he was returned to

MMA, by MMA personnel, after picking him up from the local Police Department.  One of the cadets

that went to Mexico with Daniel was never returned to the MMA Campus and has never been seen or

heard from again by Daniel.  Daniel was expelled from MMA after the last Mexico trip and his parents

were never offered a refund of any of the prepaid tuition.  Daniel witnessed assaults and hazing of other

cadets, including an incident where an minor cadet was attacked by cadets in leadership with a cattle

prod.

In November of 1994, they started Daniel in counseling with psychologist, Dr. Pat Carter.  But

Daniel was not willing to admit he had a drug problem.  In February of 1995 the Wriders placed him in

Fairway House, a group facility in Conroe.  He did have some individual and group therapy but he was

not ready to give up his addiction.  Daniel never finished high school.  He has no motivation for success.

He has low self-esteem and chronic depression.  The family could not afford better counseling or detox

residential facilities.  Since MMA, Daniel has been very depressed and struggles to be a productive

member of society.  His drug use and alcohol abuse has caused him to sever his ties with his family and live on the streets.  He is now trying to hold down a job but still remains an emaciated, hollow-eyed young man, with the feeling that he has no future.

110.  **John Doe 50-** (▮▮▮▮▮▮▮, father: ▮▮▮▮▮▮▮) John Doe 50 attended MMA as a 9th grader from August 14, 1996 through October 17, 1996. (a total of nine weeks).  Prior to attending MMA, John Doe 50's parents were searching for a supervised and disciplined academic environment for their son.  John Doe 50 had a friend that was about to attend MMA and he expressed interest in the school.  After reviewing information provided by MMA and speaking with the admissions office, John Doe 50's parents had the following representations made to them: "we help boys like ▮▮▮▮▮"; No alcohol or drugs are tolerated;  supervised environment, etc.  John Doe 50 was accepted and his parents paid the entire tuition up front.  Within the first month of attending MMA, John Doe 50 went off campus all weekend unsupervised with another cadet.  His parents were never informed. Upon returning late to campus, the entire company was punished and made to sleep on the floor of the laundry room that night.  During that punishment, all the cadets except John Doe 50 smoked marijuana. The following morning John Doe 50 reported the drug use to his Drill Instructor, Sgt. Mjr. Rick Hughes.  Death threats and retaliation began almost immediately.  John Doe 50 was subjected to physically attacks, including blanket parties, where he was beaten until he was unconscious.  On October 9, 1996, two cadets, Martinez and DeLaGarza, ganged up on John Doe 50 and Cadet Martinez put him in a headlock until he passed out, then one of the cadets starting kicking him. After John Doe 50 reported this to the D.I., Martinez started threatening to kill Scott.

In another incident, John Doe 50 was attacked by Cadet Almarez who came into his room without permission and threw him across the hall.  John Doe 50 became increasingly depressed and as a result, was seen by an MMA psychologist and was placed on antidepressants, all without the

knowledge and permission of his parents.  On October 17, 1996, John Doe 50 was so depressed and in fear for his life that he ran away from MMA campus and returned home.  The parents were not informed and did not realize he had left the school until he made his way home.

Since leaving MMA John Doe 50 has had bouts of major depression.  He felt hopeless and abandoned.  He had suicidal ideation for a long time.  He has nightmares and wakes up in a cold seat. He has lost all respect for authority.

111.  **John Doe 51** (███████ **Mother and Father** ███████████).  John Doe 51 attended the summer program of 1998 and attended the fall semester in August, 1998 until December, 1998.  John Doe 51's father checked out MMA and was told by Col. Hill and Col. Myers what a great place it was for their son.  The family was given the impression that MMA was affiliated with the U.S. Marine Corps.  MMA was staffed by former Marines.  The family placed John Doe 51 at MMA because it was represented to his parents that MMA would provide excellent academics, discipline and supervision.  John Doe 51's parents took out a second mortgage on their house in order to give their son a "wonderful" and productive" junior year.  It turned out to be a nightmare.

John Doe 51's mother talked to Msgt. McLaughlin for a long time asking him questions as to the policies of the school. He said that it was a "perfect school for a kid who needed structure," that the boys were fully supervised, that the upperclass cadets were the "cream of the crop," that there was supervised study time, and that MMA had a "zero tolerance" as to drugs and alcohol. He further promised that MMA "never accepted a kid with a criminal background." He told her not to read the letters or communicate with her son for over a month. When MMA knew the 20/20 story about the school was going to run, they assured parents that it painted an untrue picture. Plaintiff parents received e-mails from other parents saying that these were all bad boys that brought the lawsuit, that most the

incidents depicted did not happen and that the ones that did (Cortez) were isolated incidents. The family did not know what to believe, but were urged to trust MMA.

On September 20, 1998, in Alpha Barracks John Doe 51 and other cadets were knocked out by choke holds, called the "passing out game." (This same practice was reported in the Alpha barracks in Plaintiff Ryan Foley's records of the Fall of 1994).    John Doe 51's mother called the new commandant and started crying because of her concern. He assured her that he would take care of it. An investigation was made of the allegations and the perpetrators were expelled from MMA according to Hager. So the parents felt relieved and were convinced to allow their son to stay. Every time John Doe 51's mother called MSgt. Hager with her fears, Hager would call her son in and belittle him, telling him things like: "If your mom loved you, you wouldn't be here." She found out later from her son that this company was very rough and had numerous former gang members in it. Shortly after that, in December of 1998, their son was a victim of a "blanket" party. A vertebrae in his back was fractured as a result of this blanket party when a cadet jumped on him. This injury continues to give him problems today. This assault happened after MMA was exposed by ABC's 20/20 program as to the hazing and violence at the school and one year after the lawsuit was filed. What will it take to make this tradition of violence and hazing stop???

The parents of John Doe 51 feel very betrayed by this school and have had their relationship with their son damaged as a result of it. John Doe 51's relationship with his parents has been very damaged. He suffers from depression, anger control and has frequent nightmares. John Doe 51 struggles with alcohol and drug dependency. He has been diagnosed with Post Traumatic Stress Disorder. He has a fear of anyone in uniform. When he is around service men in the airport or anywhere, he breaks into a sweat and tries to leave the area as soon as possible.

112.    **John Doe 52** - (Joseph G. Arbini, father: Jerrold E. Arbini) John Doe 52 attended

MMA during the school year of 1996.   The family  placed John Doe 52 at MMA because the staff

had represented to the Arbinis that MMA would provide excellent academics, discipline and

supervision.  These representations were false and their son was injured as a result of the lack of

supervision.  Further, these misrepresentations were made knowingly to Plaintiff Jerrold Arbini by

Defendant MMA and its agents. On  approximately April 20, 1996, while 16 year old Plaintiff Joseph

Arbini was on unsupervised leave in Harlingen, Plaintiff Arbini was picked up by two adult males.  He

was enticed to their apartment with the promise of beer, girls and a party.    While he was there, the

two adults raped him and forced him to perform sex acts against his will.  After he escaped and

returned to MMA by taxi, he reported the crime to his drill instructor, Sgt. Jim Hager and Col. Hobbs.

He was told by Col. Hobbs and Sgt. Hager not to report the crime.  However, after talking with cadet

Adam Rekerdres, Plaintiff Arbini did make the report to the Harlingen Police Department.  He was

stigmatized by the personnel of MMA by having to ride, in a clandestine manner, in the back of the van

which delivered him to the psychological counseling in Harlingen recommended by MMA.  He was

made to feel like the attack had been his fault.  While attending MMA, John Doe 52 was subjected to

hazing and was assaulted on numerous occasions.  On one occasion, on approximately May 17, 1996,

Plaintiff Joseph Arbini was assaulted by Cadet Sgt. Charles George, Cadet Urano and other cadets.

Each of them hit Arbini in the stomach and chest, numerous times.  Cadet Sgt. George forced Plaintiffs

Joseph G. Arbini and Peter Villano to eat an entire packet cigarettes, including package itself, to make

them vomit.  When this failed, Cadet George compelled Arbini and Villano to spin around and around

in another attempt to induce vomiting.  When Plaintiff ███████ threw up after being spun around

repeatedly, he was forced to roll up his vomit into a ball and eat it.  This procedure was also applied to

Arbini in order to induce the same reaction. When Arbini could not throw up, he was sprayed with a

water hose by George.   After ███████ was released, George and the other cadets continued to assault

Arbini for two more hours. George then threw Arbini into a brick wall several times and stated he would kill him if he told anyone what he had suffered. Arbini, in fear of his life, fled MMA and never returned. For about two days Arbini hid in a field until he turned himself into the Combes Police Department. He has suffered serious mental anguish in the past which continues to this day because of the horrible things that happened to him while he was a student and under the control of MMA. He has been diagnosed with Post Traumatic Stress Disorder caused by his experiences at MMA. Plaintiff Jerrold Arbini has suffered severe mental anguish over these events as well. He felt betrayed and felt anguished that his son had suffered such humiliating mental and physical pain.

The acts by the defendants have and will continue to cause severe psychological pain and suffering and substantially impaired relationship between the father and son, which could be irreparable.

113. **John Doe 53** - (Shannon T. Lambert, father: Troy Lambert) John Doe 53 entered MMA at the mid-term in January of 1997. In November of 1996, the family attended a recruiting meeting in Houston. In December of 1996 they made a visit to Harlingen for a tour of the campus. Shannon had always been a polite, respectful boy who had received the honor of being in "Who's Who Among American High School Students." He was involved in church and "Young Life." The family placed Shannon at MMA because the staff had represented to them that MMA would provide excellent academics and supervision. These representations were false and their son was terrorized as a result of the lack of supervision. Further, these misrepresentations of the goods and services provided by MMA were made knowingly to Plaintiff Troy Lambert by Defendant MMA and its agents.

In February of 1996, Shannon began begging his parents to let him come home. He said the school was one of the biggest drug-dealing campuses he had ever heard about and the academic achievements were a farce due to the non-challenging courses. He told them about his drill instructor, Sgt. Jim Hager, who had been in Vietnam and had flashbacks, during which he would walk down the

halls of the barracks with a baseball bat hitting things. He once smashed a boys radio for playing it too loudly. Shannon once left the campus and went to the Harlingen Airport trying to get the nerve to fly home, but he knew how disappointed his parents would be if he quit. Shannon became physically ill and could not eat. Once when he was visiting with his family one weekend, he started shaking before he was to return to MMA. The parents had been warned in a letter from MMA that the boys would tell tales to get out of MMA and that the parents were not to put any credibility in any complaints they heard from their sons. On February 26, 1997, the Lamberts received a call from Shannon asking if he could come home. He said he was either challenged or challenged other cadets to settle differences in supervised fighting matches several times a week. The anger and frustration Shannon had at MMA made him want to hurt someone. Shannon refused to return from his home visit ending March 3rd, he said he would live alone rather than go back to MMA. Mrs. Lambert wrote to MMA requesting a parent release, so they would be able to get a transcript. Shannon still has not recovered from this experience and did not complete high school. The parents realized that sending Shannon to MMA was the worst decision they could have ever made for him. He still has sleeping problems due to this experience. Broken dreams and a broken spirit are what Shannon lives with today.

114. **John Doe 54** - (Joshua Vance, mother: Robin McMahon). Joshua Vance, was a student at Marine Military Academy during the Summer Camp of 1995 and from August, 1995 through May, 1997. During that time, he was hazed, assaulted, intimidated and mentally abused by the staff and cadets. His wrist was broken, his nose was broken and he was afraid to sleep at night. He suffers from Post Traumatic Stress Disorder now and has terrible insomnia and sleeping problems. He was exposed to drugs and alcohol while at MMA and began using drugs and alcohol while there. He currently has problems with drug and alcohol abuse . He has problems with anger control and has violent episodes since he attended MMA. MMA and its staff represented to Josh's mother, Robin

McMahon  through its recruiting personnel and written promotional materials  that her  son would be

supervised and taught to become a strong and responsible young man.  Robin McMahon did not

believe her son when he told us of the atrocities that occurred and the school because they  trusted

what the drill instructors and MMA personnel told them.   The school fraudulently concealed the truth

from Mrs. McMahon.

## 4.
## CAUSES OF ACTION AGAINST DEFENDANT MMA

115.  Plaintiffs' damages were proximately caused by the acts or omissions of Defendant

MMA.  These acts of omission include the following:

1.      Negligence;

2 .     Negligent misrepresentation;

3.      Deceptive trade practices;

4.      Negligent endangerment to minors;

5.      Negligent supervision resulting in hazing;

6.      Negligent supervision of Plaintiffs' and staff;

7.      Negligent selection, hired or continued employment of Drill instructors;

8.      Breach of fiduciary duty;

9.      Fraudulent concealment;

10.     Negligent providing access to alcoholic beverages to minors in violation of Section
        106.06 of the Texas Alcoholic Beverage Code;

11.     Negligence in providing access to controlled substances to minors in violation of
        Section 481.122 of the Texas Health and Safety Code;

12.     Negligent misrepresentation involving risk of physical harm pursuant to the
        Restatement (Second) of Torts , Section 311;

13.     Fraud; and

14      Failure to report to Child Protective Services.

## 5.
## COUNT ONE - NEGLIGENCE

116.    The conduct of the Defendant MMA, as described herein, constitutes negligence

and/or negligence per se:

1.      Failing to employ enough employees to provide adequate adult supervision
        of cadets;

2.      Failing to employ adequate security measures for the safety of the cadets;

3.      Failure to promulgate policies which encourages and requires the prevention
        of physical abuse including hazing, sexual assault and physical assault;

4.      Failing to report sexual abuse and/or assault;

5.      Failing to employ qualified and sufficient personnel including counselors
               to supervise Marine Military Academy cadets;

6.      Negligent retention of personnel;

7.      Negligently permitting upperclassmen and/or officers (students) to supervise, operate,
        and run Marine Military Academy and its' cadets on a day to day basis;

8.      Failing to employ procedures to investigate promptly, fairly, and adequately
        complaints by students; and

9.      Permitting cadets with prior instances of infractions of sexual and physical
        assault to remain at Marine Military Academy and/or supervise other cadets.

10.     Failing to adequately provide medical care to Plaintiffs, to advise Plaintiff parents
        of medical conditions of their Plaintiff sons and to obtain proper authorization for
        medical treatments of them.

11.     Failing to inspect, discover, and correct the unsafe conditions at MMA;

12.     Failing to warn Plaintiffs of the unsafe conditions at MMA

13.     Failing to heed the recommendations of the Self-Study and the SACS committee in 1994.

Each of the foregoing acts and/or omissions constituted negligence and each proximately caused the injuries and damages sustained by Plaintiffs.

**6.**

## COUNT TWO - NEGLIGENT MISREPRESENTATION

117. Paragraphs 1 through 116 are re-alleged and incorporated herein for all purposes. Plaintiffs would show that Defendant MMA, in the course of its business and through its agents, or in the course of business in which it had a pecuniary interest, and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and Col. T.A.HOBBS, supplied false and misleading information to Plaintiffs by which Plaintiffs were guided in the business of entering into a contract with MMA. In supplying such false and misleading information to Plaintiffs, Defendants failed to exercise reasonable care in communicating the information, Plaintiffs suffered pecuniary losses, physical and emotional injuries as a result of MMAs' negligent misrepresentation for which Plaintiffs have sued. The facts summarized above enumerate the breaches of duty by Defendants.

**7.**

## COUNT THREE - DECEPTIVE TRADE PRACTICE CLAIM

118.     Paragraphs 1 through 117 are re-alleged and incorporated herein for all purposes. Plaintiff - Parents were purchasing good and services from Defendant MMA. Plaintiffs would show that Defendant MMA and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and Col. T.A.HOBBS, personally, and others acting at their direction or control violated Tex. Bus. & Com. Code Ann. § 17.46, et seq., known as the Texas Deceptive Trade Practices Act, in the following respects:

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the followings:. . .

. .

13.     Failing to heed the recommendations of the Self-Study and the SACS committee in 1994.

Each of the foregoing acts and/or omissions constituted negligence and each proximately caused the injuries and damages sustained by Plaintiffs.

**6.**

## COUNT TWO - NEGLIGENT MISREPRESENTATION

117. Paragraphs 1 through 116 are re-alleged and incorporated herein for all purposes. Plaintiffs would show that Defendant MMA, in the course of its business and through its agents, or in the course of business in which it had a pecuniary interest, and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and Col. T.A.HOBBS, supplied false and misleading information to Plaintiffs by which Plaintiffs were guided in the business of entering into a contract with MMA. In supplying such false and misleading information to Plaintiffs, Defendants failed to exercise reasonable care in communicating the information, Plaintiffs suffered pecuniary losses, physical and emotional injuries as a result of MMAs' negligent misrepresentation for which Plaintiffs have sued. The facts summarized above enumerate the breaches of duty by Defendants.

**7.**

## COUNT THREE - DECEPTIVE TRADE PRACTICE CLAIM

118.    Paragraphs 1 through 117 are re-alleged and incorporated herein for all purposes. Plaintiff - Parents were purchasing good and services from Defendant MMA. Plaintiffs would show that Defendant MMA and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and Col. T.A.HOBBS, personally, and others acting at their direction or control violated Tex. Bus. & Com. Code Ann. § 17.46, et seq., known as the Texas Deceptive Trade Practices Act, in the following respects:

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following:. . .

## COUNT FOUR -NEGLIGENT SUPERVISION OF PLAINTIFFS AND STAFF

120.    Paragraphs 1-119 are re-alleged and incorporated herein for all purposes. Plaintiff would state that Defendant, MMA failed to supervise the cadets under their charge, allowing the physical and sexual abuse and hazing of Plaintiffs, as specifically referenced above. Defendant, MMA also failed to supervise its employee Drill Instructors who either participated in or allowed the physical or sexual assault of Plaintiffs.

121.    Plaintiffs would show that the acts or omissions of Defendant MMA or its employees constituted Hazing offenses as defined by the Texas Educational Code, Section 37.151 et. seq. These hazing offenses, including failure to report hazing and failure to promulgate adequate or appropriate hazing policies, constitute negligence per se under Texas law. General Glasgow was informed personally of these dangers in December, 1995, with a letter from a parent telling him of the assaults that took place at night in the barracks of MMA. General Glasgow disregarded the information and the safety of the children in his charge.

122.    Plaintiffs would show that Defendants violated the Texas Endangerment of Minors Statute by placing children under 15 years old in danger and exposing these minors to an unreasonable risk of harm. Defendants had a duty of "care, custody, or control" of minor boys, and put those boys "in circumstances in which no reasonable, similarly situated adult would leave a child of that age and ability". In other words, leaving a small 12, 13 or 14-year-old boys unsupervised to be sexually and physically preyed upon at night in a dormitory by larger, older boys, with no protection, is to leave those boys "under circumstances which no reasonable, similarly situated adult would leave a child of that age and ability." Physical and emotional harm were caused to the Plaintiffs as a result. General Glasgow was informed personally of these dangers in December, 1995, with a letter from a parent telling him of the assaults that took place at night in the barracks of MMA. Defendant, General Glasgow disregarded the information and

the safety of the children in his charge. Such violation of the Child Endangerment Statute constitutes negligence per se for which MMA and Defendant Glasgow are liable.

123.  All Defendants, including the Trustees on the Board, were negligent in failing to follow the recommendations of the Self-Study performed by Defendant MMA, including its officers and trustees, which specifically recommended that MMA "provide additional Drill Instructor assistance to enhance overall supervision of Cadets throughout each day." MMA, its staffs, officers, and Trustees also disregarded the recommendations of the SACS committee after their visit in April of 1994, which specifically recommended assistant Drill Instructors, so the D.I.s could have some form of "Off Time." The committee stated the assistant drill instructors "can also assist in providing a quiet environment for rest between the hours of 2200-0600." Therefore, Defendant MMA and the Board of Trustees, are liable for the acts or omissions of its Drill Instructors and other staff because of their negligence in not providing more supervision and under the doctrine of Respondeat Superior.

## 9.
## COUNT FIVE- NEGLIGENT SELECTION OR RETENTION

124.  Paragraphs 1 through 123 are re-alleged and incorporated herein for all purposes. Defendant, MMA was negligent in its selection or retention of its employee Drill Instructors who either participated in or allowed the physical or sexual assault of Plaintiffs. MMA continued to employ individuals whom it knew or should have known were dangerous to young boys. MMA is liable for the acts of its employees or agents under the Doctrine of Respondeat Superior.

## 10.
## COUNT SIX - BREACH OF FIDUCIARY DUTY

125.  Paragraphs 1 through 124 are re-alleged and incorporated herein for all purposes Defendant MMA, Glasgow, Hobbs and Andreson, owed the Plaintiffs and their parents the highest duty of trust and confidence and were required to act in the Plaintiffs best interests. The Plaintiffs-parents

entrusted their most precious sons to the Defendants' care for an excellent education, room and board,

food, security from emotional and physical harm and guidance. The Plaintiffs-Parents were led to believe

that the relationship between MMA and their sons and themselves was a special or confidential relationship

akin to a surrogate parent in which MMA had a duty and responsibility to deal with the Plaintiffs-Sons

or to act on the Plaintiffs-Sons behalf with the highest degree of trust, confidence honesty, utmost good faith

and loyalty. The Plaintiff-Parents necessarily trusted and relied on the belief that MMA would not allow

or direct the emotional and physical injuries be inflicted upon the children pledged to its care. MMA

breached this confidential and special relationship by violating the Plaintiffs' trust in directing others under

MMA's control to act or by failing to act to prevent the sexual abuse, physical abuse, emotional abuse

or hazing of Plaintiffs-Sons. These acts or omissions proximately caused damages to Plaintiffs.

## 11.
## COUNT SEVEN -FRAUD AND FRAUD IN THE INDUCEMENT

126.     Paragraphs 1 through 125 are re-alleged and incorporated herein for all purposes

Plaintiffs would show that Defendant MMA fraudulently induced the Plaintiff parents into entering into

contract agreements without revealing pertinent and material facts. MMA acting in concert with the others

known and unknown to Plaintiffs, systematically engaged in an active pattern of fraud and deceit upon

which the Plaintiffs and their families relied to their detriment, in entering into their contract with MMA. This

fraud was perpetrated upon Plaintiffs by the Defendants MMA, recruiters for MMA, Defendants

Andreson, Hobbs and Glasgows' misrepresentation, concealment or failure to disclose the  toxic

environment which existed at the school of which these Defendant's had special knowledge which Plaintiffs

did not. Plaintiffs would show that Defendant MMA fraudulently induced them to send their sons to MMA

while they fraudulently concealed the extent and nature incidents of physical abuse sexual abuse and hazing

perpetrated on cadets and the failure to report such acts as required by law to Child Protective Services

and other official agencies of the State.     In particular, this fraud included the cover-up and

misrepresentations of incidents of physical, emotional and sexual abuse of cadets and failure to report such acts as required by law to Child Protective Services and other official agencies of the State. These misrepresentations and fraudulent conduct of promoting MMA as a healthy environment for a child was done with the knowledge of its falsity by Defendants or made recklessly without any knowledge of the truth and as a positive assertion. These misrepresentations as to the character and caliber of this school were made with the intention that Plaintiffs-parents act on these misrepresentations enrolling and keeping their sons at MMA. This fraudulent conduct, misrepresentations and failure to disclose injured Plaintiffs and their sons. Defendants surreptitiously sent a number of cadets to a psychiatrist named Dr. Anthony Ramashwar and other physicians contracting services to MMA, to be treated for the traumas caused by the physical and sexual assaults, often without the knowledge or authorization of the Plaintiff-Parents.

## 12.
## COUNT EIGHT - NEGLIGENT PROVIDING MINORS ACCESS TO ALCOHOL

127.    Paragraphs 1 through 126 are re-alleged and incorporated herein for all purposes

Defendant MMA by providing access to alcoholic beverages to the Plaintiffs when they were minors in violation of Section 106.06 of the Texas Alcoholic Beverage Code. Such violation of this statute constitutes negligence per se.

## 13.
## COUNT NINE - NEGLIGENT PROVIDING
## ACCESS TO CONTROLLED SUBSTANCES

128.    Paragraphs 1 through 127 are re-alleged and incorporated herein for all purposes

Defendant MMA by providing controlled substances and access to controlled substances to the Plaintiffs when they were minors in violation of Section 481.122 of the Texas Health and Safety Code. Such violation of this statute constitutes negligence per se. Defendants surreptitiously sent cadets, to a psychiatrist named Dr. Anthony Ramashwar, contracting services with MMA, to be treated for their

traumas caused by the physical and sexual assaults. That physician prescribed psychotrophic drugs to several of the cadets without the knowledge or consent of their parents.

**14.**
## COUNT TEN - FAILURE TO REPORT TO CHILD PROTECTIVE SERVICES

129.   Paragraphs 1 - 128 are re-alleged and incorporated herein for all purposes. Defendant MMA either failed to timely report or failed to report child sexual abuse to the authorities as required by law pursuant to the Texas Reporting Statute, Article 695c (2) §2 et seq., Vernon's Ann. Civ. St. Such violation of Texas law constitutes negligence per se for which Defendant  MMA is liable.

130.   Defendants breached their duty to protect the privacy of the minor children in their charge, who are Plaintiffs and in doing this they violated the Family Educational Rights and Privacy Act (FERPA). Such violation of FERPA constitutes negligence per se for which Defendant  MMA is liable.

**15.**
## COUNT ELEVEN -
## SPOLIATION OF DOCUMENTS & EVIDENCE

131.  Paragraphs 1 - 130  are re-alleged and incorporated herein for all purposes. Defendant MMA had a fiduciary duty to maintain accurate and truthful records of the cadets in their charge and the activities surrounding the operation of MMA. Defendant under a court order to disclose and produce all of the records of the Plaintiffs' in this cause, who were formerly cadets at MMA. Defendant has intentionally and/or negligently destroyed or illegally withheld documents which were ordered by the court for them to produce. Plaintiffs request the court issue proper sanctions, including presuming all things are against MMA (omnia praesumuntur contra spoliatorem — all things are presumed against a despoiler.)

**16.**
## DAMAGES FOR JOHN DOES

132.   **Common Damages for John Does:**

A.        As a result of the conduct and incidents described herein, and as to each boy in

paragraphs 65-114, Plaintiffs have incurred medical and counseling expenses in the past which were reasonable and necessary and, in all reasonable probability, such expenses will continue in the future.

B.      Plaintiffs have experienced severe psychological pain and suffering in the past and, in all reasonable probability, will sustain severe psychological pain and suffering in the future as a result of his psychological injuries.

C.      Plaintiffs have suffered mental anguish in the past and, in all reasonable probability, will sustain mental anguish in the future.

D.      Plaintiffs have suffered many other damages including loss of self esteem, loss of trust and in all reasonable probability their social and professional adjustment in the future will be adversely impacted.  Further, Plaintiffs' relationship with their parents have been damaged and/or destroyed.

E.      Plaintiffs have suffered a diminished wage earning capacity in the past and, in all reasonable probability, will suffer loss of earning capacity in the future.

F.      As a result of the above, Plaintiffs seek damages in excess of the jurisdictional limits of the Court and seek a judgment against the Defendants, jointly and severably.

G.      Plaintiffs also seek punitive and exemplary damages in order to punish and deter the outrageous conduct of the Defendant.  Facts as alleged above, will be proven by Plaintiffs, by clear and convincing evidence, that Defendants acted maliciously in that, either by an act or omission, they exposed Plaintiff-Sons to an extreme degree of risk, considering the probability and magnitude of the potential harm to them.  Defendants further had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of the Plaintiff-Sons while they were cadets at Defendant MMA.  These damages, in part,  were additionally based on conduct described as a felony, specifically Texas Penal Code §22.011 (sexual assault) and §22.04 (injury to a child) and were committed knowingly and/or intentionally.

H.      Reasonable attorneys' fees as allowed by law, specifically: Tex. Bus. & Com. Code Ann. § 17.50 (d)(DTPA) and Tex. Civ. Prac. & Rem. Code § 38.001.

I.      Plaintiffs  herein claim interest in accordance with Texas Finance Code §304.001 *et seq.* and pre-judgment and post-judgment interest in accordance with Article 5069-1.05 of V.A.T.S. and any other applicable law.

J.      Plaintiffs request a jury of their peers hear this case and , that Plaintiffs have judgment against Defendants, jointly and severally, for all damages pled as described herein, for cost of suit, attorneys fees, interest as allowable by law and for such other relief to which Plaintiffs may be justly entitled.

## 17.
## COMMON DAMAGES FOR PARENTS OF JOHN DOES

133.    **Damages for the parent(s) of John Does:**

A.      The Plaintiff-Parents of the John Does,  as a result of the incidents described herein, and specifically as to each parent as described in paragraphs 65-114, have incurred medical and counseling expenses in the past which were reasonable and necessary and in all reasonable probability such expenses will continue in the future.

B.      The Plaintiff-Parents of John Does have incurred attorneys' fees and request reasonable attorneys' fees as allowed by law, specifically: Tex. Bus. & Com. Code Ann. § 17.50 (d)(DTPA) and Tex. Civ. Prac. & Rem. Code § 38.001 to be awarded in this cause.

C.      The Plaintiff-Parents of John Does have incurred out of pocket expenses and tuition costs based on Defendant's  misrepresentations  for which they  seek reimbursement.

D.   The Plaintiff-Parents have suffered mental anguish as a result of the misrepresentations made by Defendant MMA and from the betrayal. They have felt anguished that their son had suffered such

humiliating mental and physical pain. They have felt further mental anguish from the estrangement that Defendant MMA has caused between the Plaintiff-Parents and their sons. More specifically, many parents have lost the love, advice, comfort, companionship and society of their children, the John Doe plaintiffs.

   E. These act were done knowingly and the amount found by the jury should be trebled accordingly pursuant to the Tex. Bus. & Com. Code Ann. § 17.50 (b)(1)(DTPA).

**18.**
## STATEMENTS TO THE COURT

  134. Plaintiffs plead delayed discovery of their claims against Defendants despite the exercise of reasonable diligence on their part, thus tolling the statute of limitations.

  135. Plaintiffs plead delayed discovery of the harm caused by physical abuse by Defendants or due to their negligence and the delay in treatment despite the exercise of reasonable diligence on their part, thus tolling the statute of limitations.

  136. Plaintiffs plead fraud and fraudulent concealment of this fraud on the part of Defendants, thus suspending the running of limitations as to all claims.

  137. Plaintiffs plead fraudulent concealment of facts under Defendants' control giving rise to a cause of action against all Defendants, thus suspending the running of limitations as to all claims.

  138. Plaintiffs plead breach of fiduciary duty, including the duty to disclose, against all Defendants, thus suspending the running of limitations as to all claims.

  139. Plaintiffs plead a concert of action, a conspiracy to conceal negligence, to commit fraud and to fraudulently conceal the acts and the existence of the fraud and conspiracy, thus suspending the running of limitations as to all claims against Defendants.

140.  Plaintiffs allege that the actions of the Defendants have caused them to suffer an unsound mind, thus suspending the running of limitations, pursuant to Section 16.001 of the Texas Civil Practice and Remedies Code.

141.  Plaintiffs allege that the actions of all Defendants, because of their conduct, statements and promises, preclude them from claiming a bar of limitations to any of Plaintiffs' claims.  Plaintiffs thus plead the doctrine of Equitable Estoppel.

## 19.
## PRAYER

142.  FOR THE REASONS STATED ABOVE , Plaintiffs pray that they be awarded all damages plead , including actual compensatory and punitive damages.  Plaintiffs seek a judgment against all Defendants, jointly and severably.  Plaintiffs also seek attorneys' fees, interest as allowed by law and such other relief by law or in equity as the court deems appropriate.

## 20.
## JURY DEMAND

143.  The Plaintiffs request a trial of this case by jury of their peers and have paid the jury fee pursuant to Rule 216 of the Texas Rules of Civil Procedure.

RESPECTFULLY SUBMITTED:

MARY ALICE McLARTY
State Bar No.13740450
LAW OFFICE OF MARY ALICE McLARTY
North Dallas Bank Tower, Suite 803
12900 Preston Road, LB 39
Dallas, Texas 75230
(972) 774-9883 telephone
(972) 778-9889 telecopier

ATTORNEY FOR PLAINTIFFS

Frank Costilla

State Bar Card No. 04856500

Law Offices of Frank Costilla

5 E. Elizabeth St.

P. O. Box 4417

Brownsville, TX 78523-4417

(956) 541-4982

(956) 544-3152 fax

CO-COUNSEL FOR ARBON PLAINTIFFS

## CERTIFICATE OF SERVICE

I, MARY ALICE McLARTY, do hereby certify that on the _3/r_ day of May, 2001, pursuant to the Texas Rules of Procedure, a true and correct copy of the above instrument has been sent to all counsel of record by certified mail.

MARY ALICE McLARTY

*Exhibit B*

## NO. 99- 11- 4891-E

| | | |
|---|---|---|
| THE PARENTS INDIVIDUALLY AND AS PARENTS OF JOHN DOES 30, 37-A, 39 AND 45 AND JOHN DOES 30, 37-A, 39 AND 45, INDIVIDUALLY, Plaintiffs | § § § § § § | IN THE DISTRICT COURT OF |
| Versus. | § § | CAMERON COUNTY, TEXAS |
| THE MARINE MILITARY ACADEMY, INC. d/b/a THE MARINE MILITARY ACADEMY, JAMES BUTLER, III and his parents, JAMES BUTLER, JR. (JIM) AND PAT BUTLER and MAJ. GENERAL HAROLD G. GLASGOW, Lt. Col. G. D. ANDRESEN and Col. T.A. HOBBS, Individually and as Officers of MARINE MILITARY ACADEMY, Defendant | § § § § § § § § § § | 357TH  JUDICIAL DISTRICT |

---

## PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR JURY TRIAL

---

TO THE HONORABLE VALDEZ:

Plaintiffs, who were originally parties in Cause No. 97-117227-E and whose claims were severed by order of the court file their Original Petition and Request for Jury Trial in the above-referenced severed cause and respectfully state as follows:

### I.

### JURISDICTION AND INTRODUCTION

1.     The Marine Military Academy ("MMA") in Harlingen, Cameron County, Texas, is a private, legally <u>unregulated</u> boarding school which, for approximately $16,500 per year per cadet, undertakes the care and custody of boys ages 12 through 22. All pertinent allegations contained in this petition occurred in Cameron County, Texas. Jurisdiction is proper in Cameron County pursuant to §15.002(1) of the Texas Civil Practice & Remedies Code. MMA has ignored and concealed the physical, sexual and emotional abuse that has plagued the school. MMA fraudulently induced the Plaintiff-Parents to trust them, through false advertising and representations designed to make parents think that MMA is a top-notch school and that it is part of the United States Marine

Corps. Based on these material misrepresentations, MMA persuaded Plaintiff-Parents to pay a total of approximately $20,000 per year, including travel, etc. for the privilege of sending their Plaintiff-Sons to an inadequately supervised and underlined unregulated school.

2.    It appears that the only thing regulated by law at the school is the food under the authority of the local health department. The teachers are not certified by the Texas Education Association (TEA), or any other governmental body. There appears to be no background checks, training requirements, or proficiency standards for the teachers and other staff members.

3.    To save money, the school placed older boys, some with known behavior problems, in charge of younger adolescent boys, in dormitories poorly supervised by adults. When the lights were turned off, serious foreseeable harm resulted. That harm included the traditional MMA "blanket parties" where older and stronger boys came into a young cadet's room, forcibly held him down under his blanket and proceeded to pummel him with socks or pillowcases containing padlocks and bars of soap.

4.    Although Defendants, MMA, Lt. Col. G. D. Andresen and Maj. General Harold G. Glasgow specifically had numerous warnings and knowledge of security problems, night time dangers to cadets, and other forms of liability from parents and professionals, the brutality and hazing continued. The daily emotional and physical pain suffered by the Plaintiff-Sons, to say nothing of the sexual occurrences, created such a pervasive fear that boys slept with makeshift weapons and clubs in their bunks to try to protect themselves through the night. This hellish existence has been described in various forms by former cadets, Plaintiffs among others, as a "prison without guards" and a place like the movie, "Lord of the Flies."

5.    This was all done in the name of "discipline" and often at the implied or specific direction from drill instructors, coaches, or other MMA personnel, to young and impressionable boys, ages 12, 13, 14, etc. Plaintiffs and their families have brought this action to warn other parents about MMA, to protect boys who might attend the school in the future, to stop the false and

deceptive advertising, to obtain refunds of their tuition, and to obtain restitution for damages, both past and future, for themselves and their sons.

6.     The school "over-booked" enrollment knowing that there would be an attrition rate of a certain percentage, and despite this knowledge the Defendant school strongly encouraged full, up-front payment of tuition.  When Plaintiff-Parents pulled their boys out of MMA, the school engaged in the practice of refunding only a small portion of the $16,500 tuition only after a parent discovered the breach of the contract.  If they secured a small refund, e.g., $2,000, the Plaintiff-Parents were asked to sign a release of claims against the school, at which point they were generally unaware of the fraud perpetrated by the school with regard to the above-stated misrepresentations and the more serious harms, including sexual and physical abuse, which were often perpetrated against their Plaintiff-Sons.  The reason for the parents' continued ignorance has been that the Plaintiffs' sons had not immediately informed their parents, of the above-described conditions until after leaving the school.  The parents signed a release of claims, but were not fully informed as to the full extent of the child's abusive experiences, until a year or more had passed.  This pattern has been consistently carried out by the school on a repetitive basis against individuals who have claimed a refund of tuition is due.

7.     Despite the knowledge of prior harm, and despite repeated requests by employees of the Defendant school to augment and increase the number of paid adult supervisors necessary to adequately supervise the boys, the Defendant school continued to refuse to provide additional adult supervision of the cadets.  The Defendant school also participated in a "cover-up" to hide the fraud and damage perpetrated by the school and its agents.

## II.
## PARTIES

8.     Defendant, Marine Military Academy (*MMA*) is a private school in Harlingen, Texas and is an Arizona non-profit corporation, Charter No. 00023804-07.  This Defendant has been

served with citation and filed an answer in Cause No. 97-117227-E from which this cause was severed pursuant to the court's order and is therefore properly before the court.

9.  Defendant James Butler, III, is an individual, who presumably resides at 1037 Veterans Memorial Drive, Mt. Vernon, Illinois 62864. Defendant James Butler, III, sexually assaulted the Plaintiff-Sons. This Defendant has been served with citation and filed an answer in Cause No. 97-117227-E from which this cause was severed pursuant to the court's order and is therefore properly before the court.

10.  Defendants James Butler, Jr., (Jim) and Pat Butler are individuals and the parents of Defendant James Butler, III. They reside at 1037 Veterans Memorial Drive, Mt. Vernon, Illinois 62864 and should be served with process at that address. They were responsible for their minor son's acts, as they knew or should have known his sexual predator propensities. They also both worked for MMA, lived on campus and therefore were agents or ostensible agents of MMA. Further, Jim Butler served as President of the Parents' Club for MMA. These Defendant has been served with citation and filed answers in Cause No. 97-117227-E from which this cause was severed pursuant to the court's order and are therefore properly before the court.

11.  Defendant Maj. Gen. Harold G. Glasgow is an individual and was President of MMA for several years.  This Defendant has been served with citation and filed an answer in Cause No. 97-117227-E from which this cause was severed pursuant to the court's order and is therefore properly before the court.

12.  Defendant Lt. Col. G. D. Andresen is an individual and is still an employee of MMA. This Defendant has been served with citation and filed an answer in Cause No. 97-117227-E from which this cause was severed pursuant to the court's order and is therefore properly before the court.

13.  Defendant Col. T. A. Hobbs is an individual and was an employee of MMA.  This Defendant has been served with citation and filed an answer in Cause No. 97-117227-E from which this cause was severed pursuant to the court's order and is therefore properly before the court.

14..    John Doe 30 is Christobal Chapman and the mother of John Doe 30 is Cathryn Lisa Ortiz, who resides at 5158 San Marcelo, Brownsville, Texas 78521

15.    John Doe 37-A is James Campbell and the father and mother of John Doe 37-A are Dan and Becky Campbell, who reside at 132 Sessions Drive, Aiken, South Carolina 29803.

16.    John Doe 39 is James Grinnell and the mother of John Doe 39 is Lois Ann Gonzales, who resides at 100 Bluebonnet, Palmer, Texas  75152.

17.    John Doe 45 is Richard Alcedo and the father and mother of John Doe 45 are Mr. and Mrs. Ricardo Alcedo,  who reside at 20591 Via Verde, Covina Hills, California, 91724.

### III.
### FACTS

18.    **John Doe 30** - (Christobal Chapman, Mother:  Lisa Ortiz)  Christobal Chapman attended MMA from the October  of 1994 to July 1996.  He chose to go to MMA because all the promotional material the family received claimed it was a good school and that it would help his military career. Lisa Ortiz sacrificed financially in order for her son to attend MMA.  The family was led to believe that MMA provided a highly structured environment.  However, while at MMA he was sexually assaulted by another cadet, the Defendant James Butler, III.  James Butler, III,  was wrestling with Chris Chapman on his rack when Butler overpowered Chris, pinning him against a wall. When Chris turned, he found that Butler had pulled down his pants exposing Butler's penis and was masturbating rapidly.  Chris was very scared when this happened  and  at that moment he realized how much bigger and stronger Butler was than he, but he managed to kick Butler  with his boot and ran out of the room.  When Chris went home for the weekend, he told his mother Lisa Ortiz all about the incident.  On Monday, Ms. Ortiz  met with Col. Hobbs, Sgt Major Brown and Chris' Drill Instructor Sgt. Maj. Hager.  Chris Chapman,  Lisa Ortiz and James Butler all gave written statements to Sgt. Major Brown.  Although Ms. Ortiz wanted to report the incident to the police, MMA officials discouraged her from doing so by telling her " we will take care of it".  Ms. Ortiz

expected Butler to be expelled.  In fact, MMA refused to notify the police, Child Protective Services, or other authorities, which Ms. Ortiz thought was against the law.  Sgt. Maj. Brown's refusal to notify the police, was used as the final leverage to get Defendant Butler moved to another company. After he was moved, he assaulted at least four other boys, James Grinnell, Richard Alcedo and Ryan Whittaker, Jeffrey Burkett before he was finally dismissed. Defendant James Butler, III, sexually abused at least one boy prior to Chris Chapman, John Doe 37A, Jimmy Campbell. While Chris Chapman was at MMA, his mother personally visited weekly to make sure he was alright. Her vigilance was for naught, he was injured anyway.

19.     **John Doe 37A** - (John Doe 37-A is James Campbell, parents: Dan and Becky Campbell) Plaintiff James Campbell, attended MMA from 1994 to 1996.    The oldest son, James Doe 37-A, went to MMA because the family had been sent materials from the school that said his grades would improve, due to MMA's promised, intensive study program, smaller classes, and strict discipline surrounding the whole program.  It was made clear to the family that there would be constant supervision to assist them, among other things, in raising their GPA.  While at Marine Military Academy, James Campbell was a minor when he was sexually assaulted on more than one occasion by James Butler, III.   The first sexual assault occurred one night when Campbell was asleep.  He woke up to discover Butler's hand inside Campbell's shorts.  When Campbell asked Butler what he was doing, Butler acted as if he were sleeping.  Following the first incident of sexual assault, James went to stay at the home of Christobal Chapman and his mother Lisa Ortiz.  While he was there, James tearfully recounted the details of the assault to Chapman and his mother, Ms. Ortiz. Ms. Ortiz advised Becky Campbell of what James had experienced.  When James returned to school, he informed Lt. Col. Andresen, who told him he would take care of it, but nothing was done. James' Drill Instructor, Mstr. Sgt. Hager advised James not to tell his parents of the assault. When James informed Mstr. Sgt. Hager that he had already told his parents, Hager became upset. James Butler, III was not removed from the school.  The second sexual assault occurred a few days

after James Campbell returned to MMA and after he had spoken with MMA officials. James Campbell was asleep in his room when he awoke to James Butler, III on top of him. Another cadet saw Butler on top of Campbell and before Campbell knew it, other cadets arrived in his room, grabbed Butler, threw Butler on the floor and removed him from Campbell's room. During that time, Butler touched Campbell's anus. Although MMA was informed of the sexual assaults, they did not report it to the police or to child protective services, but were negligent and reckless in allowing James Butler, III to remain at large on the MMA campus by moving him to another barrack. MMA failed to report this incident to Child Protective Services or the authorities as required by law.

20.   **John Doe 39** - (James Grinnell, mother: Ann Gonzales). James Grinnell attended Marine Military Academy for the 1994-95 school year through February of the 1995-96 school year. After attending a seminar in Dallas, the family decided to send James to MMA because the school promised that MMA would raise his self-esteem and be in an environment that was structured and disciplined. While at Marine Military Academy, James witnessed and was subjected to physical assaults (hazing), and sexual assaults. James Grinnell was a minor when he was sexually assaulted on more than one occasion by James Butler, III. James Grinnell describes one sexual assault where James Butler III attempted to put his penis in Grinnell's mouth and tried to force Grinnell to masturbate Butler. Butler also penetrated Grinnell's anus with his finger. A similar episode is described by Grinnell in his statement to the Harlingen Police Department dated 10/31/95. Another sexual assault incident is described in James Grinnell's typewritten statement produced by MMA in response to discovery requests. James' father, contacted the Police Department to report the assault(s). Although MMA was informed of the earlier sexual assaults, they did not report it to the police or to child protective services. After being sexually assaulted on several occasions, James lost interest in his studies became angry and emotionally upset. James Butler, III, was not suspended after the assaults because his parents were employed as a teacher and a coach at MMA. Another

incident occurred in which his Drill Instructor knocked James to the floor.

21. **John Doe 45** - (Richard Alcedo, parents: Mr. and Mrs. Ricardo Alcedo). Richard Alcedo attended Marine Military Academy from January, 1995 until November, 1997. Richard wanted to attend MMA because he and his family were led to believe that attending MMA would better his chances in the Marines, as well as in college. The Alcedos were told that MMA graduates could get in any college. While at Marine Military Academy, Richard Alcedo was a minor when he was sexually assaulted on more than one occasion by Defendant James Butler, III. James Butler, III attempted to force Alcedo to engage in anal and oral sex with him over an approximate three-week time period. Plaintiff James Grinnell was Richard Alcedo's roommate and witnessed at least one incident where Butler grabbed Alcedo and attempted to force Alcedo to perform oral sex on Butler. Although MMA was informed of these sexual assaults, and knew that Butler was a sexual predator, who had attacked at least two other cadets prior to his assault of Richard Alcedo, MMA failed to report the assaults to the police or to child protective services, as required by law. Instead MMA was negligent and reckless in allowing James Butler, III to remain at large on the MMA campus by moving him to another barrack so that Butler could gain access to other minor boys and improperly gratify Butler's perverse sexual urges by assaulting other cadets, including Richard Alcedo and his roommate James Grinnell. Defendant, James Butler III was indicted by a Cameron County Grand jury for intentionally and knowingly causing the anus of Richard Alcedo, a minor, to contact the sexual organs of James Butler, III. Later, Defendant James Butler, III, pled *nolo contendere* to a lower charge (indecency with a child) involving another minor boy who is not a party to this lawsuit. MMA assured the family that both boys would receive counseling, and that everything would be alright. Even after the assault, Alcedo had to endure being tutored by the mother of the perpetrator, Pat Butler.

When Plaintiff Richard Alcedo left for MMA, he was a happy young boy. After he returned from MMA, he was depressed, suicidal, violent, a complete stranger. He spent time at a psychiatric

facility.  At MMA, after the attacks, he gradually  became less and less interested in grades and other activities.  Prior to attending  MMA,  Alcedo had not tried any type of illegal drugs.  After he was brought into the leadership ranks; he began using drugs as the company leadership did.  When he enrolled there, their family was told MMA only accepted good kids. The families' relationship with Plaintiff Richard Alcedo has been severely damaged, and he has been victimized because MMA did not have the standards they claimed,  nor did they have the number of adult supervisors they  claimed. The effect of the sexual victimization of Richard has had a far reaching effect on him and his family,  emotionally as well  as financially.  Richard's childhood was stolen and his parents' hopes and dreams for their son based on the misrepresentations of MMA have been shattered.

## IV.
## CAUSES OF ACTION AGAINST DEFENDANT MMA

22.  Plaintiffs' damages were proximately caused by the acts or omissions of Defendant MMA.  These acts of omission include the following:

1.     Negligence;

2 .    Negligent misrepresentation;

3.     Deceptive trade practices;

4.     Negligent endangerment to minors;

5.     Negligent supervision resulting in hazing;

6.     Negligent supervision of Plaintiffs' and staff;

7.     Negligent selection, hired or continued employment of Drill instructors;

8.     Breach of fiduciary duty;

9.     Fraudulent concealment;

10.    Negligent providing access to alcoholic beverages to minors in violation of Section 106.06 of the Texas Alcoholic Beverage Code;

11.    Negligence in providing access to controlled substances to minors in violation of Section 481.122 of the Texas Health and Safety Code;

12.    Negligent misrepresentation involving risk of physical harm pursuant to the Restatement (Second) of Torts , Section 311;

13.    Fraud; and

14    Failure to report to Child Protective Services.

## V.
## COUNT ONE - NEGLIGENCE

23.    The conduct of the Defendant MMA, as described herein, constitutes negligence and/or negligence per se:

1.    Failing to employ enough employees to provide adequate adult supervision of cadets;

2.    Failing to employ adequate security measures for the safety of the cadets;

3.    Failure to promulgate policies which encourages and requires the prevention of physical abuse including hazing, sexual assault and physical assault;

4.    Failing to report sexual abuse and/or assault;

5.    Failing to employ qualified and sufficient personnel including counselors to supervise Marine Military Academy cadets;

6.    Negligent retention of personnel;

7.    Negligently permitting upperclassmen and/or officers (students) to supervise, operate, and run Marine Military Academy and its' cadets on a day to day basis;

8.    Failing to employ procedures to investigate promptly, fairly, and adequately complaints by students; and

9.    Permitting cadets with prior instances of infractions of sexual and physical assault to remain at Marine Military Academy and/or supervise other cadets.

10.    Failing to adequately provide medical care to Plaintiffs, to advise Plaintiff parents of medical conditions of their Plaintiff sons and to obtain proper authorization for medical treatments of them.

11.    Failing to inspect, discover, and correct the unsafe conditions at MMA;

12.    Failing to warn Plaintiffs of the unsafe conditions at MMA

Each of the foregoing acts and/or omissions constituted negligence and each proximately caused the injuries and damages sustained by Plaintiffs.

# VI.

## COUNT TWO - NEGLIGENT MISREPRESENTATION

24. Paragraphs 1 through 23 are re-alleged and incorporated herein for all purposes.

Plaintiffs would show that Defendant MMA, in the course of its business and through its agents, or

in the course of business in which it had a pecuniary interest, and Defendants Maj. Gen. Harold.

Glasgow, Lt. Col. G. D. Andresen and Col. T.A.Hobbs, supplied false and misleading information

to Plaintiffs by which Plaintiffs were guided in the business of entering into a contract with MMA.

In supplying such false and misleading information to Plaintiffs, Defendants failed to exercise

reasonable care in communicating the information, Plaintiffs suffered pecuniary losses, physical and

emotional injuries as a result of MMAs' negligent misrepresentation for which Plaintiffs have sued.

The facts summarized above enumerate the breaches of duty by Defendants.

# VII.

## COUNT THREE - DECEPTIVE TRADE PRACTICE CLAIM

25. Paragraphs 1 through 24 are re-alleged and incorporated herein for all purposes.

Plaintiff - Parents were purchasing good and services from Defendant MMA. Plaintiffs would show

that Defendant MMA and Defendants Maj. Gen. Harold. Glasgow, Lt. Col. G. D. Andresen and

Col. T.A.Hobbs, personally, and others acting at their direction or control violated Tex. Bus. &

Com. Code Ann. § 17.46, et seq., known as the Texas Deceptive Trade Practices Act, in the

following respects:

> (b) Except as provided in Subsection (d) of this section, the term "false,
> misleading, or deceptive acts or practices" includes, but is not limited to, the following
> acts:. . . . .
>
> (1) Passing off goods or services as those of another;
>
> (2) causing confusion or misunderstanding as to the source, sponsorship,
> approval, or certification of . . . services;
>
> (3) causing confusion or misunderstanding as to affiliation, connection, or association with,
> or certification by, another;

(4) using deceptive representations . . . in connection with . . . services;

(5) representing that . . . services have sponsorship, approval, characteristics, benefits, . . . which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not; . . .

(7) representing that . . . services are of a particular standard, quality . . ., if they are of another;

(8) advertising . . . services with intent not to sell them as advertised.

(23) the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

Tex. Bus. & Com. Code Ann. § 17.46.

Defendants knew the problems of the institution, its weaknesses and its pretenses. But, had Defendants disclosed these to the parents of prospective students, the Plaintiff-Parents would not have entered into the contracts they did with MMA. The parents were deceived into thinking that the school was affiliated with the United States Marine Corps when it was not. To perpetrate this deception, the school used United States Marine Corps representations in various overt ways and, in so doing, purported to have a connection to the United States Marine Corps which it did not have, beyond simply having a JROTC program at the school. These actions were done knowingly and intentionally and damaged the families of this cause. The Defendants conduct was unconscionable and took advantage of them to a grossly unfair degree and this practice was to the Plaintiff-Parents detriment.

## VIII.
## COUNT FOUR -NEGLIGENT SUPERVISION OF PLAINTIFFS AND STAFF

26.    Paragraphs 1-25 are re-alleged and incorporated herein for all purposes. Plaintiff would state that Defendant, MMA failed to supervise the cadets under their charge, allowing the physical and sexual abuse and hazing of Plaintiffs, as specifically referenced above. Defendant, MMA also failed to supervise its employee Drill Instructors who either participated in or allowed

the physical or sexual assault of Plaintiffs.

27. Plaintiffs would show that the acts or omissions of Defendant MMA or its employees constituted Hazing offenses as defined by the Texas Educational Code, Section 37.151 et. seq. These hazing offenses, including failure to report hazing and failure to promulgate adequate or appropriate hazing policies, constitute negligence per se under Texas law. General Glasgow was informed personally of these dangers in December, 1995, with a letter from a parent telling him of the assaults that took place at night in the barracks of MMA. General Glasgow disregarded the information and the safety of the children in his charge.

28. Plaintiffs would show that Defendants violated the Texas Endangerment of Minors Statute by placing children under 15 years old in danger and exposing these minors to an unreasonable risk of harm. Defendants had a duty of "care, custody, or control" of minor boys, and put those boys "in circumstances in which no reasonable, similarly situated adult would leave a child of that age and ability". In other words, leaving a small 12, 13 or 14-year-old boys unsupervised to be sexually and physically preyed upon at night in a dormitory by larger, older boys, with no protection, is to leave those boys "<u>under circumstances which no reasonable, similarly situated adult would leave a child of that age and ability</u>." Physical and emotional harm were caused to the Plaintiffs as a result. General Glasgow was informed personally of these dangers in December, 1995, with a letter from a parent telling him of the assaults that took place at night in the barracks of MMA. Defendant, General Glasgow disregarded the information and the safety of the children in his charge. Such violation of the Child Endangerment Statute constitutes negligence per se for which MMA and Defendant Glasgow are liable.

29. Defendant MMA is liable for the acts or omissions of its Drill Instructors and other staff under the doctrine of Respondeat Superior.

## IX.
## COUNT FIVE- NEGLIGENT SELECTION OR RETENTION

30.     Paragraphs 1 through 29 are re-alleged and incorporated herein for all purposes. Defendant, MMA was negligent in its selection or retention of its employee Drill Instructors who, either participated in or allowed the physical or sexual assault of Plaintiffs. MMA continued to employ individuals whom it knew or should have known were dangerous to young boys. MMA is liable for the acts of its employees or agents under the Doctrine of Respondeat Superior.

## X.
## COUNT SIX - BREACH OF FIDUCIARY DUTY

31.     Paragraphs 1 through 30 are re-alleged and incorporated herein for all purposes Defendant MMA, Glasgow, Hobbs and Andreson, owed the Plaintiffs and their parents the highest duty of trust and confidence and were required to act in the Plaintiffs best interests. The Plaintiffs-parents entrusted their most precious sons to the Defendants' care for an excellent education, room and board, food, security from emotional and physical harm and guidance. The Plaintiffs-Parents were led to believe that the relationship between MMA and their sons and themselves was a special or confidential relationship akin to a surrogate parent in which MMA had a duty and responsibility to deal with the Plaintiffs-Sons or to act on the Plaintiffs-Sons behalf with the highest degree of trust, confidence honesty, utmost good faith and loyalty. The Plaintiff-Parents necessarily trusted and relied on the belief that MMA would not allow or direct the emotional and physical injuries be inflicted upon the children pledged to its care. MMA breached this confidential and special relationship by violating the Plaintiffs' trust in directing others under MMA's control to act or by failing to act to prevent the sexual abuse, physical abuse, emotional abuse or hazing of Plaintiffs-Sons. These acts or omissions proximately caused damages to Plaintiffs.

## XI.
## COUNT SEVEN -FRAUD AND FRAUD IN THE INDUCEMENT

32.     Paragraphs 1 through 31 are re-alleged and incorporated herein for all purposes Plaintiffs would show that Defendant MMA fraudulently induced the Plaintiff parents into entering into contract agreements without revealing pertinent and material facts. MMA acting in concert with

the others known and unknown to Plaintiffs, systematically engaged in an active pattern of fraud and deceit upon which the Plaintiffs and their families relied to their detriment, in entering into their contract with MMA. This fraud was perpetrated upon Plaintiffs by the Defendants MMA, recruiters for MMA, Defendants Andreson, Hobbs and Glasgows' misrepresentation, concealment or failure to disclose the toxic environment which existed at the school of which these Defendant's had special knowledge which Plaintiffs did not. Plaintiffs would show that Defendant MMA fraudulently induced them to send their sons to MMA while they fraudulently concealed the extent and nature incidents of physical abuse sexual abuse and hazing perpetrated on cadets and the failure to report such acts as required by law to Child Protective Services and other official agencies of the State. In particular, this fraud included the cover-up and misrepresentations of incidents of physical, emotional and sexual abuse of cadets and failure to report such acts as required by law to Child Protective Services and other official agencies of the State. These misrepresentations and fraudulent conduct of promoting MMA as a healthy environment for a child was done with the knowledge of its falsity by Defendants or made recklessly without any knowledge of the truth and as a positive assertion. These misrepresentations as to the character and caliber of this school were made with the intention that Plaintiffs-parents act on these misrepresentations enrolling and keeping their sons at MMA. This fraudulent conduct, misrepresentations and failure to disclose injured Plaintiffs and their sons. Defendants surreptitiously sent a number of cadets including James Grinnell and Richard Alcedo to a psychiatrist named Dr. Anthony Ramashwar and other physicians contracting services to MMA, to be treated for the traumas caused by the physical and sexual assaults, often without the knowledge or authorization of the Plaintiff-Parents.

## XII.
## COUNT EIGHT - NEGLIGENT PROVIDING MINORS ACCESS TO ALCOHOL

33.      Paragraphs 1 through 32 are re-alleged and incorporated herein for all purposes

Defendant MMA by providing access to alcoholic beverages to the Plaintiffs when they

were minors in violation of Section 106.06 of the Texas Alcoholic Beverage Code. Such violation of this statute constitutes negligence per se.

## XIII.
## COUNT NINE - NEGLIGENT PROVIDING ACCESS TO CONTROLLED SUBSTANCES

33.     Paragraphs 1 through 32 are re-alleged and incorporated herein for all purposes. Defendant MMA by providing controlled substances and access to controlled substances to the Plaintiffs when they were minors in violation of Section 481.122 of the Texas Health and Safety Code. Such violation of this statute constitutes negligence per se. Defendants surreptitiously sent cadets, to a psychiatrist named Dr. Anthony Ramashwar, contracting services with MMA, to be treated for their traumas caused by the physical and sexual assaults. That physician prescribed psycho tropic drugs to several of the cadets without the knowledge or consent of their parents.

## XIV.
## COUNT TEN - FAILURE TO REPORT TO CHILD PROTECTIVE SERVICES

34.     Paragraphs 1 - 33 are re-alleged and incorporated herein for all purposes. Defendant MMA either failed to timely report or failed to report child sexual abuse to the authorities as required by law pursuant to the Texas Reporting Statute, Article 695c (2) §2 et seq., Vernon's Ann. Civ. St. Such violation of Texas law constitutes negligence per se for which Defendant MMA is liable.

## XIV.
## COUNT ELEVEN - SEXUAL ASSAULT AND BATTERY

35.     Paragraphs 1 - 36 are re-alleged and incorporated herein for all purposes. Plaintiffs would state that Defendant James Butler, III, sexually assaulted the Plaintiffs. Defendant Butler was a minor at that time, living under the supervision and control of Defendants MMA and Defendants Jim and Pat Butler. These Defendants knew or should have known of the propensities of Defendant James Butler, III as a sexual predator. These Defendants worked, in collusion with Defendant MMA, to move him around from barrack to barrack allowing him to rape and assault

other boys, including the Plaintiffs mentioned above. Defendant James Butler, III was charged in Cameron County as to the assaults of Johns Does 39, and 45, and plead to the sexual assault of another cadet, not a Plaintiff is this cause.

## XV.
## COUNT TWELVE - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

36.  Paragraphs 1 - 37 are re-alleged and incorporated herein for all purposes. Plaintiffs allege that the actions of these Defendants have intentionally inflicted emotional distress upon the Plaintiffs. In the above-alleged facts Defendants MMA, their agents and Defendant James Butler, III acted intentionally or recklessly; their conduct was extreme and outrageous; and the actions of Defendants caused Plaintiffs emotional distress; and the emotional distress suffered by Plaintiffs was severe.

## XVI.
## COUNT THIRTEEN - INTENTIONAL/NEGLIGENT SPOLIATION OF DOCUMENTS & EVIDENCE

37.  Paragraphs 1 - 38 are re-alleged and incorporated herein for all purposes. Defendant MMA had a fiduciary duty to maintain accurate and truthful records of the cadets in their charge and the activities surrounding the operation of MMA. Defendant under a court order to disclose and produce all of the records of the Plaintiffs' in this cause, who were formerly cadets at MMA. Defendant has intentionally and/or negligently destroyed or illegally withheld documents which were ordered by the court for them to produce. Plaintiffs request the court issue proper sanctions, including presuming all things are against MMA (omnia praesumuntur contra spoliatorem — all things are presumed against a despoiler.)

## XVII.
## DAMAGES FOR JOHN DOES

38.  **Common Damages for John Does:**

A.  As a result of the conduct and incidents described herein, Plaintiffs have incurred medical and counseling expenses in the past which were reasonable and necessary and, in

all reasonable probability, such expenses will continue in the future.

B.   Plaintiffs have experienced severe psychological pain and suffering in the past and, in all reasonable probability, will sustain severe psychological pain and suffering in the future as a result of his psychological injuries.

C.   Plaintiffs have suffered mental anguish in the past and, in all reasonable probability, will sustain mental anguish in the future.

D.   Plaintiffs have suffered many other damages including loss of self esteem, loss of trust and in all reasonable probability their social and professional adjustment in the future will be adversely impacted.  Further, Plaintiffs' relationship wit their parents have been damaged and/or destroyed.

E.   Plaintiffs have suffered a diminished wage earning capacity in the past and, in all reasonable probability, will suffer loss of earning capacity in the future.

F.   As a result of the above, Plaintiffs seek damages in excess of the jurisdictional limits of the Court and seek a judgment against the Defendants, jointly and severably.

G.   Plaintiffs also seek punitive and exemplary damages in order to punish and deter the outrageous conduct of the Defendants.  Facts as alleged above, will be proven by Plaintiffs, by clear and convincing evidence, that Defendants acted maliciously in that, either by an act or omission, they exposed Plaintiff-Sons to an extreme degree of risk, considering the probability and magnitude of the potential harm to them.  Defendants further had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of the Plaintiff-Sons while they were cadets at Defendant MMA.  These damages, in part,  were additionally based on conduct described as a felony, specifically  Texas Penal Code §22.011 (sexual assault) and §22.04 (injury to a child) and were committed knowingly and/or intentionally.

H.   Reasonable attorneys' fees as allowed by law, specifically: Tex. Bus. & Com. Code Ann. § 17.50 (d)(DTPA) and Tex. Civ. Prac. & Rem. Code § 38.001.

I.      Plaintiffs herein claim interest in accordance with Texas Finance Code §304.001 *et seq.* and pre-judgment and post-judgment interest in accordance with Article 5069-1.05 of V.A.T.S. and any other applicable law.

J.      Plaintiffs request a jury of their peers hear this case and , that Plaintiffs have judgment against Defendants, jointly and severably, for all damages pled as described herein, for cost of suit, attorneys fees, interest as allowable by law and for such other relief to which Plaintiffs may be justly entitled.

## XVIII.
## COMMON DAMAGES FOR PARENTS OF JOHN DOES

39.     **Damages for the parent(s) of John Does:**

A.      The Plaintiff-Parents of the John Does, as a result of the incidents described herein, have incurred medical and counseling expenses in the past which were reasonable and necessary and in all reasonable probability such expenses will continue in the future.

B.      The Plaintiff-Parents of John Does have incurred attorneys' fees and request reasonable attorneys' fees as allowed by law, specifically: Tex. Bus. & Com. Code Ann. § 17.50 (d)(DTPA) and Tex. Civ. Prac. & Rem. Code § 38.001 to be awarded in this cause.

C.      The Plaintiff-Parents of John Does have incurred out of pocket expenses and tuition costs based on Defendant's misrepresentations for which they seek reimbursement.

D.      The Plaintiff-Parents have suffered mental anguish as a result of the misrepresentations made by Defendant MMA and from the betrayal. They have felt anguished that their son had suffered such humiliating mental and physical pain. They have felt further mental anguish from the estrangement that Defendant MMA has caused between the Plaintiff-Parents and their sons.

## XIX.
## PRAYER

40.     FOR THE REASONS STATED ABOVE , Plaintiffs pray that they be awarded all

damages plead , including compensatory and punitive damages. Plaintiffs seek a judgment against all Defendants, jointly and severably. Plaintiffs also seek attorneys' fees, interest as allowed by law and such other relief by law or in equity as the court deems appropriate.

## XX.
## JURY DEMAND

41.    The Plaintiffs request a jury trial.

Respectfully submitted,

LAW OFFICE OF MARY ALICE MCLARTY
Founders Square, Suite 540
900 Jackson Street
(214) 742-4040
(214) 742-4545 fax
Dallas, TEXAS 75202

MARY ALICE McLARTY
State Bar Card No.13740450

ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, MARY ALICE McLARTY, do hereby certify that on the _29th_ day of December, 1999, pursuant to the Texas Rules of Procedure, a true and correct copy of the above instrument has been sent to opposing Counsel, George J. Petras, IV, Henslee, Fowler & Hepworth, 800 Frost Bank Plaza, 816 Congress Avenue, Austin, Texas  78701, attorney for Defendant MMA and Robert Banks, 218 East Harrison Avenue, Harlingen, TEXAS attorney for the Butler Defendants.

MARY ALICE McLARTY

*Exhibit C*

## CAUSE NO. 98-01-119

| | |
|---|---|
| DEBBIE WAYNE, ADAM WAYNE, § | IN THE DISTRICT COURT OF |
| ADAM WAYNE, TAMMY CALHOUN, § | |
| DEAN EVANS, MIKE STUMP, LAURA § | |
| BOOKER, D.J. ROGERS, CHERYL § | |
| TOMBARELLI, and EREN TOMBARELLI, § | |
|    Plaintiffs § | |
| § | |
| v. § | CAMERON COUNTY, TEXAS |
| § | |
| THE MARINE MILITARY ACADEMY, INC., § | |
| d/b/a MARINE MILITARY ACADEMY § | |
|    Defendant § | 197th JUDICIAL DISTRICT |

### PLAINTIFFS' SEVENTH AMENDED PETITION

COME NOW, Debbie Wayne, Adam Wayne, Tammy Calhoun, Dean Evans. Mike Stump,

Laura Booker, D.J. Rogers, Cheryl Tombarelli, and Eren Tombarelli, Plaintiffs herein, and file this

*Plaintiffs' Seventh Amended Petition* and would show unto the Court the following:

I.
### PARTIES

All parties have generally appeared before this Court and no further service is necessary on

the Defendant pursuant to Defendant's agreement regarding the addition of Plaintiffs Adam Wayne.

Dean Evans, D.J. Rogers, and Eren Tombarelli.

II.
### JURISDICTION AND VENUE

Jurisdiction is proper in that the events made the basis of this lawsuit occurred in Texas and

the amount of damages exceed the minimum jurisdictional limits of the Court.



Venue is proper pursuant to *Tex. Civ. Pract. & Rem. Code* § 15.002(a)(1) and (3) (Vernon Supp. 1998) in that all or a substantial part of the events on giving rise to this lawsuit occurred in Cameron County and Cameron County is Marine Military Academy's principal office in this state.

III.
### BACKGROUND

Plaintiffs Adam Wayne, Dean Evans, Mike Stump ("Stump"), D.J. Rogers ("Rogers"), and Eren Tombarelli were students at Marine Military Academy. During the time Plaintiffs Adam Wayne, Dean Evans, Stump, Rogers, and Eren Tombarelli attended Marine Military Academy, they were subject to sexual and physical abuse, including hazing. In particular, Plaintiffs, Stump, Rogers, and Eren Tombarelli were abused by upperclassmen, and officers. This was a result of Marine Military Academy's failure to have adequate supervision, security, and proper training of Marine Military Academy's employees, officers, and fellow cadets, despite notice, warnings, and prior incidents to Marine Military Academy and Marine Military Academy's practices of admitting persons with known criminal and/or psychiatric backgrounds and/or behavioral problems. Furthermore, the assaults, physical and sexual, were not reported to law enforcement authorities.

Prior to Plaintiffs', Stump's, Rogers', and Eren Tombarelli's admittance and entry into Marine Military Academy, representatives and agents of Marine Military Academy made various representations, both express and implied, to Plaintiffs Debbie Wayne, Tammy Calhoun, Laura Booker (hereinafter "Booker"), and Cheryl Tombarelli (hereinafter "Tombarelli"). Such representations and promises were deceptive and false. Such representations and promises were intended to be relied upon by Plaintiffs Debbie Wayne, Tammy Calhoun, Booker, and Tombarelli. Such representations and promises included that Marine Military Academy had proper adult supervision of the students, Marine Military Academy only accepted boys with good moral character,

Marine Military Academy had official connections with the United States Marine Corp., and Marine

Military Academy maintained moral and educational standards.

Any statute of limitations are tolled by the discovery rule and/or fraudulent concealment by

the Defendant.

IV.

**NEGLIGENCE**

The conduct of the Defendant as described in Paragraph III constitutes negligence and/or

negligence per se in one or more of the following particulars:

1.     Failing to employ adequate adult supervision for Marine Military Academy;

2      Failing to employ adequate security measures for the students by not providing a system for checking and/or supervising students in any sort of regular manner, by allowing persons with known psychiatric and/or behavioral and/or criminal histories to go unsupervised or to be in control of supervision, and/or failing to employ any devices to notify Marine Military Academy of dangerous situations or attacks;

3.     Employing a system which discourages and/or ignores the reporting of sexual and physical abuse including hazing;

4.     Failing to report sexual abuse and/or assault;

5.     Failing to employ qualified and sufficient personnel including counselors to supervise Marine Military Academy students by not having adequate adult supervision in the cadets' quarters at all times, including sleeping hours, by not properly counseling and disciplining those with behavioral problems or removing such cadets from the school curriculum. employing too small a ratio of adults to cadets for supervision purposes. and failing to provide proper training to adults in recognizing and dealing with sexual and physical abuse;

6.     Permitting upperclassman and/or officers to supervise, operate. and run Marine Military Academy and its cadets on a day to day basis;

7.     Failing to employ procedures to investigate promptly, fairly, and adequately complaints by students; and

8.     Permitting students with prior instances or infractions of sexual or physical assault or behavioral problems to remain at Marine Military Academy and/or supervise other students.

The conduct of the Defendant described above proximately caused Plaintiffs' injuries and

mages.  Plaintiffs seek damages for such negligence in excess of the minimum jurisdictional limits

f the Court.

## V.
## BREACH OF CONTRACT

The conduct of the Defendant described in Paragraph III constitutes a breach of contract.

spite the Defendant's promises and agreements to minor Plaintiffs' parents, the Defendant failed

abide by its oral and written contracts with Plaintiffs, including but not limited to:

1.   Failure to educate the cadets in an environment free from abuse;

2.   Failure to supervise and care for the cadets in an proper school atmosphere;

3.   Failure to educate the cadets at a level commensurate with the representations
     made by Marine Military Academy;

4.   Failure to furnish proper and safe lodging to the cadets;

5.   Failure to providing proper and necessary adult supervision to the cadets;

6.   Employing fictional admissions policies designed to allow those with serious
     behavioral, psychiatric and criminal histories to be admitted;

7.   Demanding tuition monies in advance for services to be rendered by Marine
     Military Academy according to its pamphlets and representations which were
     not rendered; and

8.   Breaching the tuition agreement between Marine Military Academy and
     Plaintiffs.

intiffs seek damages in excess of the minimum jurisdictional limits of the Court.

## VI.
## DECEPTIVE TRADE PRACTICES ACT

The conduct of the Defendant described in Paragraph III constitutes violations of the Texas

eptive Trade Practices Act, specifically, *Tex. Bus. & Comm. Code Ann.*, § 17.46 et seq (Vernon

NTIFFS' SEVENTH AMENDED PETITION - Page 4

subsequent educational fees.

## VIII.
## <u>ATTORNEY'S FEES</u>

The Defendant's conduct entitles Plaintiffs to reasonable attorney's fees.  Plaintiffs are entitled to attorney's fees pursuant to *Tex. Civ. Pract. & Rem. Code Ann.* § 38.001 (Vernon 1997) and *Tex. Bus. & Comm. Code Ann.* § 17.50(d) (Vernon Supp. 1998).

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Defendant be cited to appear and answer, and that on final trial Plaintiffs have:

1.    judgment, including all double and/or treble damages, against the Defendant for a sum in the maximum amount of $10,000,000 pursuant to Tex. R. Civ. P. 47 and Defendant's request that plaintiffs plead a maximum amount sought;

2.    reasonable attorney fees;

3.    interest before and after judgment at the highest legal rate until paid;

4.    costs of suit; and

5.    such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,
LAW OFFICE OF MARK A. TICER

By: _____
Mark A. Ticer
State Bar #20018900
Claire Collins Schwarz
State Bar #00783859
3300 Oak Lawn Avenue, Suite 700
Dallas, Texas  75219
(214) 219-4220
(214) 219-4218 (FAX)

ATTORNEY(S) FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been delivered to all parties of record via certified mail, return receipt requested on this the /5/ day of _____ June _____, 2001.

_____

Mark A. Ticer/Claire Collins Schwarz

*Exhibit D*

FILED

# UNITED STATES BANKRUPTCY COURT

FEB

## DISTRICT OF ARIZONA

KEVIN E. ORR, CLERK
UNITED S.
BANKRUPTCY ST
FOR THE DISTRICT OF ARIZONA

In re:                                    )    **Chapter 11**
                                          )
MARINE MILITARY ACADEMY, INC.,            )    **No. 00-05507-ECF-CGC**
an Arizona nonprofit 501(c)(3)            )
corporation,                              )    **STIPULATED ORDER REGARDING**
                                          )    **MOTION FOR RECONSIDERATION**
            Debtor.                       )    **OF ORDER RE ESTIMATION**
                                          )    **MOTION AND RELATED**
                                          )    **MATTERS**
_____)

This matter came before the Court pursuant to the "Motion For:
(1) Reconsideration of Order re Estimation Motion; (2) New Trial; (3) Stay of Proceeding
Pending Hearing on this Motion; and (4) Request for Expedited Hearing Regarding the
Foregoing" filed by Marine Military Academy (the "Debtor") on October 23, 2000 (the
"Motion for Reconsideration"). The Motion for Reconsideration was contested by the
Official Committee of Tort Creditors (the "Tort Committee") pursuant to the filing of the
"Opposition to Motion For: (1) Reconsideration; (2) New Trial; (3) Stay" filed on
October 31, 2000 (the "Tort Committee Objection") as well as certain tort claimants as
set forth in the "Joinder in Committee's Response in Opposition to Debtor and Motion
For Reconsideration on Claims Estimation Order" filed on or about November 9, 2000
(the "Claimants' Joinder") by counsel representing certain prepetition tort claimants
(collectively the "Joining Claimants").[1] In addition, the remaining tort claimants also

---

[1] The Joining Claimants are Brandon Whiddon, Aaron C. Nefe, James A. Varas, Toby Stroud, Adam
Rekerdres, Ted and Carolyn Rekerdres, Spender Lanham, Tamye Lanham, Jason Neil, Michael Risher, Von M.
Risher, Chris Chapman, Joseph Gassner, Carol Gassner-Smith, Ryan Stout, Earl Stout, Daniel Rider, Florida R.
Rider, Sean Fagan, Peter and Pamela Fagan, Shannon Lambert, Tray and Gayla Lambert, David Aguilar, Suzanna
Aguilar, Justin Waltz, Ben White, Arlene White, Gary M. palmer, Jr., Gary and Carolyn Palmer, Ryan P. Foley,
James and Dee Ann Foley, Charles Ehm, Charles and Carol Ehm, Justin Blanton, Jeanette Blanton, Eric J.
Westbrook, Elzie and Debra Westbrook, Mark A. Woods, Carrie Woods, Kristopher M. Johnson, Allen E. Gray, Pat
Gray, John S. Cromby, Enrique Molina, Jr., Enrique Molina Sr., Ronald C. Lasley, Ramona Lasley, Kevin L.
McIntyre, Peter Vigliano, Stace McIntyre, Wyatt T. Turner, Ryan Alcorn, Elizabeth Alcorn, John R. Trice, Jr., John
R. Trice, Sr., Curtis Henderson, Scott White, Jim Dowell, Marion Dowell, Ryan Martin, Danny and Candy Martin,

1

1    joined in the Tort Committee Objection (the "Remaining Claimants").

2       In light of the foregoing, and upon the agreement of the Debtor and Joining

3    Claimants as evidenced by the signatures of counsel approving this Order as to form and

4    content below, and good cause appearing therefor,

5       IT IS HEREBY ORDERED as follows:

6       1.      The Debtor's Motion for Reconsideration be and hereby is withdrawn.

7       2.      "Personal Injury Claims" are defined herein as personal injury tort or

8    wrongful death claims (as used in 28 U.S.C. § 157(b)(5)), and further includes the

9    negligence or fraud claims of the former cadet claimants which resulted in personal

10    injury tort damages.  Other than the Personal Injury Claims, any and all "Claims" (as that

11    term is defined in Bankruptcy Code § 101(5)) of the Joining Claimants, including but not

12    limited to breach of contract, fraud, misrepresentation, and Deceptive Trade Practices Act

13    claims (collectively the "Non-Personal Injury Claims"), shall be, and hereby are,

14    determined to be "core" proceedings to be adjudicated by this Court, and the Joining

15    Claimants hereby submit to this Court's jurisdiction for those purposes.  The Joining

16    Claimants shall stipulate to severance of the Non-Personal Injury Claims if a formal

17    stipulation is required in whatever court ultimately will adjudicate the Personal Injury

18    Claims.

19       3.      The Personal Injury Claims will be adjudicated in the District Court

20    Proceedings wherever the United States District Court for the District of Arizona decides

21    is appropriate.  For the purpose of this Order "District Court Proceedings" shall mean

22    *Wayne, et al. v. Marine Military Academy*, CIV 00-1094; *Blanton, et al. v. Marine*

23

---

24 Damon Brown, James Campbell, Dan and Becky Campbell, Danny Campbell, James Grinnell Richard Alcedo,
25 Ricardo and Virginia Alcedo, Theresa Campbell, Robert Hunter, Joe and Hyden Hunter, Scott Navarre, John and
Vicki Navarre, Richard Davis, Jr., Richard Davis, Sr., Ryan Whittaker, Paula Whittaker, Joseph Arbini, Jerrold
Arbini, Cameron Nelson, Ken Kruckenberg, Layne Floria, Sherwood Floria, Thomas Mason, Jr., Thomas Mason,
26 Sr., Jeffrey Snider, Mark Snider, Estate of Joshua Campbell, Linda Champion, Paulette Hawkins, Jan Baker,
Elizabeth Blum, Gail Madden, Candace Wyatt, Bonnie Thiele, Rhonda Brown, Catherine L. Ortiz, Ann Gonzales,
Debra Morris, Sandra Koult, Laurie Abajian, and Susan Yarbrough.

1  *Military Academy*, CIV 00-1095; *Peter, et al. v. Marine Military Academy*, CIV 00-1503;

2  *Parents, et al. v. Marine Military Academy*, CIV 00-1504; and *Chalfant, et al. v. Marine*

3  *Military Academy*, CIV 00-1505.

4        4.     Notwithstanding anything in this Order or in the adjudication of the Non-

5  Personal Injury Claims, nothing that has or may occur in this Court shall have a collateral

6  estoppel, *res judicata*, evidentiary, or any other preclusive effect with respect to the

7  District Court Proceedings, nor shall either the Debtor or the Joining Claimants attempt to

8  use this Order in that manner. In addition, this Order cannot be used or alluded to in any

9  pleading or argument, including but not limited to issues pertaining to remand,

10  abstention, or any other state or federal proceeding by any party.

11        5.     The Debtor and the Joining Claimants shall enter into a discovery

12  agreement whereby discovery in this Court and non-Bankruptcy Courts shall be shared in

13  all proceedings, and can be offered in all proceedings whether or not counsel for the

14  Debtor and Joining Claimants were present when such discovery was undertaken, so long

15  as proper notice of the discovery was given to counsel. The aim of the parties is to

16  expeditiously and cost effectively handle all discovery issues as to the Personal Injury

17  Claims and Non-Personal Injury Claims. This discovery agreement shall be reduced to

18  writing and submitted to this Court for approval.

19        6.     The Debtor shall, by agreement to this Order, withdraw with prejudice its

20  Motion to Refer All Pending Claims to the Bankruptcy Court For Trial Preparation,

21  insofar as the Motion relates to the Personal Injury Claims (the Non-Personal Injury

22  Claims being severed and referred by this Order and related orders), which motion was

23  filed in the District Court Proceedings.

24        Dated: _____*Feb. 5*_____, 2001.

25

26  

                       Honorable Charles G. Case
                       United States Bankruptcy Judge

3

AGREED AS TO FORM AND SUBSTANCE:

SNELL & WILMER, L.L.P.                    LEONARD COLLINS & KELLY, P.C.


By _____              By _____
Christopher H. Bayley                       Daniel P. Collins
Attorneys for Debtor                        Attorneys for Joining Claimants

4

*Exhibit E*

RECEIVED

MAR 2 0 2001

SNELL & WILMER

FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 1 5 2001

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DEBBIE WAYNE, Individually and as Next Friend of ADAM WAYNE, et al., | No. CIV 00-1094-PHX-SRB |
| | No. CIV 00-1095-PHX-SRB |
| Plaintiffs, | No. CIV 00-1503-PHX-SRB |
| | No. CIV 00-1504-PHX-SRB |
| vs. | No. CIV 00-1505-PHX-SRB |
| MARINE MILITARY ACADEMY, INC., | **ORDER** |
| Defendant. | |
| THE PARENTS OR PARENT, Individually and as Next Friend of JOHN DOE 15 (Gary and Carolyn Palmer), et al., | |
| Plaintiffs, | |
| vs. | |
| MARINE MILITARY ACADEMY, INC., et al., | |
| Defendants. | |
| JOHN PETER, Individually and as Next Friend of TIMOTHY PETER, | |
| Plaintiff, | |
| vs. | |
| MARINE MILITARY ACADEMY, INC., | |
| Defendant. | |
| THE PARENTS Individually and as PARENTS of JOHN DOES 30, 37-A, 39 and 45, et al., | |
| Plaintiffs, | |
| vs. | |
| MARINE MILITARY ACADEMY, INC., et al., | |
| Defendants. | |

(49)

1

2  MARILYN CHALFANT, Individually and)
   as Next Friend of SAMUEL ELZA,       )
3                                       )
            Plaintiff,                  )
4                                       )
   vs.                                  )
5                                       )
   MARINE MILITARY ACADEMY, INC.,       )
6                                       )
            Defendant,                  )
7                                       )
   vs.                                  )
8                                       )
   MATTHEW PAUL SMITH                   )
9                                       )
            Third-Party Defendant.      )
10  ————————————————————————————————————)

11          Pending before the Court are: (1) Motion for Discretionary Abstention and Remand

12  of Plaintiffs Debbie Wayne, et al. (CIV00-1094, doc. 22); (2) Motion for Discretionary

13  Abstention and Remand of Plaintiffs John Doe 15, et al. (CIV00-1095, doc. 5); (3) Motion

14  for Remand or Alternatively, Abstention of Plaintiffs John Peter, et al. (CIV00-1503, doc.

15  31); (4) Motion for Discretionary Abstention and Remand of Plaintiffs John Does 30, et al.

16  (CIV00-1504, doc. 6); (5) Motion for Remand or Alternatively, Abstention of Plaintiffs

17  Marilyn Chalfant, et al. (CIV00-1505, doc. 28); (6) Motion to Strike Plaintiffs' Motion to

18  Abstain/Remand of Defendant Marine Military Academy, Inc. (CIV00-1505, doc. 36); and

19  (7) Motion to Strike Plaintiffs' Motion to Abstain/Remand of Defendant Marine Military

20  Academy, Inc. (CIV00-1094, doc. 52). On January 31, 2001, following an evidentiary

21  hearing and oral argument, the Court took the above referenced matters under advisement.

22  I     BACKGROUND

23          Defendant Marine Military Academy, Inc. ("MMA") is a nonprofit corporation,

24  incorporated in Arizona, that operates a college preparatory boarding school for boys in

25  Harlingen, Texas. Plaintiffs, consisting of former cadets and their families, brought suit

26

27

28                                    - 2 -

1  against Defendant[1] in five separate lawsuits originally filed in the District Court of Cameron

2  County, Texas.   The lawsuits involve claims for assault, sexual abuse, hazing,

3  misrepresentation, fraud, and breach of contract.

4        On May 23, 2000, Defendant filed a Chapter 11 bankruptcy in the United States

5  Bankruptcy Court in the District of Arizona.  Upon filing bankruptcy, Defendant removed

6  the five cases to the District Court for the Southern District of Texas, which subsequently

7  transferred the cases to this Court pursuant to 28 U.S.C. § 157(b)(5).

8        Defendant's bankruptcy filing caused an automatic stay of the cases pursuant to 11

9  U.S.C. § 362(a).  On October 13, 2000, the Bankruptcy Court entered an order lifting the stay

10  allowing these cases to proceed to trial.

11  **II      DISCUSSION**

12        **A. Abstention**

13        Plaintiffs request that the Court abstain under 28 U.S.C. § 1334(c)(1).  Defendant

14  argues that abstention is not an available option because no parallel state court proceeding

15  remains.  In *Security Farms v. International Brotherhood of Teamsters*, 124 F.3d 999, 1109

16  (9th Cir. 1997), the Ninth Circuit has stated that "[a]bstention can exist only where there is

17  a parallel proceeding in state court.  That is, inherent in the concept of abstention is the

18  presence of a pendant state action in favor of which the federal court must, or may, abstain."

19  Because the cases before the Court were removed to federal court, and there remains no

20  litigation pending in Texas state court, abstention is unavailable.

21        **B. Remand**

22        Alternatively, Plaintiffs request that the Court remand the cases to Texas state court

23  based on equitable considerations.  Defendant argues that 28 U.S.C. § 157(b)(5) precludes

24  the remand of these claims under 28 U.S.C. § 1452(b) to Texas state court.  The Court

25  disagrees.

26  _____

27        [1]  In cases CIV00-1095 and CIV00-1504, defendants also include Gen. Harold Glasgow,
   Col. T.A. Hobbs, Lt. Col. G.D. Andresen, James Butler III, and his parents James and Patricia Butler.

28  In case CIV00-1095, defendants include members of MMA's Board of Trustees.

Title 28 U.S.C. § 157(b)(5) provides that:

The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy is pending.

Standing alone, § 157(b)(5) appears to limit the Court's authority in the selection of venue for these personal injury tort claims in either the District Court of Arizona or to the district where these claims arose, the District Court for the Southern District of Texas, Brownsville Division. However, under 28 U.S.C. § 1452(b), the district court to which a claim is removed has broad discretion to remand such a cause of action on "any equitable ground." Read together, these two sections of Title 28 of the United States Code applicable to bankruptcy practice raise an apparent conflict between the forum which can, and the forum which should try these personal injury claims.

In support of its contention that § 157(b)(5) precludes remand to state court, Defendant cites *In re Pan American Corp.*, 950 F.2d 839 (2d Cir. 1991), and excerpts from bankruptcy treatises. In *Pan American*, fifty-five wrongful death actions were filed in Florida state court on behalf of passengers and a crew member who died in the Lockerbie, Scotland plane crash. 950 F.2d at 841. The defendants moved in the Southern District of New York to transfer the state court actions to that district where bankruptcy proceedings were pending. *Id.* at 842. The defendants contemplated that the transfer would be followed by a second transfer to the Eastern District of New York, where all the federal cases had been consolidated for pretrial proceedings. *Id.* The District Court in the Southern District of New York abstained from transferring the Florida cases. *Id.* at 843. On appeal, the Second Circuit reversed the district's court's decision to abstain as to the passengers' claims, but upheld the district court's decision to abstain from transferring the crew member's action. *Id.* at 848.

Defendant argues that to remand these cases to state court would be contrary to the purpose and legislative history of § 157(b)(5). In a discussion of abstention and § 157(b)(5) in the context of the Bankruptcy Code's treatment of personal injury claims, the Second Circuit in *Pan American* stated that the purpose of § 157(b)(5) is to "centralize the

-4-

1    administration of the estate and to eliminate the 'multiplicity of forums for the adjudication
2    of parts of a bankruptcy case.'" *Id.* at 845 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d
3    994, 1011 (4th Cir. 1986), *cert. denied*, 479 U.S. 876 (1986)). The Second Circuit noted that
4    "'the district court, if it elects to abstain and have the claim liquidated in state court, may be
5    contravening the legislative history.'" *Id.* at 845 (quoting 1 L. King, COLLIER ON
6    BANKRUPTCY,¶ 3.01[3][b], at 3--82 (15th ed. 1991)). "Transfer should be the rule,
7    abstention the exception." *Id.* at 845.

8           Defendant is unable to provide authority that § 157(b)(5) precludes the court from
9    remanding to state court. In fact, the Second Circuit, in upholding the district court's
10   decision to abstain from exercising its power to transfer one action to federal court, noted that
11   the "district courts enjoy wide discretion when deciding whether to exercise their transfer
12   powers or to abstain," as long as their decisions are "informed by legitimate considerations."
13   *Id.* at 848. Furthermore, contrary to Defendant's strict interpretation of § 157(b)(5), the
14   Second Circuit noted that "[d]espite the apparently mandatory 'shall order', section 157(b)(5)
15   has consistently been construed to recognize discretion in district courts to leave personal
16   injury cases where they are pending." *Id.* at 844.

17          Defendant argues that § 157(b)(5) limits the liquidation of personal injury claims
18   against the debtor to a federal venue, and that because this statute is a specific statute, it
19   "trumps" the more general remand statute, 28 U.S.C. § 1452(b). While Defendant has not
20   cited, and the Court's research has not disclosed a case supporting what Defendant argues,
21   other courts have interpreted the effect of § 157(b)(5) in the context of abstention and forum
22   non conveniens.

23          In *In re White Motor Credit*, 761 F.2d 270 (6th Cir. 1985), the Sixth Circuit resolved
24   the conflict between § 157(b)(5) and permissive abstention under 28 U.S.C. § 1334(c)(1).
25   In *White Motor Credit*, there were approximately 160 separate, unliquidated products liability
26   personal injury cases asserted against the debtor, pending in state and federal courts. 761
27   F.2d at 271. The district court where the bankruptcy was pending abstained and ordered the
28

- 5 -

cases to be left for adjudication in those courts. *Id.* On appeal, the debtor argued that §157(b)(5) precluded the district court from abstaining, and instead, required the court to order that the claims be tried either before it or in the federal district in which the claims arose. *Id.* In upholding the district court's decision, the Sixth Circuit held that the district court had the authority to leave tort cases in the courts in which they were pending, including state courts. *Id.* at 273. The court noted that under § 157(b)(4)[2], personal injury tort claims were specifically exempted from mandatory abstention provisions of § 1334(c)(2), but that the statute was silent as to whether such personal injury tort claims were subject to discretionary abstention under § 1334(c)(1). *Id.* at 272. Relying on legislative history, the Sixth Circuit interpreted § 157(b)(5) to allow abstention in personal injury cases, and only when the district court decides not to abstain, must the cases be tried in district court. *Id.* at 273.

In *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir. 1993), the Fifth Circuit considered the application of §157(b)(5) in the context of forum non conveniens. The plaintiffs were nineteen German citizens who filed wrongful death actions in Texas state court against a German airline for damages arising out of an airplane crash in Germany. *Id.* at 827. After filing bankruptcy in the Western District of Texas, the defendant removed the actions to federal court. *Id.* at 828. The district court granted the defendant's motion to dismiss the cases on the grounds of forum non conveniens, finding the proper forum to be Germany for the resolution of the plaintiffs' claims. *Id.* at 829. On appeal, the plaintiffs argued that § 157(b)(5) precluded dismissal under forum non conveniens. *Id.* In concluding that § 157(b)(5) did not abrogate the doctrine of forum non conveniens, the Fifth Circuit noted that the purpose of § 157(b)(5) advanced by the plaintiffs -- to centralize litigation involving the bankruptcy estate in a single forum -- was undermined by the language of the statute, which permitted the transfer of cases away from the forum where the bankruptcy was

---

[2] Section 157(b)(4) provides: "Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2)."

1  pending to a district in which a plaintiff's cause of action arose. *Id.* at 831, 834. The court

2  also reasoned that by giving the district court the power to transfer venue to the jurisdiction

3  where a plaintiff's cause of action arose, Congress recognized that this jurisdiction may have

4  an interest in litigating the matter and that eyewitnesses and evidence may be located there.

5  *Id.* at 831. In light of § 157(b)(5), the court stated, "we cannot fairly impute to Congress an

6  intention implicitly to remove from the courts their inherent power also to effect the transfer

7  of an appropriate wrongful death claim to a foreign forum where the cause of action arose."

8  *Id.* at 831-32.

9      While the court's decision in *White Motor Credit* was in the context of abstention and

10  the decision in *Baumgart* dealt with forum non conveniens, the Court finds these decisions

11  persuasive authority in determining the effect of § 157(b)(5) on the Court's power to remand

12  to state court.

13      As the Sixth Circuit discussed in *White Motor Credit*, under § 157(b)(4), personal

14  injury tort claims that are non-core proceedings under § 157(b)(2)(B) are specifically

15  exempted from mandatory abstention. *See* 761 F.2d at 272, 273. However, § 157 is silent

16  as to whether such claims are subject to discretionary abstention. *See id.* The same logic

17  applies to remand in this case. If the statutory scheme of § 157 was intended to prohibit

18  remand to state court, the statute presumably would have expressly so stated. *See Russello*

19  *v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in

20  one section of a statute but omits it in another section of the same Act, it is generally

21  presumed that Congress acts intentionally and purposely in the disparate inclusion or

22  exclusion.") (citations omitted).

23      The court's reasoning in *Baumgart* is equally applicable to the instant case. There,

24  the court stated that by conferring power in the district court to fix venue in the forum in

25  which a cause of action arose, Congress must not have intended to implicitly remove the

26  authority from courts to effect the transfer of a claim to a forum where the cause of action

27  arose through dismissal based on forum non conveniens grounds. *Baumgart*, 981 F.2d at

28

1   831-32. There is no reason to treat differently the court's authority to remand an action to

2   a state court where the action arose. When fixing venue to a forum where an action arose,

3   remand, § 157(b)(5) and forum non conveniens all involve considerations of fairness to the

4   parties and a recognition that such a forum may have an interest in trying the matter and that

5   the witnesses and evidence may be present there. *See id.* at 831.

6       A logical reading of § 157 in its entirety persuades the Court that §157(b)(5) does not

7   exclusively govern a district court's authority to remand. Rather, § 157, entitled

8   "Procedures," is a procedural statute that deals with the relationship and allocation of power

9   between the bankruptcy court and the district court.[3] There is nothing in the statute that

10  indicates it would "trump" a district court's ability to remand, as argued by Defendant.

11  Rather than reading one statue in conflict with the other, it is more logical to read them

12  together. That is, where the court decides not to abstain or remand, the district court must

13  either try the case or send it to the federal court in the district in which it arose. *See White*

14  *Motor Credit*, 61 F.2d at 273. Therefore, notwithstanding the language of § 157(b)(5), the

15  Court finds that it has the authority to remand these cases to Texas state court pursuant to

16  §1452(b).

17      **C. Timeliness**

18      Defendant moves to strike as untimely the Motions to Remand in the *Chalfant* and

19  *Wayne* cases because they were not filed within thirty days of removal. Plaintiffs argue that

20  Defendant waived any objection to timeliness by waiting to file an objection until two days

21  before the hearing, and request sanctions under Rule 11 of the Federal Rules of Civil

22  Procedure. Defendant removed to federal court on May 23, 2000. Plaintiffs' Motion to

---

24      [3] For example, § 157(a) provides that the district court may refer cases to bankruptcy

25  judges; § 157(b)(2) sets forth what proceedings are core proceedings; the bankruptcy judge determines whether a matter is a core or non-core proceeding under § 157(b)(3); the bankruptcy

26  judge may hear non-core proceedings and must submit proposed findings of fact and conclusions of law to the district court for review under §157(c)(1); § 157(d) authorizes the district court to

27  withdraw a case or proceeding from a bankruptcy judge; and § 157(e) provides that a bankruptcy judge may conduct a trial of a core or non-core proceeding if specially designated by the district

28  court and the parties consent.

- 8 -

1  Abstain and Remand was filed on July 6, 2000 in the *Chalfant* case and on August 8, 2000
2  in the *Wayne* case.

3      Section 1452(b) permits remand on any equitable ground without specifying a time
4  limit for filing the motion to remand.  Defendant argues that the thirty-day time limit
5  specified under 28 U.S.C. § 1447(c) bars Plaintiffs' motions to remand in this case.  The
6  Court disagrees.  Section 1447(c) provides:

7      A motion to remand the case on the basis of any defect other than lack of
       subject matter jurisdiction must be made within 30 days after the filing of the
8      notice of removal under section 1446(a).

9      In this case, there is no alleged defect in removal procedure.  Rather, Plaintiffs seek
10  remand based on equitable considerations.  "The imposition of § 1447(c)'s strict 30-day
11  deadline for challenging procedural defects would be uncomfortably inconsistent with the
12  liberal, 'any equitable ground' approach to bankruptcy remands." *In Re Hotel Mt. Lassen,*
13  *Inc.*, 207 B.R. 935, 939 (Bankr. E.D. Cal. 1997).

14      In ruling that the thirty-day time limit does not apply in this case, the Court finds that
15  its ruling is not inconsistent with the Supreme Court's decision in *Things Remembered, Inc.*
16  *v. Petrarca*, 516 U.S. 124 (1995).  There, the Supreme Court held that a district court's order
17  remanding a bankruptcy case to state court on the grounds of untimely removal procedure,
18  was not reviewable on appeal under 28 U.S.C. § 1447(d)[4].  *Id.* at 128.  Although §1452
19  specifically governs removal and remand of claims in bankruptcy, the Supreme Court
20  concluded that it did not negate the application of § 1447(d) to bankruptcy cases, and stated
21  that there was no reason for the two statutes not to coexist in the bankruptcy context.  *Id.* at
22  129.  While the Court recognizes that the time limit in § 1447(c) may be applied to removals
23
24  _____
       [4] Section 1447(d), is the general statutory provision governing the reviewability of remand
25  orders, which provides that:
26      An order remanding a case to the State court from which it was removed is not
27      reviewable on appeal or otherwise, except that an order remanding a case to the State
        court from which it was removed pursuant to section 1443 of this title shall be
28      reviewable by appeal or otherwise.

-9-

1  and remands in bankruptcy cases, to apply the thirty-day time limit to Plaintiffs' Motions to

2  Remand would be inconsistent with § 1452(b). *See Hotel Mt. Lassen,* 207 B.R. at 939.

3       Defendant relies upon *Maniar v. F.D.I.C.,* 979 F.2d 782 (9th Cir. 1992), and argues

4  that this case broadly defined "defect in removal procedure," mandating the application of

5  the thirty-day time limit in this case.   There, the district court remanded the case *sua sponte*

6  because the case had not been removed from state court within the proper time frame. *Id.*

7  at 784-85. The Ninth Circuit held that the district court lacked the authority to remand a case

8  *sua sponte* because the motion to remand was not filed within the thirty-day time limit. *Id.*

9  at 785-86. The court held that an untimely removal is a procedural defect rather than a

10  jurisdictional one and the district court must comply with the thirty-day period to remand

11  under § 1447(c). *Id.* at 784-85. Here, there was no defect in the removal procedure. Neither

12  this case, nor any case cited by Defendant in support of its Motion to Strike has explicitly

13  held that equitable remand is a "defect" subject to the thirty-day time limit used in § 1447(c).

14  The Court finds that Plaintiffs' Motions to Abstain and Remand in the *Chalfant* and *Wayne*

15  cases are not time barred. Plaintiff's argument that Defendant's objection to timeliness was

16  waived is moot. Plaintiffs' request for sanctions is denied.

17      **D. Equitable Remand**

18       Defendant argues if equitable remand is available, that the Court must retain

19  jurisdiction and deny remand in light of two preeminent and predominant factors: (1)

20  centralization and efficient liquidation of bankruptcy claims; and (2) the adverse impact on

21  the bankruptcy estate. Defendant contends that these factors override consideration of all

22  other factors. The Court disagrees.

23       In support of Defendant's position that consideration of the bankruptcy estate is

24  preeminent and predominant over all other factors, Defendant cites *In re HME Records, Inc.,*

25  62 B.R. 611 (Bankr. M.D. Tenn. 1986); *In re Butcher,* 46 B.R. 109 (Bankr. N.D. Ga. 1985);

26  *In re Nixon Machinery Co.,* 27 B.R. 871 (Bankr. E.D. Tenn. 1983); and *In re Commonwealth*

27  *Oil Refining Co. Inc.,* 596 F.2d 1239 (5th Cir. 1979). While all of these cases hold that the

28

- 10 -

1   most important factor for the court to consider is the economic and efficient administration
2   of the estate, they all were concerned with the transfer of venue of the bankruptcy case.  In
3   each case, in deciding the motion to transfer venue, the court's analysis focused on whether
4   the transfer of venue would be in the "interest of justice or for the convenience of the
5   parties"[5] under the 28 U.S.C. § 1412 (formerly 28 U.S.C. § 1475).  *See Nixon*, 27 B.R. at
6   872; *Butcher*, 46 B.R. at 112; *HME Records*, 62 B.R. at 613; *Commonwealth Oil*, 596 F.2d
7   at 1247.  In contrast, the cases before the Court are personal injury cases which do not raise
8   the same considerations in deciding whether to remand to a state forum.  Cases in the context
9   of remand under § 1452(b) balance a list of equitable factors, including considerations of
10  efficient administration of and adverse impact on the bankruptcy estate.  No case cited by
11  Defendant holds in the context of remand that consideration of the bankruptcy estate is a
12  preeminent or predominant factor that outweighs all other factors.  Finding no one factor to
13  be determinative in its decision to remand, the Court turns to a discussion of the factors to
14  be considered for remand.

15       Section 1452(b) states that "[t]he court to which such claim or cause of action is
16  removed may remand such claim or cause of action on any equitable ground."  A court may
17  consider the following factors in deciding whether to remand: (1) duplication or
18  uneconomical use of judicial resources; (2) effect of remand on the administration of the
19  bankruptcy estate; (3) case involves questions of state law better addressed by a state court;
20  (4) comity; (5) prejudice to involuntarily removed parties; (6) remand lessens possibility of
21  inconsistent results; and (7) the court where the action originated has greater expertise.

---

22
23   [5]  Factors relevant to the transfer of venue include:

24   (1) the proximity of creditors to the court;
25   (2) the proximity of the debtor to the court;
     (3) the proximity of necessary witnesses;
26   (4) the location of assets; and
     (5) the economics of administration of the estate.
27
28   *Butcher*, 46 B.R. at 112; *HME Records*, 62 B.R. at 613; *Commonwealth Oil*, 596 F.2d at 1247; *See also* Nixon, 27 B.R. at 872.

1   *Horton v. Nacogdoches Ind. School Dist.*, 81 F.Supp.2d 707, 711 (E.D. Tex. 2000) (citing

2   *Baxter Healthcare Corp. v. Hemex Liquidation Trust*, 132 B.R. 863, 867-68 (N.D. Ill. 1991)

3   and *Citicorp. Sav. of Ill. v. Chapman*, 132 B.R. 153, 157-58 (Bankr. N.D. Ill. 1991)); *see also*

4   *River Cement Co. v. Bangert Bros. Constr. Co.*, 852 F.Supp. 25, 27 (D. Colo. 1994);

5   *Williams v. Shell Oil Co.*, 169 B.R. 684, 692-93 (S.D. Cal. 1994).

6   Additional factors that the court may consider include: (1) the jurisdictional basis, if

7   any other than 28 U.S.C. § 1334; (2) the degree of relatedness or remoteness of the

8   proceeding to the main bankruptcy case; (3) substance rather than the form of the asserted

9   core proceeding; (4) feasibility of severing state law claims from core bankruptcy matters to

10   allow judgment to be entered in state court with enforcement left to the bankruptcy court; (5)

11   the burden of the bankruptcy on the court's docket; (6) likelihood that commencement of the

12   proceeding in bankruptcy court involves forum shopping by one of the parties; and (7)

13   presence of nondebtor parties. *Horton*, 81 F.Supp.2d at 711 (citing *Citicorp*, 132 B.R. at

14   157-58); *see also Searcy v. Knostman*, 155 B.R. 699, 710 (S.D. Miss. 1993).

15   At the evidentiary hearing, Defendant presented the testimony of its Chief of Staff,

16   Colonel Robert Hill. Through his testimony and the exhibits, Defendant attempted to

17   demonstrate a decline in cadet enrollment due to adverse publicity, causing a decrease in

18   revenue. Defendant also introduced evidence to show a decline in annual giving to the

19   school since the adverse publicity was published. Christopher Linscott, a CPA retained by

20   the Tort Creditors Committee also testified. He had reviewed Defendant's financial records

21   for the past three years and had prepared a report for the committee about the financial

22   condition of Defendant. The Court also considered the declaration of Dana Allison and the

23   chart of the location of disclosed witnesses.

24   In light of the evidence presented, the Court weighs the equitable factors in deciding

25   whether to remand to Texas state court. Not all of the factors listed above are applicable and

26   the discussion will be limited to those which apply.

27

28

1    First, consideration of judicial efficiency weighs in favor of remanding to Texas state

2    court. Since the inception of these cases in 1998, the parties have conducted extensive

3    discovery and the Texas state court has heard and resolved discovery disputes and invested

4    considerable time and resources in these cases. The Texas state court has familiarity with

5    the history of the cases and is in a better position to make discovery decisions. To retain

6    these cases in Arizona would cause duplicative use of judicial resources.

7    Next, in consideration of the effect remand will have on the administration of the

8    bankruptcy estate, Defendant argues that if the personal injury claims liquidation is allowed

9    to proceed in Texas, its ability to remain economically viable and its chances of successful

10    reorganization will be destroyed. Defendant has shown a correlation between the adverse

11    media publicity in Texas and a decline of student enrollment. With a decline in student

12    enrollment there is loss of revenue generated from tuition. Tuition is only one of the three

13    revenue sources for Defendant. Contributions of unrestricted funds have increased each year

14    since 1996. Investment income has varied each year with interest income consistently

15    between $850,000 and $950,000. Mr. Linscott also offered testimony that suggests other

16    reasons for declining enrollment. Defendant has been refurbishing its barracks and has had

17    one barracks closed each year effectively limiting enrollment to a maximum of approximately

18    450 students. Colonel Hill concurred with this point. Mr. Linscott testified that his

19    investigation also revealed a tightening of admission standards by Defendant and an overall

20    enrollment decline nationally in boarding schools.

21    Based on all of the evidence the Court cannot attribute declining enrollment to adverse

22    publicity alone. The Court cannot conclude that Defendant's evidence of correlation is

23    evidence of cause and effect. The Defendant has not proved that its future existence is

24    threatened by trial of these cases in Texas.

25    Whether these cases involve questions of state law better addressed by a state court,

26    and comity are the next considerations. These cases involve personal injury tort claims based

27    on Texas state law. A Texas state court, rather than an Arizona federal court, is the more

28

1  appropriate forum to address these issues of state law. Texas state courts have an interest in

2  hearing such controversies that arose in Texas.

3       Next, the Court considers the prejudice to involuntarily removed parties. Plaintiffs

4  vigorously advocate for remand because of the prejudice they claim they will suffer if the

5  cases are not remanded to Texas. The lawyers all reside in Texas. The overwhelming

6  majority of the Plaintiffs and witnesses reside in Texas. All of the documentary evidence is

7  located in Texas. Trying these cases in Arizona would be vastly more expensive for

8  Plaintiffs and for Defendant.

9       Consideration of the expertise of the court where the actions originated is also a

10  relevant factor. As noted above, the Texas state court has invested considerable time in these

11  cases thus far and is familiar with the parties and cases.

12       The next factor is the jurisdictional basis if any other than 28 U.S.C. § 1334. Here,

13  there is no jurisdictional basis other than § 1334. This Court would not have jurisdiction

14  absent the filing of bankruptcy by Defendant.

15       Considering the relatedness or remoteness of the proceedings to the main bankruptcy

16  case, these personal injury tort claims are unrelated to the main bankruptcy action.

17       The next relevant factor is the likelihood that commencement of the proceeding in

18  bankruptcy court involved forum shopping by one of the parties. This factor is closely linked

19  to the consideration of the prejudice to involuntarily removed parties. Of primary concern

20  to the Court is Defendant's connection to this forum. Defendant's only connection to

21  Arizona is its incorporation in Arizona in 1965. It has never done business or had any

22  employees in Arizona. The Court finds that Defendant chose Arizona to file its bankruptcy

23  in order to avoid trial of these cases in Texas.



24       Lastly, the presence of nondebtor parties is relevant. There are over one-hundred

25  Plaintiffs and twenty-seven nondebtor defendants.

26       The Court finds that the equitable factors overwhelmingly weigh in favor of remand

27  to Texas state court under § 1452(b).



28

- 14 -

1        IT IS ORDERED granting Plaintiffs' Motions to Remand in cases CIV00-1094 (doc.

2    22), CIV00-1095 (doc. 5), CIV00-1503 (doc. 31), CIV00-1504 (doc. 6), and CIV00-1505

3    (doc. 28).

4        IT IS FURTHER ORDERED denying Defendant's Motions to Strike Plaintiffs'

5    Motion to Abstain/Remand, filed in CIV00-1505 (doc. 36) and CIV00-1094 (doc. 52).

6        IT IS FURTHER ORDERED remanding all of the above cases to the District Court

7    of Cameron County, Texas.

8

9        DATED this 14th day of March, 2001.

10

11

12                     Susan R. Bolton

13                United States District Judge

14

15

16               . . . . .I certify on 3/15/01

           . . it the foregoing document is a full, true and correct

17               copy of the original on file in my office and in my cus-
           tody.

18               CLERK, U.S. DISTRICT COURT
             DISTRICT OF ARIZONA

19             By_____ Deputy

20

21

22

23

24

25

26

27

28

                          - 15 -

*Exhibit F*



**INSURA**
**ORGAN**

# EDUCATORS LEGAL LIABILITY INSURANCE

## COREGIS INDEMNITY COMPANY
**(A STOCK INSURANCE COMPANY, HEREINAFTER CALLED THE "COMPANY")**

REFERENCE NO: 1263015

POLICY NO: SBD-000136-1
RENEWAL OF:

## DECLARATIONS

> **NOTICE: THIS IS A CLAIMS MADE POLICY. EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THIS COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS WHICH ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY WHILE THE POLICY IS IN FORCE.**

**A. PUBLIC ENTITY  :**   Marine Military Academy, Inc.
DBA:

  **MAILING ADDRESS:**   320 Iwo Jima Blvd.,
Harlingen TX, 78550

**B. POLICY PERIOD:**   **FROM**   Dec 21, 1996   **TO**   Dec 21, 1997

12:01 A.M.  Standard  time at the address stated herein.

**C. LIMITS OF LIABILITY:**   $5,000,000   Each Loss and aggregate for each policy year

**D. RETENTION:**   $5,000   Each Loss

**E. PREMIUM:**   $9,312

THE DECLARATIONS PAGE AND THE FORMS LISTED BELOW AND ATTACHED HERETO, TOGETHER WITH THE COMPLETED AND SIGNED PROPOSAL SHALL CONSTITUTE THE CONTRACT BETWEEN THE INSURED (S) AND THE COMPANY.

FORMS AND ENDORSEMENTS MADE A PART OF THIS POLICY ARE LISTED ON THE ATTACHED SCHEDULE 1A.

DATE: 01/22/1997

COUNTERSIGNED _____
**AUTHORIZED REPRESENTATIVE**

CFM89.1.0004 (9/89)

COPY



INSURA
ORGANI

# SCHEDULE 1A

# SCHEDULE OF FORM (S) AND ENDORSEMENT (S)

INSURED: Marine Military Academy, Inc.
REFERENCE NO.: 1263015

POL NO: SBD-000136-1
RENEWAL OR REPLACEMENT OF:

---

COR.OOG.1683 (5/96)
        Policy - ELL Duty To Defend 96
COR.OOG.1541 (6/95)
        Application of the SIR to Claim Expenses
COR.OOG.1339 (7/95)
        Enhanced Employment Liability
COR.OOG.1675 (4/96)
        Notice To Texas Insureds
COR.OOG.1281 (6/95)
        Prior and Potential Claims Exclusion

FM 93.1.0421 (5/93)

**THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY.**

# EDUCATORS AND EMPLOYMENT LIABILITY INSURANCE

In consideration of the payment of the premium and in reliance upon the statements in the application attached hereto and made part of this Policy, and subject to all Policy terms and conditions, the Company and the Educational Entity agree as follows:

## INSURING AGREEMENTS

## I. COVERAGE

The Company will pay on behalf of the Insureds Loss as a result of civil Claims made against the Insureds by reason of a Wrongful Act, provided that Claim is first made during the Policy Period and written report of said Claim is received by the Company during the Policy Period or within sixty (60) days thereafter.

## II. DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS

As respects Claims for Loss which are covered by this Policy:

A. The Company shall have the right and duty to select counsel and to defend any Suit.

B. In addition to the applicable limit of liability, the Company shall pay:

1. Claim Expenses incurred in the defense of covered Suits.

2. For appeal bonds in an amount not to exceed the Company's liability required for the appeal of a covered Suit defended by the Company, but the Company shall have no obligation to apply for or furnish any such bonds.

C. The Company is not obligated to defend any Suits, or to pay any Claim Expenses, after the Company's limit of liability has been exhausted by payment of Loss, or by deposit or tender of the limit of liability into a court.

D. The Company shall not commit any Insured to settlement without the consent of the Educational Entity, which consent shall not be unreasonably withheld.

E. The Company shall have the right to recommend settlement of Claims. If the Educational Entity shall refuse to consent to any settlement recommended by the Company, then the Company's liability for the Claim will not exceed the amount for which the Claim could have been settled, and Claim Expenses incurred up to the date of such refusal.

F. The Insured shall not settle any Claim without the prior written consent of the Company. The Company shall not be obligated to indemnify any Insured for Loss in connection with the settlement of a Claim to which the Company did not provide prior written consent.

## III. EXTENSIONS

A. This Policy covers Loss by reason of any Claim made against the estates, heirs, legal representatives or assigns of deceased persons who were Insureds at the time of the Wrongful Act upon which such Claim is based. This Policy also covers legal representatives or assigns of the Insureds in the event of their incompetency or bankruptcy.

Case 1:02-cv-00021   Document 1   Filed in TXSD on 02/05/2002   Page 143 of 149

B.  If granted by an Outside Extension Endorsement attached to and made a part of the Policy the Policy is extended to provide coverage for Claims to which the Policy otherwise applies against the designated persons for activities in the course and scope of serving on the designated outside entity, provided that the following conditions are satisfied:

   1.  The outside entity is tax exempt;

   2.  The appointment of the designated person to the outside entity is based solely upon the person's being an employee or official of the Educational Entity; and

   3.  The person is directed by the Educational Entity to serve on the outside entity.

## IV.  TERRITORY

This Policy applies to Wrongful Acts committed anywhere in the world provided Claim is made in the United States of America, its territories or possessions.

## V.  DEFINITIONS

A.  "Educational Entity" means the entity identified in Item 1 of the Declarations as legally constituted at the effective date of the Policy Period.

B.  "Insured" means the Educational Entity and any person while acting solely within the course and scope of his or her duties and responsibilities on behalf of the Educational Entity as:

   1   an official;

   2.  an officer, trustee, director or superintendent;

   3.  an employee;

   4.  a volunteer; or

   5.  a student teacher.

   Insured does not include any independent contractor as defined by federal tax laws, or person working on a retainer basis.

C.  "Employee" means any person who has been hired to perform services either on a full-time or part-time basis by and for the Educational Entity and to whom wages or salary are paid and on whose behalf federal or local taxes are withheld.

D.  "Volunteer" means any person whose services are uncompensated and whose activities are directed and supervised by, and for the benefit of, the Educational Entity. Volunteer does not include any person performing services which are ordered by, connected with, or supervised by any court, penal or law enforcement official or institution.

E.  "Arising Out Of" means connected with, incidental to, or growing out of.

F.  "Wrongful Act" means any act, error, or omission of an Insured constituting a breach of a duty imposed by law or a breach of an Employment Contract.

G.  "Employment Contract" means any contract of employment between the Educational Entity and an Employee.

H.  "Claim" means a demand for Money Damages as of right.

Wrongful Acts, will be considered one Claim. All such Claims will be considered first made at the time the earliest such Claim was made against any Insured.

I. "Money Damages" means monetary compensation for past harms or injuries.

J. "Claim Expenses" means fees and costs charged by any lawyer retained by the Company and, if authorized by the Company, all other reasonable fees or costs incurred in the defense of a Suit, including fees and costs incurred in an appeal. Claim Expenses does not include Loss, or salaries or costs of Insureds associated with the defense or investigation of a Claim.

K. "Suit" means a proceeding in a court of law where Money Damages may be awarded.

L. "Loss" means Money Damages which the Insured becomes legally obligated to pay by reason of a Wrongful Act. Loss also includes pre-judgment and post-judgment Interest on Money Damages covered by this Policy, and costs taxed against the Insured in any Suit defended by the Company.

Loss does **not** include:

1. Sanctions, fines or penalties;

2. Liquidated damages as provided under a contract or statute;

3. Return of taxes, assessments, penalties, fines and/or fees;

4. Salaries and wages of any Insured, or other official, Employee or member or officer of the Educational Entity, or any governmental body, in connection with the investigation and/or defense of Claims;

5. Matters uninsurable under the law or against public policy;

6. Costs of investigation and defense of Claims, including attorneys' fees and expenses, costs of appeal bonds, and costs taxed against the Insured where another entity or insurer is obligated to defend or reimburse the Insured for such costs;

7. Employment Benefits owed as a result of a written Employment Contract that is not the result of a collective bargaining agreement.

M. "Employment Benefits" means wages, salaries, bonuses, incentives, perquisites, fringe benefits, or other payments, entitlements or benefits owed to any Employee as a result of an Employment Contract.

N. "Policy Period" means the period from the effective date of this Policy to the expiration date stated in the Declarations, or earlier termination date, if any. The Policy Period does not include the Extended Reporting Period, if any.

## VI. EXCLUSIONS

This Policy does not apply to the following, regardless of the cause of action or legal theory alleged:

A. any Claim or Loss Arising Out Of any Insured gaining profit, remuneration or advantage to which any Insured was not entitled.

B. any Claim or Loss Arising Out Of any criminal, dishonest, malicious, fraudulent or knowingly wrongful act or omission.

C. any demand or proceeding seeking relief or redress in any form other than Money Damages, including any form of injunctive or other equitable relief, including, but not limited to, restitution, replevin, unjust enrichment, declaratory judgments, or an accounting.

D. any Claim or Loss Arising Out Of death, bodily injury, sickness, disease, disability, shock, humiliation, embarrassment, mental injury, mental anguish, emotional distress, or injury to personal or business reputation or character.

E. any Claim or Loss Arising Out Of invasion of privacy, disparagement or defamation, including, but not limited to, libel or slander.

F. any Claim or Loss Arising Out Of assault, battery, false arrest, detention, imprisonment, malicious prosecution or abuse of process.

G. any Claim or Loss Arising Out Of trespass, nuisance, wrongful entry, eviction, or violation of rights of occupancy.

H. any Claim or Loss Arising Out Of destruction, loss, theft, conversion, loss of use, diminution in value of, or injury to, any tangible property.

I. any Claim or Loss Arising Out Of inverse condemnation, temporary or permanent taking, adverse possession or dedication by adverse use.

J. any Claim or Loss Arising Out Of strikes, lock-outs, riots, civil commotions, war, whether or not declared, civil war, insurrection, rebellion, revolution or terrorism.

K. any Claim or Loss Arising Out Of any violation of or failure to comply with the Employee Retirement Security Act of 1974 (ERISA) or any similar state statute.

L. any Claim or Loss Arising Out Of any Insured's activities as a trustee or fiduciary as respects any type of employee benefit plan, including any pension, savings or profit sharing plan subject to ERISA or any similar state statute.

M. any Claim or Loss Arising Out Of breach of contract, whether oral, written or implied, except any Employment Contract.

N. 1. any Claim or Loss Arising Out Of actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous, thermal, or aural irritant, pollutant, contaminant, or organism, including, but not limited to, noise, lead, smoke, vapors, soot, fumes, acids, alkalies, chemicals or waste materials (including those that are or are to be stored, recycled, reconditioned or reclaimed), into or upon land, air, water or property.

   2. any Claim or Loss Arising Out Of any voluntary or governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, remediate or neutralize any such irritant, pollutant, contaminant, noise, or organism, or land, air, water or property.

   3. any Claim or Loss Arising Out Of electromagnetic fields or other electrical or magnetic waves or radiation.

O. any Claim or Loss Arising Out Of the manufacture of, mining of, use of, removal of, or exposure to asbestos, asbestos products, asbestos fibers, or asbestos dust.

P. 1. any Claim or Loss Arising Out Of the use, handling, sale, distribution, transport, shipment, dispersal, storage, or disposal of any nuclear, radioactive or fissionable material, or any alleged violation of any environmental statute, regulation, or ordinance with respect to such material.

   2. any Claim or Loss Arising Out Of the planning, construction, maintenance, operation or use of any nuclear reactor, nuclear waste storage facility or disposal site or any other nuclear facility, or nuclear reaction, nuclear radiation or radioactive contamination, or to any act or condition incident to the foregoing.

Case 1:02-cv-00021   Document 1   Filed in TXSD on 02/05/2002   Page 146 of 149

or related facilities or services, including, but not limited to, any cause of action under 20 U.S.C. §1400–
1415 (Individuals with Disabilities Education Act—IDEA), 29 U.S.C. §794 (§504 of the Rehabilitation Act),
42 U.S.C. §12132 (Americans With Disabilities Act—ADA), 42 U.S.C. §1983, or any similar state or federal
statute or other law, administrative rule or regulation.

## CONDITIONS

### I.   SEVERABILITY

The conduct or knowledge of any Insured shall be imputed to all other Insureds for the purposes of determining
the validity and enforceability of this Policy, and the applicability of all exclusions except with respect to
Exclusions A and B.

### II.   AUTHORIZATION CLAUSE AND NOTICES

The Educational Entity shall act on behalf of all Insureds with respect to the giving and receiving of any notice,
endorsements, cancellation and premiums. Notice to that individual and/or titled position named in the
application at the address of the Educational Entity shall also constitute notice to all Insureds.

### III.   AUTHORITY OF AGENT OR BROKER

No insurance agent or broker is authorized to act as the Company's agent to receive reports or notices
hereunder, and any reports or notices to an insurance agent or broker shall not constitute compliance with the
terms and conditions of this Policy.

### IV.   CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or
change in any part of this Policy or estop the Company from asserting any rights under the terms of this Policy.
The terms and conditions of this Policy shall not be waived or changed, except by endorsement issued by the
Company to form a part of this Policy.

### V.   ASSIGNMENT

Assignment of interest under this Policy shall not bind the Company unless its consent is endorsed hereon.

### VI.   TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy conflicting with any statute of the State wherein this Policy is issued are amended to conform
to such statute.

### VII.   EXTENDED REPORTING PERIOD OPTION

If the Company shall cancel or refuse to renew this Policy (other than for non-payment of premium), or the
Educational Entity does not renew this Policy, then the Educational Entity shall have the right to purchase an
Extended Reporting Period under the following terms and conditions:

A. The Extended Reporting Period shall be twelve (12) months immediately following the termination of the
   Policy Period.

B. The coverage during the Extended Reporting Period shall be limited to Claims for Wrongful Acts occurring
   prior to the termination of the Policy Period to which this Policy otherwise applies, provided that Claim is
   first made during the Extended Reporting Period and written report of said Claim is received by the
   Company during the Extended Reporting Period.

~~~.~~~ ~~~~~the educational~~~ ~~~~~ty must no~~~ ~~~the co~~~~~~~ ~~~~~ ~~~~~ ~~~~~~~~~~ ~~~~~~~~~~~~~~ w~~~~~ w~~~~~ ~~~~~, ~~~ ~~~s
of the termination of the Policy Period.

D.  The premium for the Extended Reporting Period shall be fifty percent (50%) of the Policy Period premium, and shall be paid within sixty (60) days of the termination of the Policy Period.

## VIII.  NOTICE OF CLAIM

As a condition precedent to the Company's obligations under this Policy, in the event of a Claim, the Insured shall immediately provide written notice to the Company at:

COREGIS
181 West Madison Street
Chicago, Illinois 60602
Attn: POL/ELL Claims Department

The Insured shall immediately forward to the above address every demand, notice, summons or other process received by the Insured.

## IX.  REPORTING OF POTENTIAL CLAIMS

If during the Policy Period or, within sixty (60) days thereafter, the Insured first becomes aware of a Wrongful Act which might reasonably be expected to give rise to a Claim, and gives written report to the Company of such Wrongful Act as required below, during the Policy Period, or within sixty (60) days thereafter, then any Claim subsequently made against the Insured by reason of that Wrongful Act shall be deemed to have been first made during the Policy Period.

Written report of a Potential Claim shall include:

1.  the specific Wrongful Act including the date(s) thereof, and the Insureds involved;

2.  the date and circumstances by which any Insured became aware of the Wrongful Act.

## X.  COOPERATION

A.  The Insured shall cooperate in any investigation or defense by the Company of any Claim or Potential Claim, and such cooperation shall include submitting to examinations under oath taken by the Company or its representatives, attending trial and other court proceedings, assisting legal counsel and providing copies of reports, investigations, pleadings and all other papers in connection therewith.

B.  The Insured shall not, except at the Insured's own cost, admit any liability or assume any obligation.

C.  With respect to any Claims for which coverage may be available under any other policy of insurance, the Insured shall promptly give proper notice and tender the defense (if applicable), satisfy all conditions applicable, and shall seek to enforce the Insured's rights thereunder.

D.  In the event that the Company agrees to defend a Suit, and the Company reserves its rights to deny coverage on grounds which create a conflict of interest between the Insured and the Company, and the Insured does not waive the conflict, then the Insured shall be entitled to be defended by counsel chosen by the Insured with the consent of the Company. Such counsel shall have at least five (5) years experience in the defense of similar Suits, and maintain errors and omissions insurance coverage. The Insured and counsel shall provide full information, documentation and cooperation with respect to the defense, investigation and settlement of any Suits. The company shall only be obligated to pay reasonable and necessary defense costs and at rates customarily paid by the Company for the defense of similar Suits in the area where the Suit is being defended.

This Policy may be canceled by the Educational Entity by mailing to the Company written notice stating when thereafter cancellation shall be effective. If the Educational Entity cancels, earned premium shall be computed in accordance with the customary short rate table and procedure.

The Company may cancel this Policy. If the Company cancels, it shall mail to the Educational Entity written notice stating when, not less than sixty (60) days thereafter, (ten (10) days for non-payment of premium), such cancellation shall be effective. If the Company cancels, earned premium shall be computed pro-rata.

The effective date and hour of cancellation stated in the notice shall become the end of the Policy Period. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective. Payment or tender of unearned premium is not a condition of cancellation.

## XII.  OTHER INSURANCE

The insurance provided by this Policy shall apply only in excess of any Other Insurance available to any Insured.

Other Insurance includes, but is not limited to, coverage or benefits provided by self-insurance arrangements, pools, self-insurance trusts, captive insurance companies, retention groups, reciprocal exchanges, or any other plan or agreement of risk transfer or assumption.

## XIII.  LIMIT OF LIABILITY AND RETENTION

Regardless of the number of: (1) Insureds; or (2) the number of Claims or claimants, the Company's liability for Loss shall not exceed the amount stated in the Declarations.

Such limit of liability shall apply in excess of the Retention stated in the Declarations. The Insured agrees that such Retention shall be uninsured. The Retention may be satisfied only by payment of Loss by the Insured, and may not be satisfied by the release or waiver of a claim or counterclaim.

If the Company pays any part of the Retention, the Insured shall promptly reimburse the Company for such payment.

If the Company makes any payment under a reservation of rights, upon an adjudication that the Company had no obligation to make all or any portion of such payment, the Insured shall reimburse the Company within thirty (30) days.

## XIV.  ACTION AGAINST THE COMPANY

No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this Policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual and contested trial on the merits or by written agreement of the Insured, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy.

Nothing contained in this Policy shall give any person or organization any right to join the Company as a co-defendant in any action against any Insured to determine any Insured's liability. Bankruptcy or insolvency of any Insured or of any Insured's estate shall not relieve the Company of any of its obligations hereunder.

## XV.  SUBROGATION

In the event of any payment of Loss under this Policy, the Company shall be subrogated to the extent of such payment to all of the Insured's rights of recovery, and the Insured shall do everything that may be necessary

to secure and preserve such rights, including the execution of such documents necessary to enable the Company to effectively bring suit in the name of the Insured or the Company. The Insured shall do nothing to prejudice such rights.

## XVI. ENTIRE AGREEMENT

By acceptance of this Policy, the Educational Entity agrees and reaffirms as of the effective date of this Policy that:

A.  the representations in the application, attached hereto and made a part hereof, are true. complete and accurate;

B.  this Policy is issued in reliance upon the truth and accuracy of such representations; and

C.  this Policy embodies all agreements between the Educational Entity and the Company relating to this insurance.

This Policy is not valid or effective unless completed by the attachment of Declarations signed by an authorized representative of the Company and made a part hereof.

**Courtney C. Smith**
Chairman
Chief Executive Officer

**Frank C. Taylor**
Senior Vice President